F5i1mcg1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   MICHAEL McGLONE, et al.,

4                  Plaintiffs,

5           v.                          11 CV 3004 (JSR)

6   CONTRACT CALLERS INC., et al.,

7                  Defendants.          Jury Trial

8   ------------------------------x
                                        New York, N.Y.
9                                       May 18, 2015
                                        10:12 a.m.
10
    Before:
11
                        HON. JED S. RAKOFF,
12
                                        District Judge
13
                            APPEARANCES
14
    MANDEL BHANDARI LLP
15       Attorneys for Plaintiffs
    BY:  RISHI BHANDARI
16       ROBERT GLUNT
         DONALD CONKLIN
17       -and-
    ANDERSON DODSON, P.C.
18   BY:  PENN DODSON

19   THE ENTERPRISE LAW GROUP
         Attorneys for Defendants
20   BY:  LAWRENCE WITTELS
         IRA BLANK
21

22

23

24

25

F5i1mcg1

1          (Case called)

2          THE DEPUTY CLERK:  Will the parties please identify

3     themselves for the record.

4          MR. BHANDARI:  Good morning, your Honor.  My name is

5     Rishi Bhandari from the law firm of Mandel Bhandari, LLP, and

6     with me is my colleague Robert Glunt and my co-counsel Penn

7     Dodson and one of the plaintiffs Robert Schantz.

8          THE COURT:  Good morning.

9          MR. BHANDARI:  Good morning.

10          MR. WITTELS:  Good morning, your Honor.  I am Lawrence

11     Wittels from the Enterprise Law Group with my partner Ira Blank

12     and named defendants William Wertz and Michael Maguire.

13          THE COURT:  Good morning.

14          Well, if there's one thing this court cannot tolerate,

15     it's tardiness.  I'm glad I'm right on time, an hour and ten

16     minutes late.  But my apologies to everyone for the delay this

17     morning.  It won't affect our schedule because the jury panel

18     I'm told will not be ready until about 10:30.  But a couple of

19     things I wanted to put on the record.

20          I last week telephonically ruled on the various

21     motions, but I want to place them on the record.

22          The plaintiff's motion no. 1 to exclude reference to

23     various other litigation and claims by the plaintiffs was

24     granted.

25          Plaintiff's motion no. 2 relating to plaintiff's

F5i1mcg1

criminal history was granted in part and denied in part, the

court ruling that criminal history could be used for

impeachment to the extent permitted under the Federal Rules of

Evidence.

      The plaintiff's motion no. 3 relating to exclusion of

employees' disciplinary history and termination offense was

granted as unopposed.

      Plaintiff's motion no. 4 relating to so-called

sunshine time payments, the parties were essentially in

agreement as to how this should or should not come into

evidence.  Nevertheless, the court declined to rule in the

abstract.  We'll take this up on a question-by-question basis

if it arises.

      Plaintiff's motion *in limine* no. 5 relating to

exclusion of plaintiff's acquiescence to defendant's overtime

practices is granted.

      Plaintiff's motion *in limine* no. 6 relating to the

opt-in process and reference to it was unopposed and therefore

was granted on consent.

      Plaintiff's motion *in limine* no. 7 relating to

references to the attorney/client relationship was unopposed

and therefore granted on consent.

      Plaintiff's motion no. 8 relating to exclusion of

reference to attorney's fees and cost of litigation was

unopposed and therefore granted on consent.

F5i1mcg1

1          Plaintiff's motion *in limine* no. 9 relating to

2   exclusion of any reference to the stricken defenses was

3   unopposed and therefore granted on consent.

4          And plaintiff's motion *in limine* no. 10 relating to

5   exclusion of nonparty witnesses was unopposed and therefore it

6   was granted.  And indeed this court on its own always excludes

7   nonparty witnesses.  And with respect to any entity that's a

8   defendant as opposed to an individual, that entity can have one

9   witness present in court and at counsel table but not

10  otherwise.  So I will leave it to counsel to make sure that

11  none of their party witnesses appear in court except when

12  called to testify.

13         With respect to the defendant's motions *in limine*,

14  defendant's first motion seeking to exclude certain improper

15  comments by attorneys or about attorneys was unopposed and is

16  granted on consent.

17         Defendant's motion *in limine* no. 2 relating to

18  reference to CCI's size and defendant's financial status was

19  granted.

20         Defendant's motion no. 3 relating to issues related to

21  subsequent employment or lack thereof from various plaintiffs

22  and other things regarding their financial status was

23  unopposed, with the exception that plaintiffs, opt-in

24  plaintiffs, may ask why they are unable to be present for the

25  entire trial even if the answer is because they are working,

1    can't take off three weeks.  Both sides agreed to both aspects

2    of that ruling.

3         Defendant's motion no. 4 seeking to exclude references

4    to the utility services history was unopposed and was therefore

5    granted.

6         Defendant's motion no. 5 seeking to exclude arguments

7    about or referencing the "Golden Rule" was unopposed and

8    therefore granted.

9         And defendant's motion no. 6 relating to the exclusion

10   of unfounded evidence regarding defendant CCI's corporate

11   response to complaints was granted.

12        Defendant's motion no. 7 regarding exclusion of

13   improper evidence regarding the motions *in limine* themselves

14   was unopposed and was granted.

15        Defendant's motion *in limine* no. 8 seeking to exclude

16   discussions of or by counsel was unopposed and was granted.

17        Defendant's motion no. 9 seeking to exclude reference

18   to settlement discussions was unopposed and was granted.

19        Defendant's motion no. 10 seeking to exclude comments

20   on motions and pleadings was granted as to motions and denied

21   as to pleadings, to the extent they are otherwise relevant and

22   admissible.  We'll take that up as it comes up, if at all.

23        Defendant's motion no. 11 that related to other

24   lawsuits or charges filed against CCI was granted.

25        Defendant's motion no. 12 relating specifically to

F5i1mcg1

exclusion of a lawsuit filed against CCI in the District Court

for the Eastern District of Missouri was granted.

            And finally, I offered to the parties, if they wished

to, if they would submit a joint list of undisputed facts, for

example, that related to the court's summary judgment ruling

that time records were inaccurate as a matter of law.  I'm

prepared to read that list to the jury.

            All right.  That's all that we discussed on the

telephone.  Anything else that anyone needs to raise with the

court?

            MR. BHANDARI:  Your Honor, there's one issue, a

discovery type issue.  We have not received the contract

between CCI and the Department of Environmental Protection.

That had been sought much, much, much earlier in discovery.

Then we issued a trial subpoena to CCI, I believe it was last

week, and I spoke to Mr. Wittels about it and their position is

they're not going to provide that unless the court orders them

to do so.  So that's an issue we'd like to raise with the

court, to get a copy of the --

            THE COURT:  Let me hear from defense counsel.

            MR. WITTELS:  Thank you, Judge.

            The contract between New York City Department of

Environmental Protection and CCI was requested twice in

discovery and objected to twice in discovery; never produced,

never called up.  And then a trial subpoena was in fact issued

F5i1mcg1

1    to CCI in St. Louis.  The contract is certainly of a

2    confidential commercial nature between my client and one of

3    their customers, has all types of confidential information in

4    it.

5              THE COURT:  Like what?

6              MR. WITTELS:  Pricing structure, bid processing.

7              THE COURT:  This is with the city?

8              MR. WITTELS:  This is with the city of --

9              THE COURT:  Contracts with the city are usually

10   public, and in any event, their provisions are usually a matter

11   of form or regulation.

12             MR. WITTELS:  It very well may be.

13             THE COURT:  Yes.  So I don't see a reason to not

14   produce that.  If that's the issue, confidentiality, that

15   objection is overruled.  All right.  Very good.

16             MR. WITTELS:  And Judge, just to clarify, I can't

17   produce it right this second --

18             THE COURT:  No.

19             MR. WITTELS:  -- but sometime --

20             THE COURT:  They didn't raise it with me until today,

21   so --

22             MR. WITTELS:  Sometime today I'll produce it.

23             THE COURT:  But get it to them by tomorrow or

24   certainly this week for sure.

25             When do you need it?

F5i1mcg1

1          MR. BHANDARI:  We'd like it today or tomorrow, if

2     possible.

3          THE COURT:  What's the reason you're going to use it?

4          MR. BHANDARI:  Oh, we want to see what some of the

5     provisions are.  We might need it for questioning for some of

6     the witnesses who we'd be calling tomorrow.

7          THE COURT:  Okay.  Well, you certainly waited until

8     the last minute to raise it, but I'll order that it be produced

9     no later than close of business tomorrow; preferably sooner,

10    but no later than that.

11         MR. BHANDARI:  Okay.  Thank you, your Honor.

12         MR. WITTELS:  Thank you, Judge.

13         THE COURT:  Anything else?

14         MR. BHANDARI:  No, your Honor.

15         MR. WITTELS:  No, your Honor.

16         THE COURT:  Very good.  So why don't we take a

17    ten-minute break now.  We'll bring up the jury panel, and then

18    we'll start picking the jury.

19         Now I think I went over with you jury selection, but

20    let me go over it once again.

21         We'll pick a jury of nine.  I'll examine them for

22    cause.  Then each side will have three peremptories which will

23    be exercised in rounds.  So my deputy will hand you the board.

24    You might as well show them the board right now.

25         And initially the nine jurors will be seated four in

F5i1mcg1

the first row, four in the second row, one in the third row, to

correspond to the boxes in the chart.  After we've gotten them

selected, we'll bring the one there in Siberia to one of the

other rows, but this way it will make it easier for you when

you're looking at the chart.

        And so my deputy will hand the board to plaintiff's

counsel, you'll exercise your challenge for that round.  One

challenge per round.  You'll hand the board to defense counsel;

they'll exercise their challenge for that round.  We'll then

excuse those two jurors and replace them and so forth with the

second and third rounds.

        If you waive in a given round, you lose that challenge

but you don't lose your remaining challenges, unless both sides

waive the round and then of course we have our jury.

        All right.  And remind me how long each side wanted

for opening statements?

        MR. BHANDARI:  Just 30 minutes, your Honor.

        MR. WITTELS:  Judge, you indicated on the phone 30.  I

don't think I'll take 30, but --

        THE COURT:  Yes, that's fine.

        All right.  Very good.  We'll see you in ten minutes.

        THE DEPUTY CLERK:  All rise.

        (Recess)

F5ILMCG2

1      (Jury present)

2          THE COURT:  Ladies and gentlemen, we're about to hear

3   opening statements of counsel.  I want to advise you at the

4   outset that nothing that counsel says is evidence.  The

5   evidence will come from the witnesses who will testify, from

6   the exhibits that will be received in evidence, and there also

7   occasionally may be something called a stipulation where both

8   sides agree on a particular fact.  Those are the only sources

9   of evidence.

10          So why do we even have opening statements?  Well, the

11  answer of course is that the evidence will come in one little

12  bit at a time.  And so it may be a while before you get the

13  full picture.  So in order to give you some context for what

14  you're about to see and hear, each lawyer gets a chance to in

15  effect predict what they think the evidence will show or will

16  fail to show, as the case may be, and that's why we have

17  opening statements.  Each side has a half-hour for opening

18  statements, and we will begin with the plaintiff.

19          MR. GLUNT:  Thank you, your Honor.  May it please the

20  Court, good morning, ladies and gentlemen, members of the jury.

21  My name is Robert Glunt and I represent the plaintiffs in this

22  case.  There are 20 plaintiffs.

23          THE COURT:  I think so that our court reporter can

24  hear everything you say you need to bring that microphone back.

25          MR. BLANK:  Is that better?  Can you see something on

F5ILMCG2                         Opening - Mr. Glunt

1    all of your screens?  Thank you.

2              As I said before and for the sake of the court

3    reporter, my name is Robert Glunt and I represent the

4    plaintiffs in this action.  There are 20 plaintiffs in total,

5    and you're going to be hearing a lot from them over the course

6    of this trial.  I'm joined at counsel table by my colleague,

7    Rishi Bhandari, Donald Conklin, my cocounsel, Penn Dodson, as

8    well as one of those plaintiffs, Robert Schantz.  You're going

9    to be hearing from him today.

10             Over the next few minutes, I'm going to give you a

11   short preview of the facts you are going to see over the course

12   of this trial.  Thank you very much for being here and for the

13   service you are about to perform.

14             Now, this, in a nutshell, is a case about a company

15   that cheated its workers to boost profits and pad its bottom

16   line and it didn't pay its workers for all of the work they

17   performed.  In doing so, it didn't just break its promise to

18   those workers; it also broke the law.

19             Now, there are three defendants in this case -- a

20   company called Contract Callers Incorporated, as well as its

21   president, Williams Wertz and vice president Michael Maguire.

22   In 2009 Contract Callers, or CCI, was hired by the City of New

23   York to install water meters throughout Queens.  CCI was paid

24   millions of dollars by the City of New York to do this work.

25             Now, to install all of those water meters, CCI needed

F5ILMCG2                        Opening – Mr. Glunt

1    to hire workers.  My clients, the plaintiffs, are 20 workers,

2    20 formers employees of CCI, that were hired on an hourly

3    basis.  Some of them worked on the job for only a few weeks.

4    Some of them worked for almost the entire life of the project

5    was just a little under three years.  But every single one of

6    them, every one that you are going to hear from, worked hours

7    for which they were not paid.

8            Now, you're going to learn in this case, the course of

9    this trial, that each of the workers were required to come to

10   work early, sometimes more than an hour before their scheduled

11   shift began.  During that time, they were required to load

12   trucks full of heavy equipment, retrieve paperwork, and attend

13   meetings, all of which benefited the company CCI, but none of

14   them were paid for that work.

15           They also unloaded their equipment after their shifts

16   ended.  They weren't paid for that either.  In addition, some

17   of the workers were also made to work unpaid hours through

18   lunch and on weekends in order to boost CCI's profits.

19           As you're going to learn, none of this is permitted.

20   CCI paid its workers hourly and it was required to pay them for

21   all of the hours that they worked and to pay them overtime for

22   work that they performed beyond 40 hours a week.  CCI didn't do

23   that.

24           All that my clients ask is that CCI live up to the

25   letter of the law, in this case the federal Fair Labor

F5ILMCG2                          Opening – Mr. Glunt

1   Standards Act and the New York labor law.  CCI should have done

2   what every other law-abiding company is required to do, to

3   follow the same rules as everyone else.  Plaintiffs are seeking

4   to be paid the wages that they already earned for the work that

5   they already performed.

6           At the end of this case, your job is going to be to

7   determine how many hours the plaintiffs worked for which they

8   were not paid and to determine the damages that they suffered

9   as a result of CCI breaking the rules and not paying what it

10  owed to its workers.

11          So that's the highlight version.  Now let's drill down

12  into the details of this dispute starting with CCI itself.

13          Now, CCI is a company based in Augusta, Georgia.  It

14  was originally a collections agency, but now offers a variety

15  of services, including servicing electric, water, gas meters

16  for municipalities.  It is that last area of business that

17  gives rise to this case.

18          In 2007, CCI began doing business with the New York

19  City Department of Environmental Protection or DEP.  Now, some

20  of you may know that DEP is the agency in charge of managing

21  the city's water supply.  Everyone in New York gets their water

22  from the DEP.  The DEP runs the entire show from the reservoir

23  all the way out to the tap.

24          After getting a contract with the DEP, CCI opened an

25  office in Ridgewood, Queens.  Two years later, in 2009, CCI

1    started its second contract with the DEP and it's that second

2    contract that's at issue today.

3          You see, the DEP had figured out that sending people

4    to read water meters at every building in New York City was

5    very cumbersome.  They found this new type of technology called

6    automatic meter reading or AMR.  It allows a water reader to

7    radio into headquarters how much water is being used by the

8    building its attached to.  That way, rather than send a person

9    to manually read a meter every couple weeks, every couple

10   months, the meter itself can phone home via radio to DEP to

11   tell them how much water is being used.  It's an impressive

12   technology.  But in order to make it work, the DEP needed

13   someone to take these new radio boxes, called meter

14   transmitting units, or MTUs, and connect them up to the old

15   water meters.  In some cases, the whole water meter would need

16   to be replaced, as well, for the new technology.

17         So DEP hired a bunch of companies to do these

18   installations.  CCI, the defendant in the case, was hired to do

19   the installations for certain buildings.  That's where the

20   plaintiffs come into the story.  Once CCI got the contract, it

21   needed to hire workers to install these MTU boxes and swap out

22   the old water meters.  The plaintiffs are all workers who were

23   hired to do plumbing work on this project.  You'll be hearing

24   from them over the course of this trial.  A number of them are

25   in the courtroom today, so I'd like to introduce them now.

1          So you've already heard a list of these names during

2     jury selection.  And you've already been introduced to Robert

3     Schantz, who you will be hearing from today.  You may also hear

4     from Michael McGlone and Joe Frische today, depending on the

5     scheduling.  These people come from a lot of different

6     backgrounds.  Some of them are single, some of them are

7     married.  Some of them live in the suburbs, some of them live

8     in the city.  So some of them were union members, some of them

9     weren't.  But all of them, despite their backgrounds, despite

10    their very different experiences, all of them were employees of

11    CCI, were not paid for the overtime that they worked.

12          Now, each of these plaintiffs was hired by a man named

13    Angelo Solimine, who CCI put in charge of the meter replacement

14    project.  Mr. Solimine was the general manager of the project

15    and he ran CCI's Ridgewood office.  Mr. Solimine reported

16    directly to the president of CCI, the defendant, William Wertz.

17    The plaintiffs were supervised by Mr. Solimine and his field

18    supervisor, a man named Charles Loquidice.  Mr. Loquidice

19    reported to Mr. Solimine.  He supervised the workers in the

20    field and monitored each plaintiff's work.  You're going to

21    hear a lot about Mr. Solimine and Mr. Loquidice over the course

22    of this case.

23          Now, you're also going to hear a lot about the

24    individual defendants, Williams Wertz and Michael Maguire.

25    Mr. Wertz has been the president of CCI for over eight years,

1    and he's worked for the company for more than a decade.  Angelo

2    Solimine, who ran the Queens office of CCI and hired all of the

3    plaintiffs, reported directly to Mr. Wertz.  Over the course of

4    this trial, you're going to hear how Mr. Wertz received regular

5    reports from Mr. Solimine about the progress of the AMR project

6    and how much money it was making.  And you're also going to

7    hear about how Mr. Wertz traveled repeatedly to the Queens

8    office to personally review how the job was proceeding.

9         The evidence is going to show that Mr. Wertz was the

10   man with ultimate power over the plaintiffs' jobs.  He wrote

11   their job descriptions.  He hired their supervisor, and he had

12   the power to hire or fire them whenever he wished.  While

13   Mr. Solimine and Mr. Loquidice were in charge of the day-to-day

14   operations of CCI's New York office, Mr. Wertz, supervisor of

15   Mr. Solimine, was responsible for everything Mr. Solimine did.

16        Michael Maguire is the vice president of sales and

17   development at CCI.  He personally hired Mr. Solimine to

18   oversee the New York office.  He empowered Mr. Solimine to take

19   the actions that led directly to this case.  And you're going

20   to hear evidence that Mr. Maguire involved himself time and

21   time again into who was hired, who was fired, and how the CCI

22   office in Ridgewood, Queens was run.

23        So those are the players.  Those are the people who

24   are going to be involved in this case.  Let's talk a little bit

25   about what this contract was and what it required.

1           The contract between CCI and DEP to upgrade these

2      water meters and MTUs in Queens was part of a public works

3      project.  Because it was part of a public works project, CCI

4      had to agree under the contract to pay no less than a

5      prevailing wage for skilled labor.  You're going to hear a bit

6      about what exactly that means to pay a prevailing wage.  But in

7      a nutshell it means that CCI promised to pay its workers

8      approximately $45 an hour for the plumbing work they were

9      performing.  Those are the rules CCI agreed to follow when it

10     bid on this contract.

11          In addition, CCI was bound by the same rules that

12     every other company has to follow –– federal and state labor

13     law.  It also had to pay workers for all of the hours that it

14     worked.  And it also had to pay workers overtime for hours

15     worked beyond 40 a week.  We are here today because CCI either

16     would not or could not follow those rules.

17          So what did CCI do?  Why are we here today?  In a

18     nutshell, CCI made its workers work off the clock.  First CCI

19     made its employees perform work before their shifts began.  To

20     maximize the number of installations per day, Mr. Solimine told

21     the workers he wanted them knocking on doors to do

22     installations the very moment that their shift started at

23     8 a.m.  That meant that the workers had to get into the CCI

24     offices well before 8 a.m.  You're going to hear testimony that

25     everyone was required to get into the Ridgewood office

1   sometimes more than an hour before their shift was scheduled to

2   begin.  The workers had to load up their trucks with the

3   equipment and water meters that they needed to do their jobs.

4          Now, water meters are heavy, they're made out of

5   brass, and hauling a lot of them to a truck takes time.  It's

6   work.  You can see a couple of them here we have as examples.

7   This is a five-eighths inch meter.  It is one of the smallest

8   meters that they would be required to install.  And they would

9   carry crates of these meters out to their trucks in the

10  mornings and from them in the afternoons at the behest of CCI.

11  And this enormous thing here -- I'm not going to try to lift

12  this -- is a 2-inch water meter.  Again, you're going to hear

13  testimony that the plumbers had to haul these things sometimes

14  halfway down the block to their trucks to load them in before

15  their shift began.  And, ladies and gentlemen, that is work.

16         In addition to doing the hauling part of this, they

17  also had to pick up and review printouts telling them where

18  they were going, what they were doing, what appointments they

19  had over the course of the day.  And they needed to get these

20  handheld computers called CN3s that allowed them to program the

21  new radio boxes.

22         In addition to that work which they did every single

23  day, the workers also sometimes had mandatory meetings they had

24  to attend before their shift started.  And they had to do all

25  of that work -- load up their trucks, get their paperwork, get

F5ILMCG2                        Opening – Mr. Glunt

1    their CN3s, attend the meetings -- with enough time to drive

2    and be knocking on the first door to do their installations by

3    the time their shift officially was scheduled to begin.

4              Second thing that CCI did was to pressure its

5    employees to work after the end of a scheduled shift.  At the

6    end of the day after their shift ended, the workers would come

7    back to the office.  You're going to hear from the plaintiffs

8    how they took the heavy old meters that they had replaced and

9    they brought them back to CCI so that CCI could sell those

10   meters for scrap.  As I said, they're made of brass.  Then they

11   had to fill out paperwork on the jobs they had done and return

12   their handheld computer.  Then and only then, after all that

13   additional work was done, could they actually clock out and go

14   home.  None of that time was compensated.

15             And you're had going to hear from Mr. Solimine and his

16   assistant how they pressured the plaintiffs to arrive early and

17   stay late.  You're going to hear how Mr. Solimine and his

18   assistant pressured the plaintiffs to arrive early and stay

19   late even if they were not being paid.

20             Third, you will hear how CCI found other ways to force

21   its employees to work for free.  You're going to hear testimony

22   from some workers, either today or tomorrow, who worked entire

23   days off the clock.  You're going to hear from other workers

24   who were pressured to skip their lunch breaks on a regular

25   basis.  They would get calls on the radio at lunch time telling

F5ILMCG2                        Opening - Mr. Glunt

1   them to go and do more jobs, more installations, make more

2   money for CCI.  And you're going to hear from plaintiffs who

3   were told to do necessary maintenance on CCI vehicles in their

4   spare time over the weekend without signing in, without

5   receiving a dime for their services.

6           Now, you may be wondering why something like lunch

7   breaks are so important.  Well, the fact is, as you're going to

8   hear, CCI scheduled shifts ran from 8 o'clock to 4:30.  They

9   were actually eight and a half hours long.  CCI didn't have to

10  schedule them that way.  They could have scheduled them as

11  eight to four or nine to five like a lot of companies do.  But

12  because they scheduled them from eight to 4:30, wanted every

13  second they could get, it meant that as a consequence, if a

14  worker didn't take his full 30-minute lunch break every day, he

15  was actually working more than eight hours.  And over the

16  course of a week, he would then be working overtime, overtime

17  for which he was not paid.

18          The point of all this is simple.  CCI wanted to get as

19  much money from the city as possible while shaving hours off

20  the paychecks of the people who actually did the work.  They

21  wanted them to keep their expenses low and their profits high

22  by not paying for all the work they were getting.  With these

23  policies in place, CCI carried out the automated meter project

24  for the city, earning millions of dollars for the work the

25  workers did.

1          You're going to hear they finished it early because of

2     all the additional work they were getting out of the

3     plaintiffs.  The project lasted from the beginning 2009 to the

4     end of 2011.  Some of the plaintiffs you're going to hear from

5     worked for CCI for all or almost all of that time.  Others only

6     worked on the project for a couple weeks or a couple months.

7     As I said, they had different backgrounds, but none of them

8     were paid what they were required to be paid under the law.

9          Because of that, it's going to be your job to tally up

10    these numbers to determine what hours the plaintiffs worked,

11    how much they weren't paid, and what CCI owes them for the work

12    the plaintiffs did, work for which CCI was paid millions of

13    dollars.

14         Now, you may be wondering to yourself right now,

15    aren't there supposed to be records of the hours that employees

16    work?  Aren't businesses supposed to keep track of that?  And

17    you're right, they are.  And this case you're going to see that

18    CCI kept daily sign-in sheets for its workers.  And you're

19    going to see on most days, everyone signs in right at 8 o'clock

20    on the dot and out at 4:30 p.m.  You're going to hear testimony

21    from the plaintiffs that they were told just a few months into

22    the job that they were to sign in at eight and out at 4:30 no

23    matter what hours they were actually working for CCI.  You

24    already heard from the Court -- you will later hear from the

25    Court that these records, the records relied upon by CCI to pay

F5ILMCG2                    Opening - Mr. Glunt

1    the workers properly, are not accurate.  That's something

2    you're going to hear from the Court itself.

3           There are hundreds of these sign-in sheets, and you're

4    going to get a chance to look at them for yourself.  And some

5    of them are truly remarkable to look at.  You've got 20

6    different plaintiffs coming from totally different places --

7    some of them living close to the office in Queens, some of them

8    living in the Bronx or way out on Long Island, one person in

9    particular living as far away as Pennsylvania.  And every

10   single one of them signs in for work at precisely 8 a.m.

11   That's what CCI's records say and that's how they paid people.

12          Let's take a closer look at one more of these time

13   sheets.  You're going to have a chance to examine this time

14   sheet in particular from June 3, 2009 in more detail.  Take a

15   look at some of these 8 o'clock sign-ins.  The testimony and,

16   frankly, your own eyes are going to show that a lot of those

17   8 o'clock are actually 7:30s that somebody changed later with a

18   pen.  Look at the second one from the top and the second one

19   from the bottom.  After you review all these records and hear

20   all this testimony, you're going to come to your own conclusion

21   about when these people actually started work for CCI.

22          You're also going to see break sheets.  These break

23   sheets were pieces of paper that CCI made each worker sign each

24   day stating they received their 30-minute meal break and

25   15-minute morning break.  You're going to hear testimony that

1   these break sheets are completely inaccurate and people, many

2   of them, did not receive a 30-minute meal break.  You're also

3   going to hear testimony that CCI told its workers that they

4   were required to sign these sheets whether they took a break or

5   not.

6          Again, there are hundreds of these sheets, and you're

7   going to have an opportunity to look at them.  The things that

8   you will see are ridiculous -- people taking lunch at precisely

9   the same time every day for weeks on end, people writing down

10  breaks on days they didn't even work, people taking two

11  different breaks, as you can see on the one here on the screen,

12  at exactly the same time.  Yet, these are the records that CCI

13  kept and that CCI used to pay its people.

14         Let's talk a little more about overtime.  You're going

15  to hear how CCI actually paid some overtime to many of its

16  workers and that's true.  There was definitely some overtime

17  paid on this project.  But the evidence is going to show that

18  the overtime CCI paid is a total distraction.  When you look at

19  the evidence, you're going to see that in most cases, overtime

20  was paid on Saturdays rather than during the week.  And that

21  makes sense because when an employee is working an extra

22  eight-hour day on the weekend, it's hard to sweep that entire

23  thing under the rug.

24         When overtime was paid during the week, it required

25  authorization from management, which was not easy to get.  And

F5ILMCG2                        Opening - Mr. Glunt

1    you're going to hear testimony that even when management

2    authorized workers to get paid for some overtime during the

3    week, it often wasn't for all the hours they worked.  Often it

4    was only for a portion of the hours they worked.  And you're

5    going to hear how workers, even those who regularly received

6    some overtime, worked even more hours off the clock.

7             Did CCI pay some overtime for hours that plaintiffs

8    wrote down?  Absolutely.  But we're here today because CCI's

9    workers were simply not permitted to write down the hours they

10   actually worked.  Even though they worked before 8 o'clock,

11   they were not allowed to write that down.  Even though they

12   worked through lunch and into the evening, they were not

13   allowed by CCI management to write those hours down.  CCI told

14   the plaintiffs not to write down all the hours they worked.

15   Because of that, when they were paid overtime, they were not

16   paid the right amount of overtime.  They were not paid for

17   every hour they actually worked.

18            You're also going to hear about an incentive system

19   that CCI promised its workers to try to get them to swap out

20   ever more meters in a day.  CCI promised the workers that if

21   they meet their quota in the early afternoon, they could go

22   home early and get paid for the entire day.

23            The evidence is going to show that this incentive

24   system, sometimes called sunshine time, was actually a moving

25   target.  Most workers on most days had no hope of getting out

F5ILMCG2                           Opening - Mr. Glunt

1    early.  A lot of them were forced to stay late to finish the

2    quotas that CCI set.  You're going to hear testimony that even

3    when a plaintiff worked hard, got lucky and managed to meet his

4    quota early in the day, a lot of times CCI moved the goal posts

5    out further.  The worker would call in and Mr. Solimine would

6    tell him that he had to get more meters in order to go home,

7    even though he met his quota, even though he was supposed to go

8    home early that day, he had to stay out and get more meters for

9    CCI.

10          The whole point of the so-called incentive program was

11   to keep the plaintiffs working as hard as possible to make more

12   money for the company.  As such, out of the hundreds of days

13   that many of these plaintiffs worked, most of them went home

14   early on at most a handful of occasions.

15          Now, there are a few exceptions.  Some people who were

16   on a portion of the project were on such easy routes that even

17   with CCI moving the goal posts, they were still able to take

18   advantage of the incentive system on a semi-regular basis.

19   You're going to hear from them.  Those plaintiffs, and it's

20   only a couple people, obviously, are not going to be seeking

21   compensation for the days they went home early.  It doesn't

22   make any sense.  But they're here because for a lot of the

23   project, they were coming in early, staying late, and working

24   off the clock just like everybody else.

25          So let's talk about how this all adds up.  As I've

mentioned, you're going to hear from plaintiffs about how they

arrived well before their shift began and how they worked

through lunch, how they were forced to work off the clock,

after hours, or on weekends.  For any individual person, that

may be an extra hour per day of work for which they weren't

paid.  It may be two or more hours.  You're going to have to

listen and hear the testimony.

Your job will be to take all those numbers, maybe it's

45 minutes or an hour in the morning, half-hour at lunch, hour

in the evening, and figure out how many hours total each

plaintiff wasn't paid for and what damages they suffered as a

result.

It may seem like we're not talking about a lot of

money, but the lesson to learn from this case is that small

numbers over time, it really adds up.  Plaintiffs were paid

approximately $45 per hour.  For any individual worker on any

individual day, the amount of money that CCI shorted them may

not be that substantial.  But at $45 an hour for an hour or two

per day plus time and a half for overtime every day for 20

people over more than two years, CCI managed to save itself

huge amounts of unpaid wages.  By shorting its workers a little

bit at a time, CCI was able to make a lot of money for itself.

Let's consider an example, one person working an extra

hour a day.  Maybe he got in an extra half hour early in the

morning.  He got in at 7 o'clock rather than eight.  Or maybe

1  he stayed an hour late to finish his quota because he was on a

2  very hard route.  You're going to hear from people who did

3  that.  Maybe he wasn't taking a lunch as well.

4          But every single day that a person doesn't get paid

5  that hour, he loses $45 in wages.  In a week, he's lost 225.

6  In a month, it's approximately 978.  And over a single year

7  he's been shorted over $11,000.  And that's before you consider

8  overtime pay or any additional damages that the Court may

9  instruct you on later.  One hour a day may not seem like a lot,

10  but this project went on for almost three years.  As this

11  example shows, even an extra hour a day can add up to tens of

12  thousands of dollars in unpaid wages.

13          In fact, as the second part of this shows, even .1

14  hours, just six minutes a day, can add up to real money, over

15  $3,000 over the life of the contract.  That's why it is

16  critically important for you to listen carefully and determine

17  as accurately as you can how many extra hours these plaintiffs

18  worked.  Because this case is not going to be just about one

19  hour or .1 hours per day.  The evidence in this case is going

20  to show you that many plaintiffs worked a lot of extra hours.

21  It wasn't just one hour in the morning or one hour in the

22  evening.  Sometimes it was one hour in the morning and one hour

23  in the evening and additional time.  They simply weren't paid

24  for it.

25          Let's say in the same example that a CCI employee

1    worked two extra hours in a day.  He came in an hour early and

2    skipped half his lunch and stayed 45 minutes late to meet his

3    quota and drop off material.  For two hours a day, that worker

4    will be losing $450 a week, almost $2,000 a month.  Every

5    single year he could be losing $22,000 before you factor in

6    overtime or any other damages.  At three hours, 675 a week,

7    almost three grand a month, and $33,000 a year in unpaid wages

8    before any accounting for overtime or other damages.

9            But this example here, as large as these numbers get,

10   is still just one person.  As I've said, there are 20

11   plaintiffs in this case.  And as you can imagine, when all the

12   hours and all the overtime and other damages are added

13   together, the damages can become very large very fast.

14           It's going to be a lot of evidence and a lot of

15   testimony to take in.  You're going to be listening to a ton of

16   people come into this room and talk about how they worked and

17   what hours they worked.  But the plaintiffs are confident that

18   once you see all the facts of this case and hear from all of

19   the witnesses, you will see that they are entitled to well over

20   a million dollars in damages for the time they spent working

21   for CCI off the clock.

22           So how are you going to tabulate this?  Sounds like a

23   lot of work to do.  We are going to help.  We're going to walk

24   through the calculations with every single person.  We're going

25   to have a chart that you're going to see where we will fill in

F5ILMCG2                         Opening - Mr. Glunt

1    with every witness that testifies how many hours he worked in

2    the morning, how many hours he worked in the evening, whether

3    he skipped lunch or didn't skip lunch, what additional hours he

4    claims to be working.  And at the end of the trial, we're

5    confident that chart will help you to determine the amount of

6    damages that the plaintiffs are owed.

7              So that's the case.  There are a lot of witnesses.

8    There's going to be a lot of evidence.  But the facts are very

9    simple.  CCI signed a contract with New York City Department of

10   Environmental Protection to install water meters, upgraded MTUs

11   in Queens.  CCI hired workers to install these meters.  And to

12   boost its bottom line, CCU failed to pay those workers for all

13   the work they did under the CCI contract.

14             Simply put, CCI broke the rules and it cheated its

15   workers in the process.  It chose to ignore the same rules

16   about paying workers that every other business is required to

17   live with.  All of the plaintiffs ask is for what they're

18   entitled to, the money they already earned working long hard

19   hours for CCI, the money that CCI is required to pay them

20   because it could not follow the rules.  Thank you very much.

21             THE COURT:  Thank you very much.  Now we'll hear from

22   defense counsel.

23             MR. WITTELS:  Thank you, your Honor.

24             So good morning, members of the jury.  First and

25   foremost, both I and my clients what to thank you for being

F5ILMCG2                    Opening – Mr. Wittels

1    here.  I know this is a long trial and this is an imposition

2    and disruption in your life and I appreciate you fulfilling

3    your civic duty and being here.

4           We all know there are two sides to every story and

5    this is my time to tell a brief outline of what I believe the

6    evidence will show the story really to be.  I'm eager to have

7    this opportunity to be here today to represent Contract

8    Callers, sometimes you'll hear them referred to as CCI just

9    because it's a nice short way of saying it, and William Wertz

10   and Mike Maguire, who work for CCI.

11          As Judge Rakoff kind of mentioned, the purpose of an

12   opening statement is to give you an outline of where this case

13   is going.  And at the risk of showing my age, I liken it to the

14   picture on the cover of a jigsaw puzzle box.  You open that

15   box, you throw out a thousand pieces on a table, and you have

16   absolutely no idea how they fit into the overall picture.  If

17   you have a picture to look at while you're placing the pieces,

18   things seem to fit together well.

19          So why are we here?  Because the picture I'm looking

20   at is a lot different from the picture Mr. Glunt was looking

21   at.  It's that simple.  It really is that simple.

22          You heard the plaintiffs' attorney say that this is a

23   case all about workers being cheated out of pay for time that

24   they worked.  And I will tell you that it's a case about

25   ex-employees who want to have their cake and eat it too.  They

1    say that the plaintiffs were cheated.  You heard that there was

2    maybe an overtime, maybe there wasn't, that CCI refused to pay

3    overtime, that CCI refused to allow employees to work overtime.

4           Well, the fact is that CCI had a company policy to pay

5    overtime in accordance with New York law and federal law, that

6    CCI's office in Queens allowed employees to work overtime at

7    the very beginning of the project and then things changed.  At

8    some point during the project, the supervisors that you heard

9    mentioned, Mr. Solimine and Mr. Loguidice, changed the policy

10   that no more overtime would be authorized unless it was

11   precleared with supervisors because employees were working

12   many, many hours of overtime when it didn't need to be worked.

13          There are points that we have in agreement and points

14   where we diverge, and your job as the jury is to find out which

15   road you're going to travel down.

16          CCI is a company based out of Georgia.  CCI provides

17   services to the public like reading meters, like changing water

18   meters, like installing automatic reading devices throughout

19   the country.  For this project and for this case, CCI had an

20   office located in Ridgewood in Queens.  CCI provided their

21   service to the City of New York Department of Environmental

22   Protection, as you've heard.  We often refer to this company as

23   DEP and as I'm sure you must.

24          The service was in fact installing new water meters

25   like you see, and more importantly, installing the automatic

F5ILMCG2                          Opening - Mr. Wittels

reading devices which allowed DEP to monitor water usage of its

customers without sending out a meter reader.  The CCI folks

performed all these services in what DEP calls the northwest

quadrant of Queens.  CCI won this contract at a competitive

bidding process with the City of New York where the City of New

York set the time frame of the project, the number of meters to

be installed, the location of the meters to be installed, and

the wage rate to be paid to those employees working and putting

in the meters and the new meter reader devices.

         You may hear these employees referred to in various

ways -- field service rep, field service tech or plumbers.  And

I will try my best during this case to refer to them only as

plumbers because there were other employees working for CCI in

Queens, as well, but this case is about the plumbers.

         CCI had been doing business with the City of New York

on a meter reading project, had nothing to do with installing

meters, but meter reading only.  And the startup team for this

project decided to hire the general manager of the meter

reading project to head up this project and, as Mr. Glunt told

you, that was Angelo Solimine.  He was the general manager of

this project, sometimes referred to as AMR project, AMI

project, or MTU project.  You may hear all three of these

abbreviations.  They're all the same, installing new water

meters and water meter readers.

         Mr. Solimine hired Charlie Loguidice to be the field

1    supervisor.  Mr. Loguidice's job was the day-to-day management

2    of the field crew or the plumbers.  Mr. Solimine and

3    Mr. Loguidice hired every one of the plumbers on this job.  And

4    they were responsible and in control of those plumbers

5    throughout the project.  They had the power to hire, fire, set

6    their hours, set their work assignments, and nobody else at CCI

7    had that authority or exercised that authority except for

8    Mr. Solimine and Mr. Loguidice.

9            Field work began on this project in March 2009 and was

10   completed by the end of December 2011.  You heard a little bit

11   about the wage rate in this case.  This is a prevailing wage

12   rate matter.  And for those who don't know, the City of New

13   York set the wage rate to be paid to the plumbers based upon

14   the prevailing union scale in the City of New York at the time

15   this project occurred.  So the City of New York determined the

16   wage rate that the plumbers would be paid.  The plumbers were

17   paid on an hourly basis.  And while the rate varied with a few

18   cents here or there depending on how the prevailing wage rate

19   changed, it was around 45 to $46 an hour.

20           CCI had never been involved in a prevailing wage rate

21   case before, and they will admit that early on in this project

22   there was some issues with pay.  Prevailing wage rate has two

23   components -- what's called a base rate or hourly rate, and

24   benefits rate.  And there was some issues about calculating

25   benefits rate early on in the project, and there was some

1    issues regarding the weekend rate as well.  Those were brought

2    to their attention by some of the very plumbers you're going to

3    hear from in this case and those problems were corrected and

4    that pay that had been missed was paid.

5            Now, the plumbers in this case could work in one of

6    three methods, and this is going to become important when you

7    hear testimony.  They could be working by what is called a

8    canvas.  And you heard the name of the device, the CN3 device.

9    It's a small electronic device that they would have.  And that

10   CN3 would have up to a hundred addresses in it.  And they could

11   go out to the field and go to any of the addresses on their

12   CN3, knock on the door, see if the homeowner was home, and let

13   them know they needed to change their water meter and/or their

14   automatic water reading device.  That's a canvas.

15           There were also plumbers who worked by appointment.

16   So DEP sent out letters.  I don't know if any of you got them,

17   but they sent out letters asking homeowners and property owners

18   to contact DEP and/or CCI and schedule an appointment for a

19   definite time for a plumber to come out and change their

20   meters.  Now, definite times for those appointments that we all

21   hate, eight to 12, 12 to four, okay, so you get to wait around

22   a half day.  But they could be given appointments.

23           And some of the plumbers worked a combination, maybe

24   appointments in the morning and canvas in the afternoon.  And

25   the plumbers got to determine what method they wanted to work.

F5ILMCG2                    Opening - Mr. Wittels

1   Some of the guys hated appointments.  Some of the guys loved

2   appointments so they chose appointments or they chose straight

3   canvas.

4           Once the plumbers left the shop in Ridgewood, there

5   was very little if any supervision.  They're out in the field

6   throughout Queens going to addresses, changing out water meters

7   and readers.  You've heard there were two supervisors --

8   general manager Angelo Solimine and field supervisor Charlie

9   Loguidice.  The plumbers were expected to go out, change the

10  meters during the day, and come back in the afternoon.

11          There were different shifts during this project.

12  Originally this project was 7:30 to 4 a.m. -- 4 p.m., excuse

13  me.  That changed to eight to 4:30.  At times during the

14  project, there was a split shift, eight to 4:30 for some of the

15  plumbers, ten to 6:30 for other plumbers.  And at certain times

16  all plumbers were put on a four-day work week, eight to 6:30.

17  So your job during this trial is to determine what shifts were

18  being worked, when they were being worked.  There were split

19  shifts, there were mixed shifts, and you will see that on the

20  sign-in sheet.

21          Regardless of what shift a plumber was to work, they

22  were expected to take a half-hour meal break during their day.

23  And, again, they're out in the field, they're not being

24  supervised.  These are not factory workers where a whistle

25  blows at 12 o'clock and everybody stops and takes lunch.

1     They're working either canvas or appointments.  They know their

2     schedule.  They know when they can take a break, and it's their

3     duty to take a break sometime during the day.

4             DEP required the plumbers to sign in and sign out

5     every day.  DEP provided the sheet that you saw on your screen.

6     And you will see thousands of those sign-in sheets during this

7     trial because there's one for every day that the project was

8     operational.  DEP designed the sheet.  DEP required the

9     plumbers to sign in blue ink.  And those original sheets were

10    required to be turned in by CCI to DEP on a daily basis.

11            Beginning in August of 2010, CCI instituted the lunch

12    break or meal break sign-in sheet, which you also saw during

13    plaintiff's opening statement.  You'll see hundreds of those

14    sheets as well.  They were required, each plumber was required

15    to turn in one of those sheets each week indicating when and

16    how they took each break.  You'll also see on that sheet that

17    the plumbers attested that the information was true and

18    accurate.  They knew that DEP and CCI was relying on the truth

19    of their sign-in sheet and the truth of their break sheet.

20            The Queens office opened at 5 a.m. and it opened at

21    5 a.m. so Mr. Loguidice and Mr. Solimine and the warehouse

22    manager could route the employees for the day, pull their

23    product for the day, organize their equipment for the day so

24    that when the plumbers showed up they were ready to go and hit

25    the field.  The gates to CCI's Queens operation did not open

1    until 7 o'clock in the morning.  A plumber couldn't come in

2    before seven.

3            And the reason the gates opened at seven is because a

4    lot of the plumbers asked management to open the gates at

5    seven.  You heard a lot of them were coming from Long Island.

6    They were coming from New Jersey.  They were coming from

7    Pennsylvania.  They were coming from Brooklyn.  And they didn't

8    want to get caught in rush hour traffic.  So they asked for the

9    gates to be opened because there was no parking in this part of

10   Ridgewood, no parking on the street.  They asked that the gates

11   be open so they could come in early.

12           At no time were they told to be there at seven.  And

13   at no time, once the shift changed from 7:30 to eight, they

14   weren't told to be there at 7:30.  Were they allowed to come

15   in?  Yeah, they were allowed to come in.  And what did they do?

16   They went to the break room.  They had a cup of coffee.  They

17   smoked some cigarettes.  They BS'd with each other.  They came

18   in on their own accord early, at their convenience, not at the

19   request of their employer and not for the benefit of their

20   employer.

21           You also heard about this incentive program, and I

22   think it's going to become really important somewhere down the

23   road in this trial.  Mr. Solimine as the general manager

24   created an incentive program that allowed plumbers to leave

25   work early after doing a certain number of jobs.  And we may

1    not agree on the number of jobs, and we're going to hear

2    probably testimony about whether it was eight or 12 or ten or

3    six.  But every one of the plaintiffs is going to testify or

4    tell you that the incentive program existed and that they were

5    allowed to leave once they hit that quota.

6          And a lot of the plaintiffs in this case utilized that

7    program.  They left work before they put in eight hours a day

8    and they were still credited with working eight hours a day.

9    Several of the plumbers you'll hear testify worked at most five

10   hours a day almost every day that they were employed.  They

11   went home early a minimum of four, if not five days a week, but

12   still got credited with working eight hours.

13         You'll hear other plumbers testify they didn't get to

14   make the quota that often.  Maybe they only got to go home

15   early two or three days a week.  And when the plumbers left

16   early, they didn't leave at 3:39, they didn't leave at 4:01.

17   They left at 1:30 or two in the afternoon, a substantial number

18   of hours they were given credit for that they didn't work.

19         One of the things you won't see in this case, well,

20   you'll see plenty of records from CCI and you've been told that

21   those are not accurate.  Yeah, they're not accurate because

22   plumbers were allowed to sign out at 4:30 if they left at two.

23   They didn't sign out at two.  They signed out at 4:30 even

24   though they were already home by the time 4:30 came.

25         What you won't see is any records that any of the

1    plumbers kept for their own use.  You'll hear several of the

2    plumbers in this case tell you they kept detailed records of

3    the hours that they worked for CCI and learning that this

4    lawsuit had been filed while they were still working for CCI,

5    they destroyed those records and don't have them to show us

6    anymore.

7            You will hear -- they tell us in law school never to

8    make an absolute, but I think I'm going to make an absolute --

9    you will hear every plumber that testifies in this case tell

10   you that the records they submitted to the City of New York and

11   to their employer were inaccurate at their hand.  You will hear

12   every plumber tell you they falsified their reports of hours

13   worked to the City of New York.  You will hear every plumber

14   tell you that they falsified their lunch break or meal break

15   reports.  Those are reports relied on by the city and by their

16   employer and they're now going to come into court and tell you

17   that throughout this project, they falsified those records.

18   They knew they were falsifying those records even though they

19   knew who was relying on those records.

20           As the judge indicated to you, this case is going to

21   go over three weeks and while we may not be working 15 days

22   straight in a row, this is a long trial and you are going to

23   hear a lot of testimony from a lot of different people.  And as

24   you have already seen today, the plaintiffs always go first and

25   the defendant always goes second.  So the only thing I ask you

F5ILMCG2                          Opening - Mr. Wittels

1    is that you listen and weigh all the evidence all the way

2    through the trial, all the way through.

3            And at the end of this case, based on what I think

4    you're going to hear from the witness stand and the exhibits

5    you're going to see -- and there's going to be a lot of paper.

6    You see all the boxes.  There's lots of paper in this case --

7    I'm going to come back up when I get the other opportunity that

8    I have to talk to you in closing statement and I'm going to ask

9    you to return the only just and logical verdict in this case

10   after you hear all the evidence, which will be a verdict in

11   favor of CCI, William Wertz, and Michael Maguire.

12           And, again, I thank you for your attention and your

13   deliberation throughout this process.  Thank you very much.

14           THE COURT:  Thank you very much.  All right, ladies

15   and gentlemen.  We're going to let you take your lunch break

16   now and we will reconvene at 1:45, a little over an hour from

17   now.  So we'll see you then.

18           (Jury not present)

19           THE COURT:  All right.  Anything else counsel needs

20   from the Court?

21           MR. BHANDARI:  No, your Honor.

22           MR. WITTELS:  Nothing, Judge.

23           THE COURT:  All right.  We'll see you at 1:45.

24           (Luncheon recess)

25           (Continued on next page)

F5i1mcg3                        Schantz – Direct

1                       AFTERNOON SESSION

2                          2:00 p.m.

3           (Jury present)

4           THE COURT:  Please call your first witness.

5           MR. BHANDARI:  Thank you, your Honor.  The plaintiff

6    calls Robert Schantz.

7     ROBERT SCHANTZ,

8          called as a witness by the Plaintiff,

9          having been duly sworn, testified as follows:

10   DIRECT EXAMINATION

11   BY MR. BHANDARI:

12   Q.  Good afternoon, Mr. Schantz.

13   A.  Good afternoon.

14   Q.  As so the first question is:  How do you know the defendant

15   Contract Callers, Inc., also known as CCI?

16   A.  I work for them.

17   Q.  And you're a plaintiff in this case, correct?

18   A.  Correct.

19   Q.  Now we're going to get to your work at CCI in a few

20   minutes, but I wanted to just ask you a few questions about

21   your background.

22           THE COURT:  No, just put questions, counsel.  No

23   colloquy, no introduction, no nothing but questions.

24   Q.  Okay.  Where do you live, Mr. Schantz?

25   A.  I live in Hicksville, New York.

1   Q.  How long have you lived there?

2   A.  I've been there about 19 years.

3   Q.  And what type of place do you live in in Hicksville, New

4   York?

5   A.  I live in a two-family home, residential home.

6   Q.  And do you rent or own that home?

7   A.  I own the house.

8   Q.  And when you say it's a two-family house, can you please

9   describe, how is it configured?

10  A.  It's got a main floor, one dwelling, and a basement with

11  another dwelling.

12  Q.  And do they have separate entrances?

13  A.  Separate entrances, separate accesses, yes.

14  Q.  Do they have separate kitchens?

15  A.  Yes.

16  Q.  Do you live in one of the dwellings?

17  A.  I do.

18  Q.  Who lives in the other one?

19  A.  My mother lives upstairs.

20  Q.  And where did you grow up, Mr. Schantz?

21  A.  I grew up in Levittown and Hicksville.

22  Q.  And where did you go to high school?

23  A.  I went to Hicksville High School, New York.

24  Q.  And when did you graduate?

25  A.  I graduated 1988.

F5i1mcg3                              Schantz - Direct

1   Q.  And after high school did you have any additional

2   education?

3   A.  Yes, I went to college, Ithaca College, from 1988 to '92.

4   Q.  And what did you major in at Ithaca College?

5   A.  I majored in management, bachelor's in business science.

6   Q.  So you received a bachelor's degree from Ithaca College in

7   1992?

8   A.  Yes, I did.

9   Q.  So after college what type of work -- what type of

10  occupation have you been engaged in since after you graduated

11  college?

12  A.  I've been in a few different type of job environments.

13  Right after college I got into milk industry, with Local 584.

14  It was a unionized milk company.  I worked there for about six

15  years.

16          And then I went into business for a little while.  I

17  went into sales and retail management, which then I went into

18  plumbing when I was about 30 years old.

19  Q.  And how long have you been doing plumbing work?

20  A.  Going on 15 years.

21  Q.  And so when you first started doing plumbing work, what

22  types of jobs were you doing?

23  A.  Doing a lot of new home construction, residential, stuff

24  like that --

25  Q.  And what --

1   A.   -- private homes.

2   Q.   Sorry to cut you off there.   What sort of stuff would you

3   do when you were doing new construction and residential

4   plumbing?

5   A.   Heating and domestic piping to dwellings.

6   Q.   And immediately before you started working for CCI, where

7   were you working?

8   A.   I was working as a plumber.

9   Q.   And were you working for a particular company?

10  A.   I was working for -- actually, I was freelancing.   I was

11  working a little bit for two companies.   One was Kyle Richards

12  Plumbing & Heating, and the other one was RR Daniels.

13  Q.   And were you a member of any unions before you started

14  working at CCI?

15  A.   I was, yes.

16  Q.   What union were you a part of?

17  A.   I was with Local 584 Teamsters, in the utility industry,

18  and then I was -- for a few years I worked in the carpenters

19  union, Local 608.   I wasn't doing carpentry; just doing

20  rigging.

21  Q.   So how did you hear about the job at CCI?

22  A.   I actually heard about the job through Scott Vaaler.   He's

23  a friend of mine.

24  Q.   What did Scott Vaaler tell you about the job at CCI?

25  A.   He said that he might be able to get me a job, they were

F5i1mcg3                          Schantz - Direct

1    looking to expand their workforce, he knew I had plumbing

2    background.

3    Q.  And when did you start working at CCI?

4    A.  I believe it was 5/20/2009, May 20th.

5    Q.  And so you heard about the job sometime before May of 2009,

6    is that correct?

7    A.  Yes, prior to that.

8    Q.  And how did you apply for the job?

9    A.  I applied for the job.  I just had gotten a call from the

10   secretary to come in for an interview.

11   Q.  Did you go for an interview?

12   A.  Yes.

13   Q.  Who did you interview with?

14   A.  I interviewed with Angelo Solimine and Charles Loquidice.

15           (Reporter interrupted for clarification)

16   Q.  Sorry.  You were saying you interviewed with Angelo

17   Solimine and Charlie Loquidice, is that right?

18   A.  Yes.

19   Q.  And approximately how long did the interview last?

20   A.  For about an hour.

21   Q.  What kinds of things did you discuss?

22   A.  Plumbing, different types of plumbing applications and

23   basically the know-how of the job, my experience.

24   Q.  And so can you explain, what was this job that you were

25   applying for?  What specifically were you going to be doing?

F5i1mcg3                              Schantz - Direct

1    A.  It was as an installer.

2    Q.  An installer of what?

3    A.  Plumbing installer, of water meters and MTUs, which was the

4    device that was put onto the outside of the house or the

5    dwelling, or building, that transmitted the signal from the

6    water meter in the basement.

7    Q.  And before you took the job at CCI, had you ever worked

8    with water meters before?

9    A.  I'd come across them prior to that.  Not as fluent as that,

10   but every couple months we would set a meter or stuff like that

11   on a new home.

12   Q.  And you were sitting here during the opening statements,

13   correct?

14   A.  Correct.

15   Q.  And did you see what my colleague Rob Glunt was pointing

16   to, these two types of meters?

17   A.  I came across those, yeah.

18   Q.  Did these look like the sorts of meters that you replaced

19   from time to time?

20   A.  Yes.

21   Q.  And from looking at this particular meter, how would you

22   describe it?  What would this meter be called, in the

23   vernacular you would use?

24   A.  That looks like a 5/8 rotary meter, ran with a magnetic

25   impeller inside.

F5i1mcg3                        Schantz - Direct

1    Q.  You would replace these meters in houses with new meters,

2    is that correct?

3    A.  Yes.

4    Q.  And looking at this --

5            THE COURT:  Are you offering these in evidence?

6            MR. BHANDARI:  No, your Honor.  These are

7    demonstratives.  We're going to offer ones in evidence later

8    through a different witness.  This is just for the purpose of

9    demonstrative.

10   Q.  And this particular meter, what type of meter would this

11   be?

12   A.  That looks like a 2-inch Neptune.

13   Q.  And would you replace 2-inch meters from time to time?

14   A.  Yes, we would.

15   Q.  So in addition to replacing water meters, you said you were

16   installing another device called an MTU?

17   A.  Yes.

18   Q.  What was an MTU?

19   A.  MTU is a -- was a small box.  It was a -- MTU stands for

20   meter transmission units, and what it was is, in the house or

21   the building, you had the water meter, most of the time in the

22   basement, and the MTU or meter transmitting device was on the

23   outside of the house, so constantly communicated to the water

24   meter on what the reading was, and then from there it sent out

25   to -- in the neighborhoods we had installed, or the DEP

1  installed, which was DCUs, and that acronym stands for data

2  collection units, so between the water meter, the device on the

3  side of the house, and somewhere in the neighborhood, with the

4  DCUs, there was -- there was this -- a signal of transmission,

5  radio transmission.

6  Q.  So just so I understand, the MTUs would communicate with

7  DCUs, is that correct?

8  A.  Yes.

9  Q.  And the MTUs would go in people's houses --

10  A.  Correct.

11  Q.  -- or in businesses?

12  A.  Yes.

13  Q.  Now did you understand that that's what the job was going

14  to be when you applied for it prior to May 20, 2009?

15  A.  I didn't know exactly what the job totally entailed but I

16  knew it was like a water meter job.

17  Q.  And did you eventually get an offer to work for CCI?

18  A.  Yes, after the interview, I believe it was two or three

19  days later, they had called me --

20  Q.  And --

21  A.  -- to come in.

22  Q.  -- did you accept the job?

23  A.  I did.

24  Q.  And at the time that you accepted the job, were you doing

25  any other work?

1   A.  I was doing freelance plumbing.

2   Q.  And so who were you doing the freelance plumbing for at the

3   time, around the time that you were --

4   A.  RR Daniels.

5   Q.  So after you accepted the job, was there any training

6   period?

7   A.  I don't recall.  Possibly maybe about a week of training,

8   you know, in -- behind closed doors, or, you know, in offices,

9   and then basically the training was just out in the field, you

10  know, to go with somebody who was on the project already.  I

11  came in with -- within a couple months of the project starting.

12  There were guys that were already fluent with the job already.

13  Q.  You started in May of 2009, and are you saying some people

14  had already started on the job before that?

15  A.  Yes.

16  Q.  Who were some of the people who had started on the job

17  before you started?

18  A.  I think the contract started in January, or possibly March,

19  and the guys that were already there were guys like Jimmy Olson

20  and Charles Loguidice, Rocco Ceparano, Joe Frische, guys like

21  that.  They were the senior men.

22  Q.  And do you remember who you went out on any training trips

23  with?

24  A.  I went out with Jimmy Olsen.

25  Q.  And how long did you work at CCI total?  You started in May

1  of 2009.  When did you stop working?

2  A.  I stopped in I believe it was the second week in December

3  of 2011.

4  Q.  And how much longer did the project continue after you

5  stopped working?

6  A.  The project was finalized two weeks after, after they had

7  let me go.  They had three guys left on the -- in the crew,

8  like a skeleton crew, just finishing things up.

9  Q.  So you were on it from May 2009 till December of 2011, is

10  that correct?

11  A.  Yes.

12  Q.  And the project lasted for just a couple weeks after you

13  finished?

14  A.  Correct.

15  Q.  I'd like to show you a document that's been previously

16  marked as Defendant's Exhibit SS.  I have copies with me over

17  here for ease.  Just one page.

18          MR. BHANDARI:  Your Honor, what's the best way to do

19  this?  Should I approach the witness and approach the bench to

20  give the court a copy?

21          THE COURT:  Yes.

22          MR. BHANDARI:  And your Honor, I'd like to have

23  Exhibit SS entered into evidence.

24          THE COURT:  Any objection?

25          MR. WITTELS:  No objection, Judge.

1      THE COURT:  It's marked as a Defendant's Exhibit, so

2  Defendant SS is received.

3      (Defendant's Exhibit SS received in evidence)

4      MR. BHANDARI:  Okay.  And I have nine copies for the

5  jury.  Can I publish this to the jury.

6      THE COURT:  Yes.

7      MR. BHANDARI:  Okay.

8  BY MR. BHANDARI:

9  Q.  So Mr. Schantz, what's been entered into evidence as

10  Defendant's Exhibit SS is this document that you have in front

11  of you, and it should also be on the screen in front of you.

12  Do you see it?

13  A.  Yes, I do.

14  Q.  And do you see your name on this list?

15  A.  Yes.

16  Q.  And according to document --

17      MR. BHANDARI:  I'm sorry.  Let's give a moment for the

18  jury to have it all in front of them as well.

19      It appears I gave a few extras.  Thank you.

20  Q.  So Mr. Schantz, do you see your name on this list?

21  A.  I do.

22  Q.  And according to this document, what were the exact dates

23  when you worked on -- worked for CCI?

24  A.  5/20 of 2009 through 12/9 of 2011.

25  Q.  And if you look at this document, at least for the people

F5i1mcg3                    Schantz - Direct

who are on this list, the earliest that some people seem to

have started is February 24, 2009, is that correct?

A.  Yes.

Q.  And one of the people who started on February 24, 2009 is a

person, the last name on this list, a guy named Scott Vaaler.

Do you see that?

A.  Yes.

Q.  And is that your friend who introduced you to CCI?

A.  Yes.

Q.  And how did you know Mr. Vaaler?

A.  Scott was one of my friends after I graduated college.  I

had met him through like a beach town called Long Beach.

Q.  Approximately how many years did you know Mr. Vaaler before

you applied for this job at CCI in 2009?

A.  Known him about 20 years.

Q.  Now going back to your job at CCI, when you started working

at the job, can you just describe for us what you would do in a

typical day, starting in the morning and through the day.

A.  Yes.  Typical day was showing up in the morning, got there

at 7:00, sometimes quarter to 7.  Gate opened up at about 7:00.

Until then there was always paperwork.  I was always -- had

stuff to write.  There was a lot of reports and --

Q.  Okay.  So the morning, you said you got -- the gates opened

at around 7:00, is that right?

A.  Yes.

1  Q.  Where was the location of the CCI office, where the gate

2  would open at around 7:00?

3  A.  A cross street of a commercial area, Summerfield Street.

4  Q.  In what part of New York City?

5  A.  Ridgewood, Queens.

6  Q.  And Ridgewood is on the border between Queens and Brooklyn,

7  is that right?

8  A.  Yes.

9  Q.  So you would go to the CCI offices in Ridgewood, Queens,

10  every day that you were working for CCI, correct?

11  A.  Correct.

12  Q.  And what time would you usually -- sorry.  Withdraw that

13  question.

14          Was there a parking lot at the CCI offices?

15  A.  No parking lot.

16  Q.  Where would you park when you would go to the CCI offices?

17  A.  You'd try to get a spot on the street.  Most of the time

18  you were doubly parked.

19  Q.  So when people have been talking about the gates opening at

20  the CCI offices, what does that mean?

21  A.  It was a metal gate that opened up to the shop.  It was

22  like a -- kind of like a big door that opened all the way up to

23  the top of the building.

24  Q.  And so how would you get to that door?  Would you walk from

25  the street to the curb and then there would be that door or --

1   A.  Yes.

2   Q.  And so what time would you get to the street where the CCI

3   offices were, on a typical day?

4   A.  Probably about a quarter to 7.

5   Q.  And what time would the gates open?

6   A.  7:00.

7   Q.  Now when the gates would open, what would you do?

8   A.  I'd lock up my truck on the street and I'd go into the

9   warehouse, and first thing I would do is I would see if the

10  handhelds were ready for my use, they were downloaded.  They

11  weren't always ready, but most of the time they were ready.

12  Q.  So let's talk about the handhelds.  What was the name of

13  that handheld device?

14  A.  The handheld was a CN3.  That was the name of it.

15  Q.  And --

16  A.  Like a little handheld Pilot.

17  Q.  Sorry.  I didn't mean to cut you off.

18  A.  That's okay.

19  Q.  I was just going to ask you to describe it a little more.

20  A.  It was like a computer device, like a handheld, like a Palm

21  Pilot, almost, like a mini computer.

22  Q.  And why did you need to get your CN3 at the beginning of

23  each day?

24  A.  That's what has the work in it.  Your routes were in the

25  CN3.  They downloaded a hundred accounts into that CN3.

1   Without that information, you could not do your job.  You

2   couldn't -- you couldn't computerize it or write it up.

3   Q.  And so when you say a hundred accounts were in the CN3,

4   does that mean addresses?

5   A.  Hundred addresses, correct.

6   Q.  So you'd get a CN3 and it would tell you a hundred

7   addresses that you could go to in a particular day to change

8   meters and/or install MTUs, is that right?

9   A.  Yes.

10  Q.  So after you picked up your handheld device, what would you

11  do next in the CCI offices?

12  A.  The first thing we'd do when we pick up our handhelds is we

13  want to make sure the date and time is accurate on the device.

14  If the date and time wasn't accurate, there could be problems

15  with the future program.  That was kind of my protocol is once

16  I got my CN3, I grabbed my paperwork with the route or the grid

17  sheet where you were on, make sure that the CN3 was working.

18  Q.  So the second thing you said is you grabbed a route with a

19  grid sheet, is that right?

20  A.  Correct, yes.

21  Q.  Was that called a route sheet?

22  A.  It was called a -- yeah, a grid or a route -- or route

23  sheet.  It's called many things.

24  Q.  Okay.  What was on that particular document?

25  A.  That was all the pertinent information to every household.

F5i1mcg3                        Schantz - Direct

1     It gave the type of meter was in there already, the homeowner's

2     name, phone number, stuff like that.  Block and lot.  A lot of

3     information that was not really useless -- useful.

4     Q.  And what were the different types of meters that could be

5     in a particular house, or a particular business?

6     A.  The smallest they came were usually 5/8 or half inch and

7     they went up to a ¾, which is as big as the one Rishi had

8     showed you guys, and then they went to the 1-inch.  With the

9     housing, it got a little bigger and bigger, and the 2-inch, a

10    lot of the 2-inches looked like that, big brass --

11    Q.  You'd pick up your CN3, you'd pick up your route sheet, and

12    then what would you do?  After you had your route sheet in your

13    hand, what would be the next thing you would do in the morning

14    when you were working at CCI?

15    A.  The first thing I would do is go back to the CN3 to make

16    sure that that route was the right route in the CN3.  Sometimes

17    it was, you know -- it was, you know, confusion.  I made sure

18    it was the right route.  And then I'd go back and I'd get my

19    paperwork, I'd try to make a photocopy of my route sheet,

20    because sometimes it would disappear, so I had a protocol of

21    always photocopying my route sheet.

22    Q.  Okay.  So you'd photocopy the route sheet and compare it to

23    CN3 data.

24    A.  Yeah, and see if there were appointments or a canvass.

25    Beginning of the project, most of it was a lot of canvassing,

1   just letting people know that there was an upgrade going on and

2   it was going to be mandatory by the city, stuff like that.

3   Q.  So when you looked at your route sheet, it would say the

4   type of meters that the house had, right?

5   A.  Yes.

6   Q.  And what would you do next if you saw -- when you saw the

7   different meters that you were going to need for the day?

8   A.  I'd make sure -- I'd want to make sure that I had the right

9   meters on there.  Sometimes it was a -- it was a big area or it

10  was just 1-inch meters, sometimes it was just 5/8, ¾.  I'd make

11  sure that my truck was -- was prepped with the right materials.

12  If you had to go out in the field and come back to the shop,

13  you know, that would -- you weren't doing it.  That was a

14  no-no.

15  Q.  So how would you make sure your truck is prepped with the

16  right materials that you're going to need for the day?

17  A.  Well, basically see what the sizes, if there were a lot of

18  replacements, how many MTUs I had left on hand, if I had, you

19  know, the right gaskets, seal wire, wire.

20  Q.  You'd check to see what you got, and if you needed more

21  stuff, what would you do?

22  A.  I would usually load up in the morning.  It was kind of

23  tradition in the morning.  And at night I did some type of

24  loading.  There was always something going in or out of the

25  truck, morning and afternoon.

F5i1mcg3                        Schantz - Direct

1    Q.  Okay.  So let's focus on the morning for now.  What kinds

2    of stuff would you be loading and unloading from the truck in

3    the morning?

4    A.  Water meters.  Sometimes from the day before, we would

5    offload the old meters that were still on the truck.  A lot of

6    times it was a lot of big wire ones.  You wanted to make sure

7    you had enough wire to run around the buildings.

8    Q.  And so on a typical morning, you would get to CCI, the

9    street where CCI was around 6:45 in the morning and then you

10   would go inside the CCI offices at around 7.  How many trips

11   back and forth between the office and your truck would you make

12   between 7 and 8 a.m., on a typical day?

13   A.  Anywhere from four to eight trips, depending on, you

14   know -- there was a lot of back and forth.

15   Q.  And why would you make four to eight trips between your

16   truck and the CCI office in the morning?  What would you be

17   doing on those four to eight trips?

18   A.  Just loading it with proper materials.

19   Q.  Now in the mornings when you got there, did you ever see

20   anybody else who worked at CCI?

21   A.  Yes.

22   Q.  If you look at Exhibit SS, which I handed you a few moments

23   ago and it's also on the screen, can you identify the names of

24   people who you would see in the morning between 7 and 8 a.m.,

25   at the CCI offices.

F5i1mcg3                        Schantz - Direct

1    A.   Yes.

2    Q.   Okay.  Can you please do that.

3    A.   Domenic would always be there at 7.

4    Q.   Sorry.  If we can just go through from the top.

5    A.   Sure.

6    Q.   You're saying Domenic Fanelli?

7    A.   Yes, Domenic Fanelli, he was there at 7:00.  Joe Frangiosa

8    was there probably by 7, 7:30.  Bobby Gandolfo, he was always

9    there.  He was coming from Pennsylvania.  He was always there.

10   He was an early bird.  Jesse Kay was there.  Mike McGlone.

11   Rafael Soto, I used to see him in the morning.

12   Q.   And when you'd see some of these other folks in the

13   morning, the people you were talking about are people who were

14   usually there around 7:00?

15   A.   Yes.

16   Q.   Would you see other people around 7:30?

17   A.   Yes.

18   Q.   Who were the people you would see?

19   A.   Pretty much the rest -- most of the rest of the crew was

20   there by 7:30.

21   Q.   So pretty much everybody on this list, Exhibit SS, would be

22   at the CCI offices before 7:30 on a typical workday, is that

23   correct?

24   A.   Yes.

25   Q.   So after loading stuff up into your truck, what would you

F5i1mcg3                        Schantz - Direct

1   do next?  Excuse me.  Would there be anything else that happens

2   in the morning at the CCI offices?

3   A.  I try to, you know -- paperwork, I'd finish up some of the

4   paperwork if it wasn't done.

5   Q.  Okay.  Paperwork, right?

6   A.  Paperwork.

7   Q.  When you say paperwork, are there particular forms you were

8   filling out?

9   A.  Two of them in particular were called AMR reports.  They

10  were automatic meter reports.  It was just something --

11  something that was not in the ordinary that had to be

12  documented down so the city, the DEP, knew of the problem or

13  the issue.

14      And another one was seal cards, which after -- every

15  time we replaced a meter, we affixed a seal, copper seal, and

16  it's designated with a number.  It's kind of a deterrent from

17  people to cut it and to work on their meter themselves.  Once

18  you knew the seal was gone, you knew there was some type of

19  tampering.  So we had to monitor exactly what seals we filled

20  out, which day we, you know, we affixed them to, what type of

21  job it was, the block, the lot, you know, tedious stuff.

22      So if I had a little extra time, I would -- I would

23  continue with my paperwork.

24  Q.  And were there ever meetings in the morning?

25  A.  There were meetings.

F5i1mcg3                        Schantz - Direct

1   Q.   Who would call the meetings?

2   A.   Either Charlie or Angelo.

3   Q.   What was the purpose of these meetings?  What would happen

4   at these meetings?

5   A.   We'd just try to sometimes usually address -- if there was

6   a problem going on or there was some type of new protocol that

7   we needed to do or if there was any issues.

8   Q.   And approximately how -- and when would these meetings

9   happen?  When would the meetings occur?

10  A.   They were various, but I would say on average, once or

11  twice a month.

12  Q.   And at what time would the meeting happen?

13  A.   The meeting was always scheduled for 7:30.

14  Q.   So were people required to be at the morning meetings?

15  A.   Yes.

16  Q.   Were you required to be at the morning meetings?

17  A.   Yes, it was mandatory.

18  Q.   And did you attend the morning meetings?

19  A.   I did.

20  Q.   And so on the dates when there were morning meetings, would

21  you get there even before 7:30?

22  A.   Yes.

23  Q.   Why would you get there before 7:30 if there was a morning

24  meeting scheduled at 7:30?

25  A.   The reason I'd get there is just that's when I was there,

F5i1mcg3                           Schantz - Direct

1   at 7, you know, so I -- I always had stuff to do.  Even if

2   there was a meeting, it wasn't gonna stop my -- my basic

3   agenda.

4   Q.  And why were you doing that work between 7 and 8:00, as

5   opposed to doing it after 8 a.m.?

6   A.  Well, we're supposed to be on our job, our first job by

7   8:00, in the field, you know.

8   Q.  So let's just discuss that for a moment.  When you say

9   you're supposed to be on your first job by 8 a.m., what does

10  that mean?

11  A.  You had to be in the -- in the -- your territory.  If you

12  were knocking on doors, you were cold calling, you'd have to be

13  on the street knocking, or if you had an appointment, you have

14  to, you know, show up to your appointment by 8:00, you started

15  off.

16  Q.  And so in order to be at your appointments by 8 a.m. or to

17  start knocking by 8 a.m., what did you have to do to be ready

18  to do that?

19  A.  I would generally -- I would try to get out of the shop by

20  7:30, to get to the field, 'cause it was -- depending on where

21  we were working, depending on traffic, you know, in the city,

22  in Queens, it could have been 15-minute commute to 45-minute

23  commute if we're working in Long Island City or, you know --

24  Q.  And so the CCI office is in Ridgewood Queens.  Where was

25  the location where you were changing meters for the

1   approximately two years that you were on this job, two and a

2   half years?

3   A.   There were multiple zip codes.  Some of them were closer

4   than others.  It was kind of sporadic, but it was Forest Hills;

5   Woodside; there were six zip codes in Astoria; Woodhaven; Kew

6   Gardens.  Kind of sporadic.  And a lot of them you jumped on

7   the parkway or whatnot and at that time it's not short.

8   Q.   They were all in Queens?

9   A.   They were all in Queens.

10  Q.   And you just said that you would typically try and leave

11  the office by about 7:30?

12  A.   Yes.

13  Q.   How would you get from one appointment to the next?

14  A.   Drive.

15  Q.   And was it your own car?

16  A.   It was a company -- company car.

17  Q.   And when did you get issued a company car?

18  A.   I would say probably about within six months after I

19  started.

20  Q.   And so at the beginning how were you getting around?

21  A.   At the beginning we were working with teams.  We were

22  working with two guys each on each truck, which later went to

23  one person on each truck.

24  Q.   So at the beginning when you were working on changing

25  meters, you were on a two-person team, is that right?

F5i1mcg3                          Schantz - Direct

1   A.  Yes.

2   Q.  Do you remember who was your partner on the two-person

3   team?

4   A.  My partner, my training partner's name was Jimmy Olsen.

5   Q.  Then how long were you partnered with Jimmy Olsen when you

6   were working on this job?

7   A.  I would say anywhere between four to six months, three to

8   five months.

9   Q.  And then after Jimmy Olsen and you stopped being partners,

10  who were you partners with after that?

11  A.  I believe right after that I was partners with Domenic

12  Fanelli.

13  Q.  And did you have any other partners after Domenic?

14  A.  Yes, I was partners with Mike McGlone.

15  Q.  And anybody else?

16  A.  Kevin Scipio.  We had -- they changed things around often

17  so I had quite a few.  Rafael Soto I helped out a little bit.

18  Q.  So when you'd go out into the field, describe your day once

19  you're out in the field.  You would either do appointments or

20  you'd do canvassing, is that right?

21  A.  Yes.  Sometimes you'd get a little of both.

22  Q.  And if you had appointments, approximately how many

23  appointments a day would you have?

24  A.  It ranged, but between I'd say eight to ten, if you were

25  fully scheduled.  Towards the end maybe twelve appointments.

1    Q.  What does it mean to canvass?  What would that mean to you?

2    A.  Canvass is like cold calling, you know, like if you're

3    selling something, you're knocking on doors, you know, just

4    getting on the grid where the upgrade's getting done and just

5    letting people know that the -- there's an upgrade that's going

6    to be happening.

7    Q.  So you'd knock on a door.  Let's say somebody answers.

8    What would you say?

9    A.  Typically I would say, "Hi.  My name is Rob Schantz.  I

10   work for Contract Callers.  We're a subcontractor for the DEP.

11   We're doing the AMR project, which is an upgrade on the service

12   in the water meters.  They're changing the way they read their

13   systems, the way they're billing it."  That was typical.

14   Q.  Would you ask if you could change their meters at that

15   time?

16   A.  Yes.

17   Q.  And what was like usually -- do you know what your success

18   rate was when you were just cold calling on someone to see if

19   they would let you change the meter?

20   A.  It all depends.  Some days you knocked all day and some

21   days you got them -- you got them quick, you know.

22   Q.  Did Contract Callers tell you how many meters you were

23   supposed to be changing on a given day or how many MTUs you

24   were supposed to be installing?

25   A.  Yeah, from time to time the numbers were different, but --

1    Q.  What were the numbers that you remember being told?

2    A.  I remember eight meters, equivalency of eight meters, and I

3    guess equivalency of the eight meters is the meter -- we got

4    more to change the meter out than just the MTU, so it was

5    equivalent I think three MTUs to one meter, so it was -- I

6    believe eight meters or close to twenty MTUs was kind of like

7    the same corresponding monetary number.  So it was quite a

8    range.

9    Q.  And why did you care what number CCI wanted in terms of

10   like the number of changes, the number of jobs you would do

11   each day?  Why did it matter to you?

12   A.  Well, you wanted to produce, you know, you wanted to -- to

13   keep your job.  You know, just like if you were in a sales

14   team, you know, you want to be one of the top sellers.

15   Q.  Why?  Why would it matter?

16   A.  Why would it matter?

17   Q.  Yeah.

18   A.  'Cause if I didn't do my job, I wasn't gonna keep it.

19   Q.  Did anyone ever tell you that?

20   A.  Nobody ever told me that directly, but through my two and a

21   half years or whatnot, there was -- there was guys that were

22   being laid off, or fired, and furloughed and brought back and,

23   you know, there was a lot of guys that would, you know, get cut

24   off and then get back hired on and then they were hiring other

25   subcontractors, hiring them, so there was a lot of -- there was

1    a lot of turnover.

2    Q.  Did you ever get furloughed?

3    A.  I never got furloughed.

4    Q.  What does it mean to get furloughed?

5    A.  Well, furlough is -- it would be like a layoff.  Guys

6    didn't know they were definitely coming back.  Furlough I

7    believe is something where you know you're coming back.  So

8    when guys, you know, got laid off, they weren't sure if they

9    were coming back.  Not everybody did.

10   Q.  And so who were the people who would tell you what the

11   numbers were that CCI wanted?

12   A.  Charlie and Angelo.

13   Q.  And what would they say about the numbers?

14   A.  Got to get your numbers.  No excuse.  No excuses.  You got

15   to get your numbers.  Numbers, numbers.  It was numbers.

16   Q.  And so what would have happened if you started your job --

17   in your opinion what would have happened if you'd started your

18   job at 8 a.m. as opposed to coming in at 7 a.m.?

19   A.  There wouldn't be enough time to complete everything.

20   Q.  When you say that, what --

21   A.  If I got there at 8:00 and started loading and getting all

22   my paperwork, there was a fair amount of time, then by the time

23   I got out to the field, could be 9, 9:30, and that was -- that

24   was not tolerable.

25   Q.  And during the day would you ever speak to Charlie or

F5i1mcg3                          Schantz - Direct

1  Angelo --

2  A.  We would, yes.

3  Q.  -- when you were out in the field?

4  A.  Yeah, they would check in with us on an ongoing thing.  You

5  know, there was sometimes they were adamant about the numbers

6  and you would hear them more often.  You know, they were --

7  usually in the morning and afternoon they would call you, what

8  are your numbers?  What are your numbers?  If some guys'

9  numbers weren't that good, it was like, maybe you should go

10 home, we're getting killed out there, you know.  And guys went

11 home 'cause they didn't have great numbers sometimes.

12 Q.  And did you ever get sent home because you didn't have

13 great numbers?

14 A.  I got sent home a few times when things weren't working out

15 there, when they were just like, why don't you just throw the

16 towel in.  You know, I wanted to stay, but I felt like I wasn't

17 producing, that I was losing the company money.

18 Q.  Why were you losing the company money if you weren't

19 producing?

20 A.  If they weren't getting paid.

21 Q.  And when you went home early, would you get paid?

22 A.  When I went home early?  No.

23 Q.  So there were days when you went home before the end of

24 your shift and then you wouldn't get paid for those days,

25 correct?

F5i1mcg3                          Schantz - Direct

1   A.  Correct.

2   Q.  Now when was your shift supposed to end on a normal day?  I

3   know there's a few different ones, but on a typical day, when

4   would your shift run?

5   A.  8 to 4:30 was typical.

6   Q.  That's when you were supposed to be working, correct?

7   A.  Correct.

8   Q.  And were there any other shifts that you would work from

9   time to time?

10  A.  There was a couple split shifts.  Some guys came in at 10

11  to 6:30.  There was a couple times during the contract where it

12  was four days a week, four ten-hour days, so --

13  Q.  And on the four ten-hour days, what time was your shift

14  supposed to be?

15  A.  On the four ten hours?  I believe it was 8 to 6:30.

16  Q.  So those are the three different types of shifts you would

17  work, right, from 8 to 4:30, 10 to 6:30, or 8 to 6:30, correct?

18  A.  Correct.

19  Q.  And no matter what shift you were working, how many hours a

20  week were you supposed to be working?

21  A.  40 hours.

22  Q.  Now on days when your shift was from 8 to 4:30, did you

23  ever come back to the office after 4:30?

24  A.  Yeah.

25  Q.  Why would you come back to the office after 4:30?

F5i1mcg3                        Schantz - Direct

1   A.  You'd just get stuck out in the field sometimes.  You'd do

2   your last job and something went wrong, something went sour,

3   and, you know, if everything went good, you could get your job

4   done in 15 minutes to a half hour, but if things went sour and

5   you had a broken wire or you needed to drill a hole, you could

6   be there, you know, you could get stumped on a job, so a lot of

7   times it was you just got held up, or going back, it was tons

8   of traffic.

9   Q.  And when you got back to the office, whenever you got back,

10  4:30 or after 4:30 or before 4:30, what would you do when you'd

11  go back to the office?  What was your routine for closing out

12  your day?

13  A.  Find a spot, which was troublesome.

14  Q.  To find a parking spot?

15  A.  Yeah.

16  Q.  Okay.

17  A.  I'd try to grab my handhelds.  Those are the first two

18  things.  You don't want to go home with the computer devices.

19  I'd grab my handhelds and I'd go into the office, put them --

20  give them back to one of the guys that were doing the docking

21  and the downloading so they could put them in the download.

22  Q.  And after you hand in your device, what else would you do

23  in the afternoon after your shift was over?

24  A.  Then I would kind of finalize all my paperwork.  I tried to

25  make copies of my paperwork.  We would go back -- from there, I

F5i1mcg3                         Schantz - Direct

```
 1   would go back to the truck and we would take the water meters
 2   out.  Depending on how many you had -- it was always between,
 3   you know, between four and ten meters, and we needed to write a
 4   meter sheet for that.  We'd have to write the serial number on
 5   the water meter, what type meter, what type make it was, so
 6   that was what kind of followed afterwards to get the meters out
 7   of the truck.
 8   Q.  So when you would switch meters, you'd put a new meter into
 9   an office or business, is that right?
10   A.  Yes.
11   Q.  And then you would take the old meter with you?
12   A.  Yes, I would.
13   Q.  And so at the end of the day approximately how many trips
14   would you make back and forth between your truck and the office
15   unloading meters?
16   A.  At the end of the day?
17   Q.  Yes.
18   A.  I'd say about three to five trips back and forth.
19   Q.  Why would it take so many trips?
20   A.  Well, I mean, you got -- you got all these water meters,
21   and it's not like you're carrying all of them at one time, you
22   know, you kind of want to work safely.  It was heavy.  So you'd
23   have -- take your one, two meters at a time, stack them up, go
24   drop them in the box, make sure you have the right numbers, and
25   go back.  It was a back-and-forth thing.  If you had to write
```

1    any reports, or register head's defective -- that's the top of

2    the piece on the water meter -- you'd have to -- that would

3    have to be done by the end of the day too.  So you'd be going

4    back and getting register heads that you changed, which is the

5    normal occurrence to write the report with that.

6    Q.  So you would unload those water meters at the end of the

7    day, you would do paperwork, filling out these reports that you

8    just discussed, and you would load up your CN3.  Would you do

9    anything else at the end of the day?

10   A.  We would load up too sometimes at the end of the day.

11   Depending on when the warehouse supervisor called you in,

12   called to see what you needed, most of the time when you got

13   back, the material was -- was ready for you, all stacked up in

14   boxes, and it had, you know, your name on it or your route.  So

15   at times when I came back, depending on how much time there

16   was, I would continue loading.  Loading, you know, was morning

17   and at night.  It would be nice if they could all be done at

18   one time, but, you know, it didn't work that way.

19   Q.  Give me an idea, what is the sort of stuff you would store

20   in your truck other than water meters and MTUs?

21   A.  Other than water meters and MTUs?  I'd store a lot of -- I

22   had my truck stocked with plumbing equipment and tools and

23   drills and handguns and pistols, materials for the job.  Wire

24   and -- after the job was done with the water meter, there was a

25   seal wire, different from like, you know, 3 wire, like bell

1   wire.  Not to get you confused.  So there was two types of

2   wires that you were loading up.  Seal wire.  And then you would

3   get your seal caps.  You were replenishing your register heads.

4   Q.  Sorry, Mr. Schantz.  I think you said handgun.  That was

5   one of the things in your truck, is that right?

6   A.  No, like -- like pistol -- like pistol drills.

7   Q.  Ah, okay.  Pistol drills.  Got it.

8   A.  Sorry.  Is that how it came out, handgun?  Sorry.

9   Q.  So you load up -- you would load up your truck with general

10  material at the end of the day, is that correct?

11  A.  Yes.

12  Q.  And so approximately the end of each day, how long would it

13  take you to finish up your routine before you could actually

14  leave the CCI office and be done with work for the day?

15  A.  From the time I'm pulling up to get -- it was anywhere

16  between 20 minutes to a 30-minute time frame.

17  Q.  Now this would be your routine on the days where it would

18  be from 8 to 4:30, right?

19  A.  Yes.

20  Q.  Would it be the same routine if it was an 8 to 6:30 day?

21  Would you have to do the same stuff at the end of the day?

22  A.  Same routine, yes.

23  Q.  If it was a 10 to 6:30 day, would it be the same routine?

24  A.  Yes.

25  Q.  Now on a 10 to 6:30 day, obviously you weren't getting to

1   the office at 7 a.m., were you?

2   A.  No.

3   Q.  What time would you get to the office if your shift was

4   supposed to start at 10 a.m.?

5   A.  I got there for about 9 -- 9, 9:15.

6   Q.  And would you do the same routine in the morning before

7   your 10:00 shift?

8   A.  Yes.

9   Q.  So a few moments ago we talked about -- you said that

10  sometimes you would come back to the office after 4:30 p.m.,

11  correct?

12  A.  Correct.

13  Q.  And if you had a 6:30 shift, or if you had a shift that was

14  supposed to end at 6:30, would you sometimes come back to the

15  office after 6:30?

16  A.  Yes.

17  Q.  And sometimes when you came back to the office after 4:30

18  or after 6:30, you were paid overtime, correct?

19  A.  Correct.

20  Q.  Why would you get paid overtime sometimes?

21  A.  It had to be okayed.

22  Q.  It had to be what?

23  A.  Okayed.

24  Q.  And how would your overtime be okayed?

25  A.  Usually if you would get stuck out there in the field, you

1  would have to contact Charlie or Angelo and explain to them

2  what was going on.

3  Q.  And would they approve your overtime every time you asked

4  for it?

5  A.  No.

6  Q.  Can you remember any instances where you asked to be able

7  to be given some overtime but they said no?

8  A.  Yes.

9  Q.  So on a regular day, if you got back to the office at 4:30,

10 what time would you end up leaving the office and being done

11 with work for the day?

12 A.  If I got back at 4:30?

13 Q.  Yes.

14 A.  Probably about 5:00.

15 Q.  And on the days where you would leave the office at 5:00,

16 would you get overtime for those days?

17 A.  No.

18 Q.  Why not?

19 A.  We just always signed out for 4:30.

20 Q.  I'd like to show you now some time sheets that have

21 obviously been discussed a lot in this case.

22        MR. BHANDARI:  Your Honor, we have a binder,

23 Plaintiff's Exhibit Binder Volume II, which has certain

24 exhibits that I'm going to be referencing right now.  Can I

25 make sure that you have a copy in front of you and a copy is in

F5i1mcg3                           Schantz – Direct

1   front of the witness.

2              THE COURT:  All right.

3   Q.  All right.  So Mr. Schantz, I'd like for you to open up

4   Volume II of the binder that's directly in front of you to

5   Exhibit 71.  Can you do that.

6              MR. BHANDARI:  Your Honor, I'd like to have Exhibit 71

7   entered into evidence.

8              MR. WITTELS:  We have no objection to that, Judge.

9              THE COURT:  71 is received.

10             (Plaintiff's Exhibit 71 received in evidence)

11             MR. BHANDARI:  Okay.  Rob, can we please pull that up

12  on the screen so the jury can see it.

13             Okay.  If you can actually go to the very first page

14  of Exhibit 71, Rob.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1           MR. BHANDARI:  Your Honor, if you'd like to follow

2      along on the screen as well, that's what we're showing the

3      jury.  You can do it with the binder or the screen.

4           THE COURT:  Those would seem to be the logical

5      possibilities.

6           MR. BHANDARI:  All right.

7      Q.  So Mr. Schantz, do you recognize this document?

8      A.  The sign-in sheet?

9      Q.  This is a sign-in sheet, correct?

10     A.  Yes.

11     Q.  And does it look like a sign-in sheet -- is the format of

12     this sign-in sheet the format of a sign-in sheet you signed

13     from time to time?

14     A.  Yes, it is.

15     Q.  Now, your last name is Schantz, so you're obviously not

16     going to be on this first page that ends in Gandolfo.  So if we

17     can go to the next page, which is June 1, you see -- if you

18     were on this sign-in sheet for June 1, 2009, you would have

19     been between Ariel Peniche and Kevin Scipio, correct?

20     A.  Correct.

21     Q.  But you're not on the June 1, 2009 sign-in sheet, correct?

22     A.  No.

23     Q.  Going back to the previous page, do you see on this sign-in

24     sheet that there appear to be some cross-outs and some changes?

25     A.  Yes.

1   Q.  And can you read any of the cross-outs or changes that you

2   see on this sign-in sheet, if you look at the time in or time

3   out, if you see a cross-out, if you can identify who it is and

4   what the time out variation is?

5          Let's look at Michael Ceraldi, for example.  Does it

6   look like there's any variation to the time out?

7   A.  Yes, it looks like it was written over.  He was in at 7:30.

8   Q.  And it got crossed out?

9   A.  It looks like he was out at seven or 7:30, but it got

10  changed to 6:30.

11  Q.  And looking at Domenic Fanelli, does it appear like there's

12  any variation to the time in?

13  A.  Yes.

14  Q.  What does the variation appear to be to the time in?

15  A.  Same thing.  It looked like he was signed in at seven

16  something and then it was crossed out, written over, changed to

17  8 o'clock.  Same thing for the time out.

18  Q.  Now, these are obviously -- you didn't write those, did

19  you?

20  A.  No.

21  Q.  So now I'd like to go to June 3, 2009.

22          THE COURT:  Before you do that, let me ask you on

23  June 2, Mr. Schantz.

24          THE WITNESS:  Yes.

25          THE COURT:  There's a notation on the second page with

1   your name, right?

2              THE WITNESS:  Yes.

3              THE COURT:  But it's all crossed out?

4              THE WITNESS:  It's crossed out.

5              THE COURT:  Do you know what occurred there?

6              THE WITNESS:  I don't recall.

7              THE COURT:  Is that your signature that was crossed

8   out?

9              THE WITNESS:  It is my signature, yes.

10             THE COURT:  Okay.  Go ahead, counsel.

11  Q.  So going to June 3, Mr. Schantz.  June 2 when we saw your

12  name was crossed out entirely, and you don't remember why it

13  was crossed out, correct?

14  A.  No.

15  Q.  So we're not going to focus on June 2.  But June 3, if you

16  can go to the second page, do you see your name on the second

17  page?

18  A.  Yes.

19  Q.  And did you sign your name at the signature block on the

20  second page of June 3?

21  A.  I did.  That's my signature.

22  Q.  And is that your social, the last four digits of your

23  social security number?

24  A.  Yes, it is.

25  Q.  Does that appear to be your handwriting?

F5ILMCG4                          Schantz – Direct

1   A.  Yes, it is.

2   Q.  Does the signature appear to be your signature?

3   A.  Yes.

4   Q.  So to the best of your recollection, is this the first day

5   that you signed in and received pay from CCI?

6   A.  To the best of my recollection.

7   Q.  You did not receive pay on June 2, 2009, correct?

8   A.  No.

9           THE COURT:  Did you work on June 2?

10          THE WITNESS:  I don't exactly recall.  They might have

11  called me in and maybe they trained me.  I don't know why it's

12  crossed out there.

13          THE COURT:  All right.

14  Q.  You haven't seen any payroll records -- you haven't seen

15  anything indicating that you were paid for your training,

16  correct?

17  A.  Correct.

18  Q.  But you may have been paid for your training, you just

19  don't remember, correct?

20  A.  Correct.

21  Q.  So we're focusing on the time when you were working on the

22  job, not the training stuff.

23          So in this particular one, which is the first day that

24  you signed it and got paid by CCI, do you see whether or not it

25  appears that the -- what does it appear that the time in time

1    actually says?

2              MR. BHANDARI:  Can we focus in on that a little bit,

3    Rob.

4    A.  The time in looks like I signed in 7:30.

5    Q.  But was -- does it look like it was changed?

6    A.  It was changed.  It was changed with an eight, eight over

7    it.  You can see the zero over the three.

8    Q.  Now, on June 3, 2009, or maybe sometime before, were you

9    told what time you were supposed to sign in every single day?

10   A.  Yes.

11   Q.  What time were you told you were supposed to sign in every

12   single day?

13   A.  8 o'clock.

14   Q.  And what if you got to work before 8 o'clock, what time

15   were you supposed to sign in?

16   A.  8 o'clock.

17   Q.  And what if you started doing work before 8 o'clock like

18   loading your truck, filling out paperwork, and checking your

19   routes, what time were you supposed to sign in?

20   A.  We still sign, it was given we signed in at 8 o'clock.  As

21   you can tell from the sheets, as you can tell from the sign-in

22   sheets.

23   Q.  What if there was a morning meeting that started at

24   7:30 a.m., what time were you supposed to sign in on your time

25   sheets?

1    A.  I believe it was sometimes we signed in for 7:30 on a

2    meeting, but not all the time.

3    Q.  Do you recall ever signing in at 7:30 for a meeting and not

4    having it changed to 8 o'clock?

5    A.  I don't recall, no.

6    Q.  So as far as you can tell over here, you signed in at 7:30

7    but it was changed to 8 o'clock, correct?

8    A.  Correct.

9    Q.  And who told you you were supposed to sign in at 8 o'clock

10   every single morning no matter when you started doing work?

11   A.  Angelo and Charlie.

12   Q.  And when did they tell you that?

13   A.  I guess when I kind of first got hired.  I mean if you see

14   the one sheet, I guess I didn't really know really when we

15   signed in, I tried to sign 7:30 when I got there.  And then it

16   looked like it was changed to eight.  So they kind of let me

17   know that, you know, doesn't matter what time you get there.

18   We sign in and out for 4:30 unless all the time is approved for

19   the afternoon.

20   Q.  Looking at this sheet, does it appear that anyone's time

21   has been changed, anybody else's time in has been changed?

22   A.  Yeah, it looks like Kevin's was changed.  And Ariel had a

23   seven there at one time and went to an eight over it.

24   Q.  If you can go back to the previous page, the first page of

25   June 3, 2009, does it look like anybody else's time was changed

F5ILMCG4                        Schantz - Direct

1   on this time sheet?  If you can zoom in.

2   A.  Yeah.  I see Joe Frangiosa, Sal Fischetti, it looks like

3   7:30, that was changed to eight.  Same thing with Buffalino and

4   Gandolfo.

5   Q.  Did you make those changes?

6   A.  I don't remember.

7   Q.  Looking at the bottom over here, do you see where it says I

8   hereby certify that the above information is true and correct

9   at the very bottom of the sheet?

10  A.  Yes, I see it.

11  Q.  Who signed that at the bottom?

12  A.  I believe that's Angelo's signature?

13  Q.  You're not sure whose signature that is; is that correct?

14  A.  I'm not sure.  CK?

15  Q.  Whose name is down there?

16  A.  Angelo, Angelo Solimine.

17  Q.  What does it say his title is?

18  A.  General manager.

19  Q.  So who certified that these time sheets were correct?

20  A.  The general manager.

21  Q.  Angelo?

22  A.  Yes.

23  Q.  Did you certify that these time sheets were correct?

24  A.  No.

25  Q.  Now, that's one time sheet that I'd like to show you.  Now

1    I'd like to direct your attention to Exhibit 76.  Can you in

2    your binder please go to Exhibit 76.  Now, on Exhibit 76, if I

3    can direct you to November 16, 2009.

4                THE COURT:  Are you offering this?

5                MR. BHANDARI:  Sorry, your Honor.  Can we please have

6    Plaintiff's Exhibit 76 entered into evidence.

7                MR. WITTELS:  No objection.

8                THE COURT:  Received.

9                (Plaintiff's Exhibit 76 received in evidence)

10   Q.  Can I direct you to just one of the days inside Plaintiff's

11   Exhibit 76, which is November 16, 2009.

12   A.  Okay.

13   Q.  Now, looking at this document, can we pull it up, please,

14   can we go to the first page of this.

15               So looking at the November 16, 2009 sign-in sheet,

16   what is the time that everybody on the first page of this

17   sign-in sheet signed in?

18   A.  8 o'clock.

19   Q.  And what is the time that everybody on this sign-in sheet

20   signed out?

21   A.  4:30.

22   Q.  Now can you go to the second page.  On this sign-in sheet,

23   on the second page, what is the time that everybody on this

24   sign-in sheet signed in?

25   A.  8 o'clock also.

1   Q.  And with the exception of Scott Vaaler, who is your friend,

2   what is the time that every single person signed out?

3   A.  4:30.

4   Q.  Now, do you see your name on here?

5   A.  Yes, I do.

6   Q.  And what time did you sign in?

7   A.  Eight to 4:30.

8   Q.  Now, I'm going to assume you don't, but do you remember

9   specifically what you did on November 16, 2009?

10  A.  No.

11  Q.  But what time would you have gotten to work if November 16,

12  2009 is typical of the time you would normally get to work?

13  A.  7 o'clock, ten to seven.

14  Q.  And you signed in at 8 o'clock though, correct?

15  A.  Correct.

16  Q.  Were you doing work, if it was a typical day, would you

17  have been doing work that morning --

18  A.  Yes.

19  Q.  -- for CCI.

20  A.  I was always doing work.

21  Q.  Why would you sign in at 8 a.m.?

22  A.  That's when we were told to sign in, eight to 4:30.

23  Q.  And did every single person who worked at CCI get in at

24  exactly 8 o'clock?

25  A.  No.

1   Q.  Did people -- when did people get in, besides yourself,

2   when did other people get in, did they get in before or after

3   8 a.m.?

4   A.  They got in before.

5   Q.  Now looking at the time out, you signed out at 4:30 p.m.,

6   correct?

7   A.  Correct.

8   Q.  Does that mean on November 16, 2009, you definitely left

9   the CCI offices at exactly 4:30 p.m.?

10  A.  No.

11  Q.  Why would you sign out at 4:30 p.m. if you didn't leave the

12  office at exactly 4:30 p.m.?

13  A.  That's when we signed out.  You know, if I was there doing

14  paperwork or I got stuck in traffic on the way back, there was

15  no calling and getting proof for overtime for 20 minutes to

16  half an hour.  So we signed out at 4:30.

17  Q.  Now I'd like to staying here in Exhibit 76, if I can direct

18  you to -- sorry.  Let me step back for a second and ask you a

19  couple more questions about this.

20          If you worked past, if you worked past 4:30 p.m.,

21  would you have to get approval to get overtime?

22  A.  Yes.

23  Q.  And did you ever get approval for overtime for doing your

24  end of the day routine, unloading your truck, filling out

25  paperwork, depositing your CN3?

 1   A.  No.

 2   Q.  Ever once, did you ever get paid overtime for doing that

 3   work?

 4   A.  Not to the best of my recollection.

 5   Q.  Now I'd like to direct your attention to the same exhibit,

 6   Exhibit 76, if you go to November 23, 2009, looking at the

 7   November 23, 2009 sign-in sheet, what time did everybody sign

 8   in on the first page?

 9   A.  8 o'clock.

10   Q.  And looking at the second page, what time did every single

11   person sign in on November 23 on the second page?

12   A.  8 o'clock.

13   Q.  And what time did you sign in?

14   A.  I signed in at eight.

15   Q.  If you go back to the first page, can we look at that

16   again, what time did most people sign out on November 23, 2009?

17   Not every one.  What is the most frequent number of the sign

18   out time?

19   A.  4:30 .

20   Q.  And if you can go to the second page, what time did you

21   sign out on November 23, 2009?

22   A.  I signed out at 6 o'clock.

23   Q.  Okay.  So on November 23, 2009, you didn't write in 4:30,

24   did you?

25   A.  No.

1   Q.  Do you have a specific recollection on why you signed out

2   at 6 p.m. on November 23, 2009?

3   A.  I can't give you a particular answer, but there was a

4   reason why I got stuck out in the field to come back and sign

5   out at that time.

6   Q.  So if you signed out at 6 p.m., would that mean that you

7   spoke to either Angelo or Charlie about getting approval for

8   your overtime?

9   A.  Yes.

10  Q.  And did you in fact get approval on November 23, 2009 for

11  your overtime?

12  A.  That is what it looks like, yeah.  I wouldn't have

13  6 o'clock if not.

14  Q.  You wrote it down on the time sheet, you would get paid for

15  it, correct?

16  A.  Yes.

17  Q.  Every time you wrote down a time after 4:30 p.m., you would

18  in fact get paid your overtime, correct?

19  A.  Yes, if it was approved.

20  Q.  But it had to be approved, correct?

21  A.  Yes.

22  Q.  I'd like to show you another exhibit which is Exhibit 79.

23          MR. BHANDARI:  And if I could have Exhibit 79 entered

24  into evidence.

25          MR. WITTELS:  No objection.

1          THE COURT:  Received.

2          (Plaintiff's Exhibit 79 received in evidence)

3   Q.  On Exhibit 79, if we could look at the very first page,

4   which is February 1, 2010, now I'd like to just zoom in on this

5   a little bit.  If we could look, if we could zoom in on the

6   time ins.

7          Mr. Schantz, does it appear any of the time ins have

8   been altered in any way?

9   A.  Yeah, it looks like one of them or so is changed.

10  Q.  And which one is that?

11  A.  Buffalino, Charles Buffalino.

12  Q.  Is it possible to figure out exactly what that change was?

13  A.  No.

14  Q.  Now going to the next page, do you see your name on here?

15  A.  I do.

16  Q.  And is that your social, the last four digits of your

17  social security number?

18  A.  Yes, it is.

19  Q.  Is that your signature at the end?

20  A.  Yes.

21  Q.  Now I'd like to draw your attention to a couple things.

22  The time in, what time is the number that's written on top, the

23  number --

24  A.  10 o'clock.

25  Q.  Does appear that number was changed in any way?

1   A.  It looks like it was written over.

2   Q.  So this is an example of a day when your shift was supposed

3   to be 10 a.m. to 6:30 p.m., correct?

4   A.  Correct.

5   Q.  But you would have gotten there before 10 a.m., correct, in

6   order to start your 10 o'clock shift?

7   A.  Yes.

8   Q.  And did you write in 9 a.m.?

9   A.  Not sure.  I don't recall.  Could be.  There was definitely

10  another number under there.

11  Q.  What time would you get in for your 10 o'clock shift?

12  A.  About 9:15, give or take.

13  Q.  Okay.  So, Mr. Schantz, you can close that for now.  I want

14  to ask you about something totally different.

15          During the day when you were out in the field -- so,

16  Mr. Schantz, we saw all of your sign-in sheets to the best of

17  your recollection show that you signed in at 8 a.m. every

18  morning, correct?

19  A.  Correct.

20  Q.  But you started work before 8 a.m. every single morning,

21  correct?

22  A.  Correct.

23  Q.  And most of your sign-in sheets showed that you signed in

24  at the end of what your regular shift was supposed to be, which

25  was usually 4:30 p.m., correct?

F5ILMCG4                          Schantz – Direct

1    A.  Yes.

2    Q.  But you worked past 4:30 p.m. many times, correct?

3    A.  Correct.

4    Q.  And you didn't get overtime for that, correct?

5    A.  No.

6    Q.  Now, during your work day, did you ever eat food during the

7    day?

8    A.  Yeah, I ate during the day.

9    Q.  And you would eat, on a normal week, if it was a five-day

10   week, how many times during the week would you eat?

11   A.  It depends.  A lot of the eating was just on the fly, be on

12   the run going from one job to another, kind of like a bag

13   lunch.  But a typical designated half-hour break, uninterrupted

14   break, probably about maybe once a week I'd get to sit down.

15   Q.  Mr. Schantz, let me step you for a second.  My question is

16   not how long it would take you to eat.  It sounds like you

17   would eat five days a week, correct?

18   A.  Yes.

19   Q.  But you just testified that sometimes you would eat while

20   you were on the fly?

21   A.  Correct.

22   Q.  What do you mean by that?

23   A.  A lot of the time.

24   Q.  So what does that mean you would eat while you were on the

25   fly?

F5ILMCG4                          Schantz - Direct

```
 1   A.  Well, we were just in the truck, we were going from one job
 2   to the other.  You had a sandwich in the bag and you were going
 3   to eat, stuff like that.  When I first started working with
 4   Jimmy, he would have a bag lunch and I would pack a bag quick
 5   and we would try to take five, ten minutes and shoot it down
 6   and keep moving.  There wasn't much down time to start off with
 7   the job.
 8   Q.  And when you say you would eat in a few minutes and keep
 9   moving, who would be driving the truck?
10   A.  When I first started, Jimmy was driving the truck.
11   Q.  And when you would drive the truck, you would actually eat
12   while you were driving?
13   A.  Pretty much, yeah.
14   Q.  You said one day a week you would take a full half-hour
15   uninterrupted lunch, correct?
16   A.  Yes, try to.
17   Q.  What would you do for that uninterrupted lunch?
18   A.  Maybe stop pizzeria or Chinese food or something to that
19   extent, if you had time.
20   Q.  Now, I'd like to -- before I do that, did anyone ever talk
21   to you about eating lunch while you were working in CCI?
22   A.  Yes.
23   Q.  Who spoke to you about eating lunch while you were working
24   at CCI?
25   A.  Charlie.
```

1    Q.   Charlie Loguidice?

2    A.   Charlie Loguidice, yes.

3    Q.   What did Mr. Loguidice tell you about eating lunch?

4    A.   He said, basically he said if you don't take your lunch,

5    just you got to get the jobs done, you know.  If you have time

6    to take a lunch, you take it.  If not, if it's going to affect

7    your numbers, then you don't have time to take a lunch.

8    Q.   And at some point did you ever start signing a document

9    which was referred to as break sheets?

10   A.   Yes.

11           MR. BHANDARI:  Your Honor, I'd like to have entered

12   into evidence Defendant's Exhibit P.  However, we only have one

13   copy of the binder ourselves, and I think your Honor should

14   have the defendant's volume two.  And then we need one copy for

15   the witness or we can show it to him on the screen.

16           May I approach, your Honor?

17           THE COURT:  Yes.

18           MR. BHANDARI:  Your Honor, we'd like to have Exhibit P

19   entered into evidence.

20           MR. WITTELS:  No objection.

21           THE COURT:  Received.

22           (Defendant's Exhibit P received in evidence)

23           MR. BHANDARI:  Can we pull it up.

24   Q.   All right, Mr. Schantz.  So this is Defendant's Exhibit P.

25   Do you recognize what this document is, just generally what

F5ILMCG4                           Schantz - Direct

1    it's called?

2    A.  It was a break sheet.

3    Q.  And the date on this break sheet is August 23, 2010, if you

4    look at the very bottom, correct?

5    A.  Yes.

6    Q.  And according to the top, if you look at the top right-hand

7    corner, it says the week starting and the week ending, correct?

8    A.  Yes.

9    Q.  And so what was the week for this break sheet?

10   A.  It was August 17 to August 23.

11   Q.  So this was August 17 to August 23, 2010, correct?

12   A.  Correct.

13   Q.  When did you start working at CCI?

14   A.  I started working May 20, 2009.

15   Q.  So when did you first start filling out these weekly time

16   sheet with breaks?

17   A.  Probably around that time.  It wasn't -- it was probably

18   about a year and a half into the contract or so.

19   Q.  So just so we're clear on this, when you first started

20   working at CCI in May of 2009, did you fill out weekly time

21   sheets?

22   A.  No.

23   Q.  Sorry.  I asked that question wrong.

24           Did you fill out weekly time sheets with breaks?

25   A.  No.

1    Q.  And approximately a year to a year and a half later is when

2    you first started filling out the weekly time sheets with

3    breaks; is that right?

4    A.  Yes.

5    Q.  And who asked you to start filling out these weekly time

6    sheets with breaks?

7    A.  Charlie Loguidice.

8    Q.  And what did he tell you about filling out these time

9    sheets?

10   A.  He said it's a new protocol and you got to document when

11   you're taking your breaks, they need to know.

12   Q.  And did he tell you how long your breaks were supposed to

13   be for a morning break and for a meal break?

14   A.  No.

15   Q.  He didn't tell you how long they were supposed to be?

16   A.  No.

17   Q.  Well, you filled in times on these break sheets, correct?

18   A.  Right.

19   Q.  Did you actually take breaks and meals at these times?

20   A.  No.

21   Q.  So why did you fill -- why did you fill in these break

22   sheets with meals and breaks at these times if you didn't

23   actually take the meals and breaks?

24   A.  We filled them out.  That's what we were told to do, we

25   needed to sign.  It was part of our paperwork.  Whether we took

1    a break or not, it had to get done.

2    Q.  So let's start at the top.  There's two parts to each of

3    these sheets, correct, a top and a bottom half?

4    A.  Yes.

5    Q.  And for the bottom half, there's kind of a gray line which

6    says meal break to the far left.  Do you see that?

7    A.  Yes.

8    Q.  How long were you expected to write in for your meal break?

9    A.  Fifteen minutes for your break, and for your lunch break, a

10   half-hour.

11   Q.  Who told you that you were supposed to do 15 minutes for

12   your break and half-hour for your lunch?

13   A.  I believe it was Charlie.

14   Q.  And did you write down 15 minutes for your break and a

15   half-hour for your lunch every day?

16   A.  I did, yes.  That's what I was told to do.

17   Q.  Now, would you fill these out each day when you took the

18   break and took the lunch?

19   A.  No.

20   Q.  When would you fill these out?

21   A.  Sometimes at the end of the week.  Sometimes it was prior

22   to the week.  It was one less piece of paperwork that I had to

23   get done for the week.  Sometimes I filled it out prior.

24   Q.  Is it your understanding that Mr. Loguidice knew that you

25   were not actually taking lunch on the times when you said you

1    were taking lunch?

2              THE COURT:  Sustained.

3              MR. BHANDARI:  All right.

4    Q.  Did you tell Mr. Loguidice that you were taking lunch every

5    single day?

6    A.  Personally?

7    Q.  Yeah, did you ever tell Mr. Loguidice that?

8    A.  No.

9    Q.  When -- you said that Mr. Loguidice or Mr. Solimine would

10   call you when you were out in the field, correct?

11   A.  Correct.

12   Q.  Did they ever tell you to take lunch?

13   A.  No.

14   Q.  Did they ever ask you if you were taking lunch?

15   A.  No.

16   Q.  And they would call you how many times a day in a typical

17   day?

18   A.  Depending, two, three times a day.

19   Q.  And would they ever come out and visit you when you were

20   out in the field?

21   A.  Sometimes.

22   Q.  And when they came out to visit you, did they ever tell you

23   you need to take a lunch?

24   A.  No.

25   Q.  Were you ever told by anybody at CCI that you must in fact

1    take a lunch?

2    A.  No.

3    Q.  But did people at CCI tell you that you had to fill out

4    these time sheet with breaks every single week?

5    A.  Right.

6    Q.  Why did you do it if you knew that the information was

7    wrong?

8    A.  I just -- we did it because that's what we were told to do.

9    I was told to fill out the break sheet.  Like I said, most of

10   the time I filled out prior.  And when I was filling it out, if

11   you look at the numbers, they're all arbitrarily numbers,

12   different numbers.  It made it easy for me to add 15 and add

13   30.

14   Q.  You have different numbers every single day, it appears.

15   Why did you do that?

16   A.  No reason for it.  Just tried to maybe make look a little

17   more official.

18   Q.  And why were you trying to make it look official?

19   A.  I was keen on my paperwork and I always wanted everything,

20   you know, to look good.

21   Q.  Let's talk about your paperwork a little bit.

22              THE COURT:  I wonder, counsel, if this is a good time

23   to give the jury their afternoon break.

24              MR. BHANDARI:  Absolutely.

25              THE COURT:  Good.  We'll take a 15-minute break.

F5c1mcg5

1          (In open court; jury not present)

2          THE COURT:  So my law clerk is going to hand each

3     counsel a copy of the proposed preliminary instruction.  I do

4     this pretty much in every case where I give the jury a heads up

5     as to the basic issues on the second day of trial.  So take a

6     look at this tonight.  If you have any proposed additions or

7     corrections or suggestions, email them to my law clerk no later

8     than 9:00 tomorrow morning and we'll take it up when we

9     reconvene early tomorrow afternoon.  In that regard, we will

10    probably start tomorrow at 1:30 and go till 5.

11          All right.  Let's bring in the jury.

12          MR. WITTELS:  Judge, if I may.

13          THE COURT:  Yes.

14          MR. WITTELS:  Can you give us the email address.

15          THE COURT:  Pardon?

16          MR. WITTELS:  Her email address?

17          THE COURT:  Oh, you don't have that?

18          MR. WITTELS:  I don't know if I have it.

19          THE COURT:  Okay.

20          (Discussion off the record)

21          (Jury present)

22          THE COURT:  Okay.  Juror no. 2, do you want to come to

23    the sidebar, please.  With counsel.

24          (At the sidebar)

25          THE COURT:  So I've received a note from Ms. Tyson,

F5c1mcg5

juror no. 2:

            "Dear Judge Rakoff:  I've been feeling increasingly
ill yesterday and today.  Diarrhea.  I was unfortunately bit by
a cat on Friday, and I noticed today that it is very red and
more swollen throughout the whole area.  I spoke with
Ms. Kotowski and showed her the wound.  She is concerned and
asked me to write you this note.  Thank you."

            So thank you very much.

            JUROR:  Do you want to see it?

            THE COURT:  No, I'm -- oh, yes.  Oh, yes.  Look at
that.  It is really quite -- being myself a dog lover, all I
can tell you is, you've got to watch out for those cats.

            JUROR:  Yes.

            THE COURT:  So anyway --

            JUROR:  I'm taking care of the cat for somebody.

            THE COURT:  All right.  I think between that and your
issue with your mother, I think I'm going to excuse you, but
thank you so much for bringing that to my attention.

            JUROR:  What should I do in terms of the jury pool?
Like should I inform them that I'm not sure that I'll be in
tomorrow?

            THE COURT:  No.  I'm going to tell them right now that
due to a combination of circumstances -- they've heard about
your mother so they --

            JUROR:  I don't want to waste everybody's time, but --

F5c1mcg5

1              THE COURT:  That due to a combination of

2    circumstances, it has made it appropriate to excuse you.  You

3    just go back to the jury room and get your stuff and leave.

4    You should not discuss the case, however, with anyone.  Okay?

5              JUROR:  No, not at all.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  Ladies and gentlemen, a combination of

3     circumstances, some of which you heard about earlier, makes it

4     appropriate to excuse juror no. 2.

5          So what I'm going to ask you to do is, juror no. 3,

6     can you move over one.  Everyone should just basically move one

7     seat.  Juror no. 3 is now juror no. 2.  Congratulations.  And

8     so forth.  You know, keeping the same order, but just moving

9     over.  And then that will make it nice and cozy.

10         All right.  Very good.  Let's continue.

11    BY MR. BHANDARI:

12    Q.  Good afternoon again, Mr. Schantz.  You know you're still

13    under oath, correct?

14    A.  Correct.

15    Q.  Now right before we took our break we were talking a little

16    bit about paperwork.  Do you remember that, Mr. Schantz?

17    A.  Yes.

18    Q.  Now did you hear in the opening statement when CCI's

19    attorney said that plaintiffs had destroyed evidence relating

20    to their hours?  Did you hear him say that?

21    A.  Yes, I did.

22    Q.  Let me ask you this:  First, you testified earlier that you

23    made photocopies of paperwork when you went to the CCI offices

24    in the morning, correct?

25    A.  Correct.

F5c1mcg5                          Schantz - Direct

1    Q.   What paperwork would you make copies of?

2    A.   The paperwork I would make a copy of was my work report for

3    the day and some of the grid sheets and the AMR sheets.

4    Q.   Can I show you -- this is a different binder.

5              MR. BHANDARI:   Your Honor, would I be able to present

6    the witness and you with a different binder?

7              THE COURT:   Yes.

8              MR. BHANDARI:   This is plaintiff's trial binder IV.

9              THE COURT:   Oh, he's going to be so excited to have

10   another binder like that.

11             Go ahead.

12             MR. BHANDARI:   May I approach.

13             THE COURT:   Yes.

14             MR. BHANDARI:   Okay.   Thank you.

15   BY MR. BHANDARI:

16   Q.   I'd like to draw your attention to Plaintiff's Exhibit 118.

17             MR. BHANDARI:   I'd like to have Plaintiff's

18   Exhibit 118 entered into evidence.

19             THE COURT:   Any objection?

20             MR. WITTELS:   Judge, I'm -- could we approach at the

21   sidebar real quick.

22             THE COURT:   Well, hold on a minute.   If necessary, you

23   can approach, but give me in one word the nature of the

24   objection.

25             MR. WITTELS:   Foundation.

1           THE COURT:  Foundation.  All right.  Lay a foundation.

2    BY MR. BHANDARI:

3    Q.  Okay.  Mr. Schantz, do you recognize the general type of

4    document that is Plaintiff's Exhibit 118?

5    A.  In 118?

6    Q.  Yes.

7    A.  Yes.

8    Q.  Sorry.  What is 118?

9    A.  Daily worksheet.

10   Q.  Is that like a route sheet?

11   A.  I wouldn't call it a route sheet.  I would just call it

12   your final, you know, your daily schedule, your daily route

13   work.

14   Q.  Okay.  And when would a document like this be filled out in

15   general?

16   A.  Throughout the day and a lot of times when you came back.

17           THE COURT:  Who fills this out?

18           THE WITNESS:  The installers.

19   Q.  And for example, you were an installer, correct?

20   A.  Right.

21   Q.  Now on this one, the last name is Frische, correct?

22   A.  Yes.

23   Q.  And do you know an installer whose name is Frische?

24   A.  Yes, I do.

25   Q.  What was his full name?

1   A.   Joe Frische.

2   Q.   And is this, generally speaking, the type of record that

3   was kept by the installers when they were doing their job on

4   the AMR project?

5   A.   Yes.

6   Q.   But you did not create this particular grid sheet, correct?

7   A.   No, I didn't.

8        MR. BHANDARI:   Okay.  Your Honor, we would like to

9   move it into evidence as a business record.

10       THE COURT:   So if defense counsel is challenging that,

11  you may have voir dire.

12       MR. WITTELS:   Thank you, Judge.

13  VOIR DIRE EXAMINATION

14  BY MR. WITTELS:

15  Q.   Mr. Schantz, you didn't fill out anything on this sheet,

16  correct?

17  A.   That I'm looking at here?

18  Q.   Exhibit 118.

19  A.   No, I didn't.

20  Q.   None of that's your handwriting, correct?

21  A.   Correct.

22  Q.   You've never seen that sheet, couldn't testify as to the

23  veracity of the information written down on that sheet,

24  correct?

25  A.   Well, with the information I could look at it and get a

F5c1mcg5                      Schantz - Direct

1   general idea of what his day was like.

2   Q.  His day but not your day.

3   A.  No.

4   Q.  And you didn't keep this record in your normal course, this

5   particular document, in your record.

6   A.  This record, correct.

7            MR. WITTELS:  That's all I have.

8            THE COURT:  Who keeps these records normally, if you

9   know?

10           THE WITNESS:  Well, everybody had a different kind of

11   system where they kept their stuff, but as any installer, some

12   guys photocopied their paperwork for their -- for their daily

13   day, just in case down the road if anything -- there was a

14   problem or if you were asked about a particular account, you

15   were able to go back on it and recollect.

16           THE COURT:  So, for example, in this case Mr. Frische,

17   assuming he filled it out, he would have kept it?

18           THE WITNESS:  Well, the -- he would have photocopied

19   it, he would have kept one for himself, and then one of these

20   would go to the -- to Angelo's desk.

21           THE COURT:  And remind me who Angelo was.

22           THE WITNESS:  Angelo is the project manager.

23           THE COURT:  And this would have been filled out for

24   each day?

25           THE WITNESS:  Yes, by each -- each person, or each

F5c1mcg5                         Schantz - Direct

1   team.

2              THE COURT:  And then at least a copy given to Angelo

3   at the end of the day?

4              THE WITNESS:  At the end of the day.

5              THE COURT:  Well, on the objection of foundation, I

6   will receive this as a business record.  However, I'm not yet

7   prepared to admit this particular one into evidence because you

8   haven't established relevance vis-à-vis this witness.  So the

9   immediate objection is overruled, but you now need to establish

10  relevance, if you can.

11             MR. BHANDARI:  Sure.

12  BY MR. BHANDARI:

13  Q.  Did you, Mr. Schantz, create paperwork similar to

14  Plaintiff's Exhibit 118?

15  A.  Yes.

16  Q.  Okay.  And when you created that paperwork, did you also

17  make copies for yourself?

18  A.  I did.

19  Q.  Now this particular type of document, which you made copies

20  of for yourself, did this indicate the number of hours that you

21  worked when you created such documents for yourself?

22  A.  No, it doesn't.

23             MR. BHANDARI:  Your Honor, I just want to get it

24  entered into evidence for the type of record that's similar to

25  the one he had.  Well, let me ask a few more questions.

1   Q.  Did you keep copies of these grid sheets for a certain

2   period of time after you made photocopies?

3   A.  I built them up.  I tried to keep them for at least a few

4   months after the work was complete.

5   Q.  Then what would you do with them after a few months?

6   A.  I would discard them.

7   Q.  And so these documents which you discarded, you created

8   grid sheets and then you discarded them, correct?

9   A.  Yes, after a while they stacked up, you know, I'd bring

10  them home and then I'd try to get rid of them.

11  Q.  Were the grid sheets you created substantially similar to

12  the grid sheets that were created by Mr. Frische that are

13  Plaintiff's Exhibit 118?

14  A.  Yes.

15  Q.  And did those grid sheets that are Plaintiff's 118 contain

16  any indication of the hours worked by Mr. Frische?

17  A.  No.

18  Q.  Did the grid sheets you created have any indication of the

19  hours you worked?

20  A.  No.

21  Q.  And you don't have those grid sheets that you created

22  anymore, correct?

23  A.  I don't have them anymore, no.

24       MR. BHANDARI:  Your Honor, I'd like to have

25  Plaintiff's Exhibit 118 entered into evidence simply --

1          THE COURT:  I still don't think it has more than the

2     most remote relevance, and whatever relevance it may have at

3     this point with this document, the potential for confusion

4     outweighs the relevance, so it is not admitted, without

5     prejudice to your admitting it through some witness that it's

6     more relevant to.

7          MR. BHANDARI:  All right.  Understood, your Honor.

8     Thank you.

9     BY MR. BHANDARI:

10    Q.  So let's talk about your paperwork in general.  Do you have

11    any paperwork that you copied when you were working at CCI

12    currently?

13    A.  Currently, no.

14    Q.  And you discarded it before coming to court here today,

15    correct?

16    A.  Yeah, way back, you know, long back.

17    Q.  Did any of the documents you had indicate the hours that

18    you worked, as far as you can remember?

19    A.  No, none of the paperwork that I kept had any of the hours

20    on it, just the work that was done.

21    Q.  And did you discard it for any reason related to this

22    lawsuit?

23    A.  No.

24    Q.  Now let's go to a different topic.  Have you heard of

25    something called the incentive program?

F5c1mcg5                         Schantz - Direct

1    A.   Yes.

2    Q.   What was the incentive program when you were working at

3    CCI?

4    A.   If you hit a certain amount of jobs throughout the day, you

5    could go home early.

6    Q.   Do you remember what the number of jobs were that you had

7    to hit in order to go home early?

8    A.   They seemed to range from -- the best of my recollection,

9    it was equivalency of about eight or ten meters.

10   Q.   And did you ever get to go home early as part of the

11   incentive program?

12   A.   I might have took advantage of it maybe once or twice.

13   Q.   So thinking back, did you participate in the incentive

14   program on more than two occasions?

15   A.   Not that I recall, no.

16   Q.   So you worked there from May of 2009 till December of 2011,

17   correct?

18   A.   Correct.

19   Q.   And during that entire period of time you only recall

20   taking part in the incentive program on two occasions, is that

21   correct?

22   A.   Two occasions.  Maybe -- maybe three.

23   Q.   Do you remember any of them?

24   A.   No, I don't.

25   Q.   So tell me how you -- if you finished the number of meters

F5c1mcg5                    Schantz - Direct

1   that you were supposed to finish, would you just get to go

2   straight home?

3   A.   No.

4   Q.   How did the incentive program work?  What would you have to

5   do before you could go home?

6   A.   It was -- you'd have to call either Charlie or Angelo and

7   let them know what the numbers were, did I hit the incentive,

8   and it seemed that some of the numbers ranged, you know --

9   sometimes guys would go home doing eight meters and some guys

10  would be told try to get a couple more.  There was no set

11  number.  So you always call not knowing if you really did hit

12  the incentive.

13  Q.   And did you call up sometimes asking if you hit the

14  incentive and the answer was no?

15  A.   Maybe one time.

16  Q.   Did you try hard to participate in the incentive program

17  yourself?

18  A.   I was a team player out there.  I know there was a lot of

19  guys struggling out there, and it didn't feel right to leave

20  guys high and dry out there that were struggling to make their

21  numbers, so I didn't make it a big part of my job career or an

22  incentive for me.

23  Q.   So let's say you hit the number that was the number of

24  meters you changed in order to be able to go home early.  What

25  would you do on a typical day after hitting that number?

F5c1mcg5                        Schantz - Direct

1  A.  On a typical day, after hitting that number, I would try to

2  reach out to the field, see who needs a bump, you know what I

3  mean, a little help out there, you know, rather than just

4  calling up and not worrying.  Some of the guys, they didn't

5  care.  They just -- they fled.  You know, guys are out there

6  struggling.  I wasn't -- I was more a team player.

7  Q.  How would you reach out to the other guys in the field?

8  A.  On the -- on the Nextel phone, you know, you could do like

9  a group or you could talk to Charlie or Angelo, see if anybody

10 needs help, you know.

11 Q.  And so again, to just be clear on this, between May of 2009

12 and December of 2011, you participated in the incentive program

13 two or three times, is that correct?

14 A.  Yes.

15 Q.  Could it have been more than that?

16 A.  I don't think it was more than that, no.

17 Q.  Now when did the incentive program -- you started in May of

18 2009.  Was the incentive program in place from the very first

19 day you started?

20 A.  No.

21 Q.  So when did the incentive program even get started?  Was it

22 one month after, a few months after?  Do you remember when?

23 A.  At least a few months.  Could be maybe a half a year.  I'm

24 not exactly sure.

25 Q.  And did there come a time towards the end of the project

1  when the incentive program wasn't in place?

2  A.  I believe so, yes.

3  Q.  And do you remember when that was?

4  A.  Towards the end, you know, when -- when everybody was

5  loaded with appointments, you basically had to stick around

6  'cause you had to wait for the afternoon appointments.

7  Q.  Now earlier you testified that you had a truck and you

8  would load up the truck in the mornings and you would unload

9  the truck in the afternoons, is that correct?

10  A.  Correct.

11  Q.  And that was a company car?

12  A.  It was a company car, yes.

13  Q.  And when you had a company car, were you responsible for

14  maintenance on the company car?

15  A.  We were.  We were responsible for -- for oil change and

16  brake changes and maintenance of a weekly wash.

17  Q.  When you say a weekly wash, what do you mean by that?

18  A.  Well, every week they wanted your truck, you know, to start

19  off the week very, you know, clean.  Towards the end of the

20  week you kind of washed the truck.

21  Q.  When would you wash the truck, would you wash the truck

22  while you were on a shift?

23  A.  No.  It was usually on the weekends or after your shift was

24  over.

25  Q.  And when would you change the oil?

1  A.  The oil I would change when it was -- when it was due, you

2  know, after every 3,000.  I would usually try to do that on a

3  weekend too or when I was off, at a local oil spot.

4  Q.  How long would it take you to wash the car?

5  A.  Half hour to an hour.

6  Q.  And how long would it take you to change the oil in the

7  car?

8  A.  Same thing; half hour to an hour.

9  Q.  And approximately how many months would it be between oil

10 changes?  You wouldn't do that every month, right?

11 A.  No.  It was probably maybe every two or three months.

12 Q.  And did you get compensated for any of the time that you

13 spent giving the car washes or doing oil changes?

14 A.  Well, they paid -- if you brought the receipt, they paid

15 for the -- for the oil change, but not the time.

16         MR. BHANDARI:  All right.  Mr. Schantz, thank you very

17 much.  I have no further questions at this time.

18         THE COURT:  Cross examination.

19         MR. WITTELS:  Thank you, your Honor.

20         MR. BHANDARI:  Oh, I'm so sorry.  I'm absolutely

21 sorry.  I actually have one entire area of questioning that I

22 have.  I'm sorry.  Would you mind.  I apologize to everyone for

23 that.

24 BY MR. BHANDARI:

25 Q.  Sorry, Mr. Schantz.  So this is -- I just want to be clear

1   about the time that you were working at CCI that you did not

2   get paid for.

3            So starting in the mornings, what time would you

4   typically get there and start doing work?

5   A.  Typically 7:00, 10 to 7.

6   Q.  You would get to CCI before 7, correct?

7   A.  Yes.

8   Q.  Well, what would you do before 7 a.m., before they opened

9   the gates?

10  A.  I would wait in the truck or take a look at my stock and

11  clean up, tidy stuff up, maybe finish some last-minute

12  paperwork.

13  Q.  And then starting at 7 a.m., what would you be doing?

14  A.  Starting at 7 a.m., once the gate opened up, I would get my

15  route materials, CN3 and paperwork.

16  Q.  So on a typical day, how much time -- you'd be working

17  between 7 a.m. and 8 a.m. on a typical day, is that correct?

18  A.  Yes.

19  Q.  But you never signed in before 8 a.m., is that correct?

20  A.  Correct.

21  Q.  Okay.  So is it correct that you did approximately one hour

22  of work in the morning on a typical day that you did not get

23  paid for?

24  A.  Yes.  One hour, yes.

25  Q.  In the afternoons, you said that it took you approximately

1    20 or 30 minutes to finish your checkout routine, correct?

2    A.  Yes.

3    Q.  Now some days you would get back to the office at 4:30,

4    correct?

5    A.  Yes.

6    Q.  And on those days you would get out between 4:50 and 5:00,

7    is that correct?

8    A.  Yes.

9    Q.  Would you ever get back to the office after 4:30 p.m. or

10   after 6:30 p.m. for the different shift but not get paid

11   overtime?

12   A.  Can you repeat that one more time.

13   Q.  Sure.  Would you ever get back to the office after

14   4:30 p.m. but not get paid overtime?

15   A.  Yes.

16   Q.  So this question is, on days when you got back to the

17   office after 4:30 p.m. but did not get paid overtime, what

18   would be the average time that you'd be getting back to the

19   office on a day where you were not getting overtime but you

20   were coming back after 4:30 p.m.?

21   A.  I would try to get back for about maybe a quarter after 4,

22   20 after 4, try to get back to it, knowing that to get all

23   wrapped up and said and done is another 20, 30 minutes.

24   Q.  So some days you'd get back to the office at about 4:40 or

25   4:45 and then it would take you another 20 minutes to half

F5c1mcg5                          Schantz - Direct

1    hour, correct?

2    A.  Yes.

3    Q.  So that would mean that you'd get out of the office between

4    5:15 and 5:30 on those days, is that correct?

5    A.  If I got back that late, yes.

6    Q.  But you didn't get back that late every day, correct?

7    A.  No.

8    Q.  In fact, fair number of days you got back at 4:30 or

9    before, correct?

10   A.  Yes.  That's what I tried to shoot for.

11   Q.  So on average, if you took all of this on the days where

12   you got out at 5:30 on some days and you got -- you came back

13   to the office and you got out by 4:30, you'd leave the CCI

14   office at 4:30, if you averaged it all together, what would you

15   say did is the average time on a typical day that you would be

16   leaving the CCI office?

17   A.  The average time?

18   Q.  Yes.

19   A.  Usually about 4:40 to 10 to 5.

20   Q.  Okay.

21   A.  Approximately.  Around there.  Give or take.  If I got back

22   at 4:15, I might be able to get out of there by 4:40, but

23   sometimes when I got back at 4:30, it was close to 5:00.

24   Q.  And some days you'd get back at 4:45 and it would be closer

25   to 5:15.

F5c1mcg5                         Schantz - Direct

1   A.  Yes.

2   Q.  So would it be fair to say on a typical day, on average,

3   some days it would be an hour after 4:30?  If you left at 5:30,

4   that would be an hour later, correct?

5   A.  Yes.

6   Q.  But some days you'd get out at 4:30, correct?

7   A.  Yes.

8   Q.  And some days you might even get out at 4:15, correct?

9   A.  Yes.

10  Q.  But if you average it all out together, fair to say that it

11  was between 4:50 and 5:00, 20 to 30 minutes would be the extra

12  overtime at the end of the day?

13  A.  Yes.  Yeah.

14  Q.  Okay.  So let's say that it is 20 to 30 minutes.  30

15  minutes would be a half hour, correct?

16  A.  Okay.

17  Q.  And 20 minutes would be 1/3 of an hour, correct?

18  A.  Yeah, right.

19  Q.  So halfway between 1/3 and a half hour -- this is where it

20  gets tricky -- is .4, between .41 and .42, I believe.  So let's

21  just say it's .4.  Can we round out and make it .4?

22  A.  Yes.

23  Q.  So in the afternoon it would be a little bit less than a

24  half hour on average that you were given time, if we round out

25  a little bit, correct?

F5c1mcg5                          Schantz - Direct

1   A.  Correct.

2   Q.  Now for lunches, you testified one day a week you took a

3   full half-hour lunch, correct, uninterrupted, with an

4   uninterrupted lunch one day a week, correct?

5   A.  Tried for one day a week, yes.

6   Q.  But four days out of the week, typically, you would be

7   eating on the run, correct?

8   A.  Yes.

9   Q.  And so you'd be going from one job to another, is that

10  right?

11  A.  Correct.  Sometimes not eating at all.

12  Q.  Sometimes not eating at all?

13  A.  Yes.

14  Q.  So if we just take those four days and it's a half hour

15  each day, that comes to two hours.  Four times a half hour

16  comes to two hours, which is 120 minutes?

17  A.  Okay.

18  Q.  So let's say on a typical day -- if we take that 120

19  minutes each week and then we break it down to five days, which

20  is a normal week, that comes to -- if you divide 120 by 5, I

21  believe that comes to 24 minutes a day.  So that's, again, a

22  little bit more than a third of an hour.  So between -- yeah,

23  it's a little bit more than a third of an hour.  So can we say

24  that that's a .3?

25  A.  Yes.

1    Q.  Okay.  So again, rounding down.  Actually, that would be --

2    sorry.  Can we figure out exactly what that is?  I don't want

3    to round down all of your time, and on that one we should be

4    able to do it.  I just can't do it.  I'm sorry.

5             MR. BHANDARI:  .4?  Oh, so it's .4 also.

6    Q.  So 24 minutes is .4.  So that means on a typical day, if

7    you had one hour of unpaid time in the morning and then you

8    would work 20 to 30 minutes of unpaid time in the afternoon and

9    you would not have lunch, an uninterrupted lunch, that comes to

10   a total of 1.8 hours on a typical day.  Is that correct?

11   A.  Correct.

12   Q.  And what was the approximate -- what was the amount you

13   were supposed to get paid each day?  What was your base rate,

14   if you remember?

15   A.  Base rate?

16   Q.  Yeah.

17   A.  Daily base rate?

18   Q.  Hourly.

19   A.  Hourly was $45 an hour.

20   Q.  Okay.  Around $45 an hour?

21   A.  Yes.

22             MR. BHANDARI:  Okay.  Thank you.  I have no further

23   questions.

24             THE WITNESS:  Thank you.

25             THE COURT:  All right.  Cross examination.

1              MR. WITTELS:  Thank you, Judge.

2   CROSS EXAMINATION

3   BY MR. WITTELS:

4   Q.  Mr. Schantz, during the time that you worked at CCI, there

5   was in fact an overtime policy, isn't that correct?

6   A.  Yes.

7   Q.  And the overtime policy was that you got paid overtime if

8   you worked more than 40 hours a week, correct?

9   A.  Correct.

10   Q.  Now we started to get into records and records that you

11   kept and records that you didn't keep.  You kept records of the

12   actual work that you performed at least for some period of

13   time, correct?

14   A.  Correct.

15   Q.  And that was your choice, correct?

16   A.  Yes, it was.

17   Q.  All right.  The company didn't require you to make copies

18   of your records, right?

19   A.  Didn't require it.

20   Q.  And it was something that you thought benefited you,

21   correct?

22   A.  Me and the company itself.

23   Q.  And on these records that you kept for your own personal

24   use, you didn't record any of the times that you worked any

25   day, correct?

F5c1mcg5                        Schantz - Cross

1   A.  No, I didn't take any recordings.

2   Q.  And you didn't keep records of the hours that you worked

3   because you didn't need to, right?

4   A.  Most of the time, yes.

5   Q.  Because you knew you worked 40 hours a week every week,

6   there was no reason to keep track of your hours, right?

7   A.  Yes.

8   Q.  But you didn't work 40 hours every week, isn't that

9   correct?

10  A.  Correct.

11  Q.  You're testifying here today that there were weeks that you

12  worked more than 40 hours, correct?

13  A.  Yes.

14  Q.  And you had no record of that, correct?

15  A.  It was never recorded, no.

16  Q.  And there were weeks that you worked less than 40 hours

17  even if we add -- if I can see the chart.  Looks like 1.8 hours

18  a day.  If we add the 1.8 hours a day that you're now

19  testifying to, there were still weeks that you didn't work 40

20  hours, right?

21  A.  Yes.

22  Q.  You were still working for CCI at the time this lawsuit was

23  filed, correct?

24  A.  Correct.

25  Q.  And it was brought to your attention that this very lawsuit

F5c1mcg5                         Schantz - Cross

1   that we're here today on was filed by one of your ex-coworkers,

2   correct?

3   A.  Yes.

4   Q.  And even after learning that the lawsuit had been filed,

5   you kept no record of the hours that you worked, correct?

6   A.  Correct.

7   Q.  Now you knew that there was a sign-in sheet, and we -- I

8   think the exhibit book is in front of you that has any

9   number -- 500 pages of sign-in sheets, correct?

10  A.  Correct.

11  Q.  You knew there was a sign-in sheet and it was your

12  responsibility on a daily basis to sign in and sign out,

13  correct?

14  A.  Correct.

15  Q.  No one could sign in for you, correct?

16  A.  No.

17  Q.  No, not correct?  Someone could sign in for you?

18  A.  No, nobody could sign in for you.

19  Q.  And nobody was allowed to sign out for you.

20  A.  No.

21          THE COURT:  No meaning correct.

22          THE WITNESS:  Correct, yes.  But I believe it did

23  happen -- it happened a few times, yeah.

24  Q.  And you weren't supposed to sign in or out for any other

25  employee, correct?

1  A.  Yes.

2          MR. WITTELS:  Judge, if I may approach the witness.

3          THE COURT:  Yes.

4          MR. WITTELS:  This is Exhibit II.

5  Q.  I've handed you Exhibit Defendant's II and ask you to turn

6  to page 2 of that exhibit.

7          First of all, is that your signature that appears?

8  A.  We are looking at the daily sign-in one or --

9  Q.  Yes, the daily sign-in one.

10 A.  That is my signature.

11 Q.  All right.  And --

12         MR. BHANDARI:  Sorry.  I'm looking at II.  Oh, there's

13 a revised II?

14         MR. WITTELS:  Yes.

15         MR. BHANDARI:  Oh, okay.

16 Q.  That's your signature that appears, correct?

17 A.  Correct.

18 Q.  And --

19         THE COURT:  Excuse me.  On both papers?  Both pages?

20         THE WITNESS:  On both pages, yes.

21 Q.  And on --

22         THE COURT:  Are you offering II?

23         MR. WITTELS:  I am offering II, Judge.

24         THE COURT:  Any objection?

25         MR. BHANDARI:  Only I would ask if we could get a copy

F5c1mcg5                              Schantz - Cross

1   of that, because that's not in the exhibit binder we have.

2                THE COURT:  All right.  Let me have my law clerk hand

3   you my copy so we can move this along.

4                MR. BHANDARI:  Thank you.  No objection.

5                THE COURT:  Received.

6                (Defendant's Exhibit II received in evidence)

7   BY MR. WITTELS:

8   Q.  And what's the date on that document?

9   A.  The date is 7/24/09.

10  Q.  So July 24th of '09 is when you executed that document,

11  correct?

12  A.  Correct.

13  Q.  And it states that it's your responsibility to sign in and

14  out every day, correct?

15  A.  Yes.

16  Q.  And it states that you're to state the correct start time

17  and end time of each day, correct?

18  A.  Correct.

19  Q.  And it states that falsifying the sign-in/signout sheet is

20  a serious company offense, correct?

21  A.  Correct.

22  Q.  So you understood the significance of the sign-in/signout

23  sheet on a daily basis, right?

24  A.  Correct.

25  Q.  You knew that that sheet was being turned in to DEP to

F5c1mcg5                         Schantz - Cross

1    verify your working hours, correct?

2    A.   That I didn't know it was getting turned in to the DEP, but

3    now I know.

4    Q.   Does the exhibit indicate that DEP is requiring the

5    sign-in/signout sheet, one of the things that you acknowledged?

6    A.   Yes, it does.

7    Q.   At some point -- August, I believe, 24th was the exhibit

8    that was put up before -- you began filling in meal break

9    sheets, correct?  I believe that's Exhibit P that is still in

10   front of you.

11   A.   Okay.  Correct.

12   Q.   Defendant's Exhibit P.  If you'd take a look at it.  It's

13   not in the binder.  It's the looseleaf pages that are up there.

14   Correct?

15   A.   Yes.

16   Q.   And you've now told us today that you didn't take the

17   breaks that are indicated on the meal break sheet, correct?

18   A.   Correct.

19   Q.   And it's your testimony that Charlie just told you to fill

20   in whatever you wanted to fill in but you'd better fill in

21   something, right?

22   A.   It had to get filled in, yes.

23   Q.   Is that your signature?  You have a whole stack of those

24   break sheets, is that right, in front of you?

25   A.   Yes.

F5c1mcg5                        Schantz - Cross

1    Q.  If you'll take a second to look through them.

2    A.  Okay.

3    Q.  You signed each and every one of those weekly break sheets,

4    didn't you?

5    A.  I did.

6    Q.  And by signing it, you've attested to the information as

7    true, you swore that the information was true, correct?

8    A.  Correct.

9    Q.  And now you're telling us all that none of it is true,

10   correct?

11   A.  Correct.

12   Q.  Besides Charlie and Angelo, or Mr. Loguidice and

13   Mr. Solimine, did you ever tell anybody at CCI that you were

14   falsifying your records?

15   A.  No.

16   Q.  You knew that you were supposed to take a half-hour meal

17   break, correct?

18   A.  Correct.

19   Q.  And your testimony is that on average once a week you took

20   a half-hour meal break.

21   A.  Correct.

22   Q.  And that was the whole time that you worked at CCI,

23   correct?

24   A.  Yes.

25   Q.  Day one through December 9, 2011, on average, once a week,

F5c1mcg5                          Schantz - Cross

1    you took a meal break.

2    A.  On average, yes.

3    Q.  No one told you what time you were supposed to take a meal

4    break, correct?

5    A.  No.

6    Q.  You had the discretion to take a meal break when and where

7    you wanted to take that break.

8    A.  Sometimes.

9    Q.  Sometimes.  So you're out in the field, Charlie didn't ride

10   with you, correct?

11   A.  No, he didn't.

12   Q.  Angelo didn't ride with you.

13   A.  No.

14   Q.  If you wanted to take a break at Burger King, you could

15   take a break at Burger King, if that was your choice.

16   A.  Yeah, if I was caught up on my work.

17   Q.  And your testimony is you didn't take a meal break 'cause

18   you couldn't get your work done, correct?

19   A.  Correct.  That was one of the reasons why I didn't have

20   time to take a break.  The job was very demanding.

21   Q.  You also testified that you, two to three times in your

22   entire career, took advantage of the incentive program,

23   correct?

24   A.  Correct.

25   Q.  Now there were other days that you finished the amount of

F5c1mcg5                          Schantz - Cross

```
 1   the quota that you chose to help other workers work; that's
 2   what you testified to, correct?
 3   A.  Yes.
 4   Q.  That was your choice, correct?
 5   A.  Well, it was never told that you hit the quota and you can
 6   go home or you can stay, you know.
 7   Q.  But it was your choice not to even call Mr. Loguidice or
 8   Mr. Solimine and see if you could go home; you decided on your
 9   own to go help other coworkers, correct?
10   A.  Correct.
11   Q.  When you were eligible, could have called in, maybe you
12   would have been given permission, maybe you wouldn't have, but
13   you didn't even try to call in, correct?
14   A.  Correct.
15   Q.  On those two or three days that you did take advantage of
16   the incentive, you got credit for working a full day even
17   though you didn't work a full day, correct?
18   A.  Correct.
19   Q.  But you were given eight hours' credit for working,
20   correct?
21   A.  I was, yes.
22   Q.  Now there were some guys that you worked with that took
23   advantage of that incentive program almost on a daily basis,
24   weren't there?
25   A.  I don't know about on a daily basis.
```

1   Q.  Well, your friend Scott Vaaler, who got you the job, left

2   early a lot, didn't he?

3   A.  I believe so.

4   Q.  And it was almost a daily basis for him to leave early;

5   call in, get quota, leave early.

6   A.  At some point in the contract.

7   Q.  Anthony Buffalino did the same thing, correct?

8   A.  Yes.

9   Q.  Were you ever paired with Scott Vaaler when he was going

10  home early?

11  A.  No.

12  Q.  Were you ever paired with Anthony Buffalino when he was

13  going home early?

14  A.  Not that I recall, no.

15  Q.  You testified that you lived, during the time that you

16  worked for CCI, in Hicksville, New York, correct?

17  A.  Correct.

18  Q.  If you left your house at 6 in the morning, how long did it

19  take you to get to the Ridgewood, Queens office of CCI on an

20  average day of commuting?

21  A.  Average day, probably about 40, 40 minutes.

22  Q.  All right.

23  A.  45 minutes.

24  Q.  So if you left at 6, you pulled up in Ridgewood around

25  6:45-ish, correct?

F5c1mcg5                          Schantz – Cross

1   A.  Correct.

2   Q.  If you left your house at 7, how long would the commute be?

3   A.  The commute would be longer, an extra 15.

4   Q.  20, 30, 40 minutes sometimes?

5   A.  Yeah, maybe double the time, yeah, double the amount of

6   time.

7   Q.  If you left at 7 from your house, you would never make it

8   to work on time at 8:00, would you?

9   A.  No.

10  Q.  So you left your house early for your convenience so that

11  you would avoid traffic and be able to get to work on time,

12  correct?

13  A.  Not for my convenience.  I left early so I could get there

14  so I had substantial amount of time to properly do my job.

15  Q.  And when you got there at 6:45, you couldn't go in to work,

16  right?  You couldn't go into the facility?

17  A.  No.  It was usually locked.

18  Q.  Gates were drawn and locked, right?  And Mr. Solimine and

19  Mr. Loguidice and some of the other management people were

20  inside working, getting the equipment ready for the day and

21  routing, preparing the handhelds and doing routing so that you

22  could get to work when they opened up, correct?

23          THE COURT:  Sustained.

24          MR. WITTELS:  I will rephrase.

25          THE COURT:  Good idea.

1           MR. WITTELS:  Thank you, Judge.

2    Q.  Mr. Loquidice and Mr. Solimine were at work before 7:00.

3    A.  No, not every day.  That's -- no.

4    Q.  There were management personnel at work before 7:00 every

5    day.

6    A.  Yes.

7    Q.  And one of the things they were doing was routing, correct?

8    A.  Correct.

9    Q.  And one of the other things they were doing was gathering

10   the equipment and organizing it for you to pick up in the

11   morning.

12   A.  Yes.

13   Q.  You didn't go through the warehouse and pick out your own

14   water meters, correct?

15   A.  Sometimes you did.

16   Q.  All right.  Most of the days the boxes of water meters were

17   set, ready for you to pick up when you got there.

18   A.  Towards the beginning, yeah.

19   Q.  You were actually -- well, nobody ever beat you to work,

20   did they, of the plumbers?

21   A.  Bobby Gandolfo was there most of the time when I showed up.

22   Q.  But either you or Bobby were always the first to be there.

23   A.  Pretty much.

24   Q.  You testified that you worked on some of the paperwork from

25   the day before, correct?

1    A.  Yes.

2    Q.  You didn't finish that on the day that it was supposed to

3    be turned in and so you came in early, you say, and did some of

4    your paperwork.

5    A.  Right.

6    Q.  When you turned in the meters the night before, were you

7    supposed to turn in the tags for the meters?

8    A.  The tags?  Can you repeat that?

9    Q.  The seals.

10   A.  Okay.  Yes.

11   Q.  And the seal cards.

12   A.  Yeah, right.  The meter sheet.

13   Q.  You weren't supposed to turn in a meter without a seal

14   card.

15   A.  Well, the meters were turned in without -- the seal cards

16   weren't given every day or every week.  They were kind of just

17   taken when you can give them to them.

18   Q.  But once you turned in a meter, you couldn't fill out a

19   seal card 'cause you no longer had the information.

20   A.  Well, you had your -- the information was on your grid

21   sheet.  That was one of the reasons why I photocopied my -- my

22   jobs, work, so I can go back and fill out seal cards when I had

23   time.

24   Q.  And did Charlie tolerate turning in meters without seal

25   cards?

F5c1mcg5                        Schantz - Cross

```
 1   A.  Yeah.  I remember there was -- the one time, I'm not sure
 2   exactly when it was, but they were all collecting seal cards.
 3   It was months that went by where they collected any of the seal
 4   cards.  Some guys were giving them in, some guys weren't.  We
 5   had to rewrite our seal cards.  I remember guys staying up
 6   overnight to fill out the seal cards, 'cause they needed them.
 7   Q.  One of the things that you did when you say that you stayed
 8   after hours is that you made copies of your work for that day,
 9   correct?
10   A.  Correct.
11   Q.  And a lot of the plumbers did that, correct?
12   A.  A lot of guys had their own system of keeping their
13   paperwork, yes.
14   Q.  A lot of them copied their paperwork for their records.
15   Yes?
16   A.  Yes.
17   Q.  You personally did not like turning in messy work, correct?
18   A.  Right.  Well, if it wasn't legible, we would hear it, you
19   know, if they couldn't read it.
20   Q.  But you had a thing about making sure that your work that
21   you turned in looked nice and was presentable, correct?
22   A.  Correct.
23   Q.  So a lot of times you'd come back to the office and redo
24   the paperwork that you had been doing during the day because it
25   was messy and you wanted it to look nice, correct?
```

F5c1mcg5                          Schantz - Cross

1   A.  Because it wasn't legible, you know, there was times your

2   hands were blackened and you're dealing with one piece of paper

3   in an eight-hour day and multiple entries and you can imagine

4   what it looks like, you know.

5   Q.  You didn't like turning in messy work.

6   A.  Right, that wasn't legible.

7   Q.  No one at CCI told you to redo your paperwork on all those

8   occasions, did they?

9   A.  No.  But there were times when people -- they were told

10  that, we can't read your paperwork, we don't understand what

11  this is.

12  Q.  That was other people, not you.

13  A.  Maybe once or twice, which caused me to be so anal about

14  keeping my paperwork neat.

15  Q.  When you were interviewed -- I believe you testified you

16  were interviewed by Mr. Loguidice and Mr. Solimine, correct?

17  A.  Correct.

18  Q.  And they offered you -- one or the other offered you a job.

19  correct?

20  A.  Not that day.

21  Q.  No, but eventually, when you were made the offer, it came

22  from --

23  A.  Yeah, a couple days later, Angelo called.

24  Q.  Right.  And when the job was over in December, it was

25  Mr. Solimine who told you that the job for you was over,

F5c1mcg5                          Schantz – Cross

1    correct?

2    A.   Correct.

3    Q.   On a daily basis you either reported to Mr. Loguidice or to

4    Mr. Solimine, correct?

5    A.   Yes.

6    Q.   They set your hours, correct?

7    A.   They did.

8    Q.   They set your work assignments, correct?

9    A.   Correct.

10   Q.   They determined your schedule, correct?

11   A.   They did.

12   Q.   Mr. Maguire, sitting here, didn't hire you or fire you,

13   correct?

14   A.   No.

15   Q.   And he didn't supervise you at all, correct?

16   A.   Correct.

17   Q.   He didn't set your work schedule or your work conditions,

18   correct?

19            MR. BHANDARI:   Objection.   Calls for speculation.

20            THE COURT:   No.   I think it could be answered to his

21   knowledge.   Overruled.

22   Q.   He never told you what your work shift was, did he,

23   Mr. Maguire?

24   A.   No.

25   Q.   And he never told you what your work assignments were, did

F5c1mcg5                           Schantz – Cross

1   he?

2   A.   No, but there were times when Angelo or Charlie had to make

3   a decision and told the crew that it was Tim Wertz or Mike

4   Maguire's decision as far as getting rid of guys and furloughs

5   and stuff like that.

6   Q.   Okay.  So we'll see when those people testify if that's

7   accurate or not.  But they never told you --

8              MR. BHANDARI:  Objection.

9              THE COURT:  The comment of counsel will be stricken.

10  Put a question.

11  Q.   He didn't determine your rate of pay, did he?

12  A.   Not to my knowledge.

13  Q.   The prevailing wage was determined by the city of New York,

14  by contract, right?

15  A.   Yes.

16  Q.   And you never received a directive, a direct order from

17  Mr. Maguire to you, correct?

18  A.   No direct order.

19  Q.   All right.  And you never received a direct instruction

20  from Mr. Maguire to you. correct?

21  A.   I had called him one time during the contract.  Never, you

22  know, any particular --

23  Q.   You called him one time.

24  A.   Right.

25  Q.   'Cause you had a question about the contract?

1    A.  No.

2    Q.  What did you call him for?

3    A.  I called him, there was -- I had a problem with Angelo, so

4    I had called him and just wanted to explain to him what

5    happened, you know, I feared for my job at the time.

6    Q.  And did somebody from corporate respond to you?

7    A.  Actually, I talked to Mike on the phone.

8    Q.  Who talked to Mike on the phone?

9    A.  Me.

10   Q.  And that was one time.

11   A.  One time.

12   Q.  Mr. Wertz didn't hire you or fire you, correct?

13   A.  Correct.

14   Q.  He didn't supervise your work schedule, control your

15   workday, that you know of, right?

16   A.  Not that I know of.

17   Q.  He didn't determine your rate of pay.

18   A.  No.

19   Q.  He didn't determine how you got paid, did he, to your

20   knowledge?

21   A.  Not to my knowledge.

22   Q.  And to your knowledge he didn't maintain your employment

23   records, right, to your knowledge?

24   A.  To my knowledge, no.

25   Q.  You never received a directive from Mr. Wertz, correct?

F5c1mcg5                              Schantz - Cross

```
1   A.  Correct.

2   Q.  And you never received an order or an instruction from

3   Mr. Wertz, correct?

4   A.  Correct.

5   Q.  And in fact, you didn't really even know who Mr. Wertz was

6   before this lawsuit came about, isn't that correct?

7   A.  Yeah, I didn't really -- didn't see him much.

8   Q.  Didn't see him much, never talked to him, didn't have any

9   contact with him at all.

10  A.  No.

11  Q.  There were certain employees, certain plumbers, who you've

12  testified were the early birds, correct?

13  A.  Yes.

14  Q.  And there were certain employees who were the late birds,

15  weren't there?

16  A.  They came later, yes.

17  Q.  There were several occasions when you actually had to have

18  a meeting postponed because certain workers weren't there at

19  8:00, couldn't start the meeting; do you recall those?

20  A.  Not -- not to my recollection.

21  Q.  And most of the crew you testified got there around 7:30,

22  not 7 like you, correct?

23  A.  Correct.

24  Q.  Now there were times I believe you testified that you were

25  sent home early because you weren't producing, correct?
```

1    A.  Yes.

2    Q.  And you signed out early on those days, correct?

3    A.  I did.

4    Q.  That was a form of punishment?

5    A.  I don't know if it was punishment.  It was -- it was just a

6    decision I may make.

7    Q.  You just weren't getting any work done so you might as well

8    just go home, right?

9    A.  Right.

10   Q.  On Exhibit 71, the sign-in sheets, you don't know who

11   changed any of the -- you went through three or four examples

12   with Mr. Bhandari about what appeared to be changes on those

13   sheets.  You don't know who made any changes at all, do you?

14   A.  I don't know, no.  Can just tell by looking at them that

15   they were altered.

16   Q.  Were there times that you signed in incorrectly and had to

17   re-sign in, that you recall?

18   A.  One of the guys maybe signed on the wrong spot and then the

19   whole sheet had to get re-signed.

20   Q.  Were there any times that you did that?

21   A.  Not that I recall.

22   Q.  And the incentive program you indicated started not right

23   away, right?  Not in May of 2009, correct?

24   A.  Correct.

25   Q.  But sometime in 2009, within a few months of you being

1    there, that program began.

2    A.  I'd say yeah, within six months, I believe.

3    Q.  And the 1.8 hours on this chart, that's your claim of how

4    many hours on average per day you worked but were not given

5    credit for, correct?

6    A.  Correct.

7    Q.  You don't know, as you sit here, if the 1.8 hours are all

8    overtime or not, correct?

9    A.  I'm not sure.

10          MR. WITTELS:  Nothing further, Judge.

11          THE COURT:  All right.  Any redirect?

12          MR. BHANDARI:  Yes, just a few questions.

13   REDIRECT EXAMINATION

14   BY MR. BHANDARI:

15   Q.  Mr. Schantz, you were asked earlier whether it was the CCI

16   policy to pay overtime if you worked overtime, correct?

17   A.  Correct.

18   Q.  And you answered yes to that.  Do you remember that?

19   A.  Yes.

20   Q.  Was it CCI's policy to pay overtime if you worked overtime

21   or was it CCI's policy to pay for overtime if that overtime was

22   previously approved by either Angelo or Charlie?

23   A.  If it was approved.

24   Q.  Okay.  So did CCI have a policy -- in fact, did Angelo or

25   Charlie tell you that that was the policy, that the only

F5c1mcg5                         Schantz - Redirect

1    overtime that would be paid was overtime that they had

2    approved?

3    A.   Had to be preapproval, yes.

4    Q.   You were asked earlier whether or not other people got

5    there at around 7:30 instead of 7 a.m. like you.  Do you

6    remember being asked that question?

7    A.   Yes.

8    Q.   But you didn't arrive at the offices of CCI at 7 a.m., did

9    you?  You arrived before then.

10   A.   Most of the time before, yes.

11   Q.   What time would you arrive?

12   A.   Anywhere between quarter to and 7.

13   Q.   And you said that Bobby Gandolfo was there sometimes before

14   you?

15   A.   Yes.

16   Q.   You're not seeking any overtime for the period of time

17   between 6:45 and 7 a.m., are you?

18   A.   No.

19   Q.   Now the other people who arrived after you, did some of

20   them also arrive before 7 a.m., even though they arrived after

21   you?

22   A.   There was a couple guys.

23   Q.   And the other people who we went over when we looked at

24   Exhibit SS --

25   A.   Right.

F5c1mcg5                              Schantz - Redirect

1    Q.  -- you said that pretty much everybody on Exhibit SS

2    arrived before 7:30, is that correct?

3    A.  Correct.

4    Q.  And so what was the range of time when everyone arrived on

5    the project, as far as you know?

6    A.  The range of time?

7    Q.  Yes.

8    A.  Between 7:00 and 20 to 8.

9    Q.  And would the same people arrive at 7:00 every day?

10   A.  Yeah, it was kind of like the same faces came the same

11   time.

12   Q.  And you were asked earlier if you knew that --

13          Do you recall being asked on cross examination if you

14   were aware that a lawsuit was filed, this lawsuit was filed

15   while you were still working at CCI?

16   A.  Yes.

17   Q.  And do you recall when you learned that this lawsuit was

18   filed?

19   A.  Don't recall exactly when, but just, you know, hearsay

20   that, you know, there was going to be -- Mike McGlone was going

21   to be suing the company.

22   Q.  And you left CCI in 2011, correct?

23   A.  Correct.

24   Q.  And this lawsuit was filed in 2011, correct?

25   A.  Yes.

F5c1mcg5                          Schantz - Redirect

1   Q.  Did anybody ever tell you that you needed to start keeping

2   different records of your time in connection with this lawsuit?

3   A.  No.

4   Q.  Did anybody ever ask for you to give testimony in this case

5   prior to you testifying here today?  Sorry.  Let me rephrase

6   that question.  Withdrawn.

7          Did you ever sit for a deposition in this case?

8   A.  Yes.

9   Q.  And did you sit for a deposition in 2011?

10  A.  I believe it was 2012, maybe.

11  Q.  And who deposed you?

12  A.  The two gentlemen right there.

13  Q.  And when they deposed you, did they ask you for your time

14  records?

15         MR. WITTELS:  Judge, I'm going to object.

16  A.  Not that I recall.

17         THE COURT:  Sustained.

18  Q.  Now you testified before about being sent home early on

19  occasion.  Do you recall that?

20  A.  Yes.

21  Q.  How often would that happen?

22  A.  Depending on, you know -- it seemed to happen more in the

23  deep -- deep of the winter, when things were really cold and a

24  little snowy out there, but there were times it happened or

25  once a month.

F5c1mcg5                          Schantz - Redirect

1    Q.  During winters?

2    A.  Yeah.

3    Q.  And so the winters --

4    A.  Maybe twice a month.

5    Q.  And the winters would be what months?  What months do you

6    consider to be winter?

7    A.  December through March.

8    Q.  So it happened once or twice from December through March,

9    correct?

10   A.  Right.

11   Q.  And you testified -- or you were asked for some weeks you

12   worked less than 40 hours.  Do you remember being asked about

13   that?

14   A.  Yes.

15   Q.  Have you done any calculations to know how many hours you

16   worked every single week after you added in 1.8 each day?

17   A.  No.

18   Q.  Did you know for sure if you worked more than 40 hours or

19   less than 40 hours on any given week?

20   A.  Nothing written down, no.

21              (Continued on next page)

22

23

24

25

1            MR. BHANDAR:  What documents would you need to see in

2      order to be able to do the calculation to see if you add 1.8

3      hours to the amount you work every single week, whether or not

4      you in fact did work one to 40 hours some weeks.

5      A.  I guess at time sheets.

6      Q.  Have you done that math?  Did you look at all the time

7      sheets and add 1.8 hours to every single day to decide whether

8      or not you worked more than 40 hours in some weeks?

9      A.  No.

10     Q.  You were asked if you knew you were supposed to take a half

11     hour meal break; do you remember that?

12     A.  Yes.

13     Q.  Were you ever told to take a half hour meal break?

14     A.  We were just fill out the sheets.  It wasn't followed up

15     like the boss is going to say, you guys are taking lunch,

16     right?  I have had other jobs before where the boss, the

17     supervisors are making sure, you guys are taking lunch, right?

18     And it was never asked, you know.

19     Q.  And in fact, what were you told about taking lunch?

20     A.  That if you didn't take it the sheet gets filled out either

21     way.

22     Q.  And what do you think would happen to you if you didn't

23     fill out the sheet as you were asked to do?

24     A.  I think I would have a problem, some type of problem if you

25     see everybody filling out the sheets.

F5IAAMCG6                          Schantz - Redirect.

1   Q.   What type of problem did you think you might have?

2   A.   Just a problem going against the grain, you know.

3   Q.   What did you think might happen?

4           THE COURT:   Sustained.

5   Q.   You testified that you called Mr. McGuire during the time

6   period between because you feared for your job; do you recall

7   that testimony?

8   A.   Yes.

9   Q.   What did you discuss with Mr. McGuire on that phone call?

10  A.   I just had discussed with him me and Angelo had a

11  difference and kind of behind closed doors, went into like an

12  argument and stuff like that.  He sent me home.  Said I was

13  suspended.  And so I just wanted to let Mike McGuire know what

14  happened.  Angelo kind of, he got a little out of control and

15  was throwing stuff around and pushing desks and chairs.  And

16  you know, I was just trying to explain to him that we just we

17  had a hurricane on my route that Saturday.  There were trees

18  down all over the neighborhood.  I don't know if you remember

19  back when we got hit.  And the numbers weren't great.  So I was

20  just sticking up for myself.  He said it was unacceptable and I

21  should step it up.

22  Q.   Who told you it was unacceptable?

23  A.   Anglo.

24  Q.   What did he tell you was unacceptable?

25  A.   The numbers that day.  There was no reason for the numbers

F5IAAMCG6                    Schantz - Redirect.

1   to be that low.  Meanwhile we could barely get around the

2   neighborhood cause of the trees and fences down every where.

3   So we had -- we kind of escalated.  I guess, he didn't like

4   what I had to say in front of the guys and sent guys off to

5   work and brought me in his office with, I believe it was Kelly

6   and Charlie.  And it was just seemed very unprofessional the

7   way he went about it.  So I just wanted to kind of document it

8   to the higher ups.

9   Q.  Why did you call Mr. McGuire?

10  A.  The reason why I feared for my Job, I was actually -- I was

11  told hearsay -- that somebody overheard.

12          MR. WITTELS:  Objection.

13          THE COURT:  Sustained.

14  Q.  Why did you fear for your job?

15  A.  The reason -- well, somebody overheard Anglo saying that I

16  was --

17          MR. WITTELS:  Still objecting that he head overheard.

18          THE COURT:  Well, see, you did not object, counsel, to

19  the original question which was, why did he fear for his job.

20  And that necessarily involves the state of his mind.  So this

21  will be received not for its truth but for his state of mind.

22          Overruled.

23  Q.  So again, why did you fear for your job, Mr. Schantz?

24  A.  I was told that somebody had overheard in the next room

25  that Anglo said that my days were numbered.  So by seeing what

F5IAAMCG6                          Schantz - Redirect.

1    everything was going on prior to me I was like, I'm done, you

2    know.  Even though I was one of the better guys, you know

3    didn't matter.

4    Q.  When you say you were one of the "better guys" what does --

5               THE COURT:  No.  We are getting so far beyond what I

6    consider reasonable redirect that it's going terminate in two

7    minutes.  You can ask two minutes worth of questions, counsel,

8    about the one that I just sustained the clever objection to.

9               MR. BHANDAR:  OK.  Sorry.  I missed it.  I can or

10   cannot ask the question?

11              THE COURT:  You cannot.

12              MR. BHANDAR:  OK.  Understood.

13   Q.  So Mr. Schantz, was it important to you to make sure that

14   your numbers were consistent with what Anglo and Charlie

15   expected the numbers to be?

16   A.  It was, yes.

17              MR. BHANDAR:  I have no further questions.

18              THE COURT:  All right.  Anything else from defense

19   counsel?

20              MR. WITTELS:  No, recross.

21              THE COURT:  Thank you very much.  You may step down.

22              All right.  Ladies and gentlemen, so we're off to a

23   good start and your reward is you don't have to sit tomorrow

24   morning.  As I had told had you when you first were sworn in,

25   we will start at 1:30 tomorrow.  Because it's a short day we

F5IAAMCG6                        Schantz - Redirect.

1    will probably go till five.  We'll never go beyond five but we

2    will tomorrow go to five.  So, we'll see you tomorrow at 1:30.

3    Have a very good evening.

4              (Jury not present)

5              THE COURT:  Please, be seated.

6              All right.  Anything counsel needs to raise with the

7    Court?

8              MR. WITTELS:  Yes, your Honor.  If we could approach

9    because I really don't want to say it --

10             THE COURT:  OK.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F5IAAMCG6                         Schantz – Redirect.

1            (Sidebar)

2            THE COURT:  Yes.

3            MR. WITTELS:  It appeared to me, your Honor, that

4   Juror No. Seven, new number seven was taking notes on a

5   notepad.

6            THE COURT:  Yes.  That's totally permitted.

7            MR. BHANDAR:  I didn't know because there was no

8   instruction about it.

9            THE COURT:  My policy is I don't tell them they have

10  to but I have no problem if they wish to.  I know there are

11  some jurisdictions where it's forbidden and I've always felt

12  that that was irrational.  But for me to say that in a written

13  opinion would require me taking notes and I don't think I

14  should do that.

15           MR. WITTELS:  Well said.

16           MR. BHANDAR:  Your Honor, I have to two other things.

17           THE COURT:  Sure.

18           MR. BHANDAR:  One, I believe on the phone last week

19  you had said that Thursday was going to be a half day also.

20           THE COURT:  No, that's not longer.  I've changed

21  things around.

22           MR. BHANDAR:  Then the second is, we have two nonparty

23  witnesses who we subpoenaed who are coming tomorrow.  They were

24  not supposed to -- they are not next on our witness list but we

25  would like to call them out of order.

F5IAAMCG6                           Schantz - Redirect.

1                MR. WITTELS:  No objection.

2                THE COURT:  Very good.

3                MR. WITTELS:  Let me make sure I understand.  They

4     will be the first two?

5                MR. BHANDAR:  Yes.  We told them to be here at one

6     o'clock.

7                THE COURT:  All right.  So since we're at the sidebar,

8     I have another matter that is about to start so just clear the

9     stuff away including the easel and we'll see you tomorrow at

10    1:30.

11               (Adjourned to Tuesday, May 19, 2015 A 1:30 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                          INDEX OF EXAMINATION

2    Examination of:                              Page

3    ROBERT SCHANTZ

4    Direct By Mr. Bhandari . . . . . . . . . . . .42

5    Cross By Mr. Wittels . . . . . . . . . . . . 122

6    Redirect By Mr. Bhandari . . . . . . . . . . 142

7                          PLAINTIFF EXHIBITS

8    Exhibit No.                                Received

9     71    . . . . . . . . . . . . . . . . . . . .77

10    76    . . . . . . . . . . . . . . . . . . . .85

11    79    . . . . . . . . . . . . . . . . . . . .90

12                          DEFENDANT EXHIBITS

13   Exhibit No.                                Received

14    SS    . . . . . . . . . . . . . . . . . . . .52

15    P     . . . . . . . . . . . . . . . . . . . .94

16    II    . . . . . . . . . . . . . . . . . . . 126

17

18

19

20

21

22

23

24

25
```