F5KAMCG1ps

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  MICHAEL MCGLONE, et al.,

4                  Plaintiffs,

5          v.                        11 CV 3004 (JSR)

6  CONTRACT CALLERS INC., et al.,

7                  Defendants.

8  ------------------------------x
                                    New York, N.Y.
9                                   May 20, 2015
                                    10:20 a.m.
10
   Before:
11
                      HON. JED S. RAKOFF,
12
                                    District Judge
13                                      and a jury
                       APPEARANCES
14
   MANDEL BHANDARI LLP
15      Attorneys for Plaintiffs
   BY:  RISHI BHANDARI
16      ROBERT GLUNT
        DONALD CONKLIN
17      -and-
   ANDERSON DODSON, P.C.
18 BY:  PENN DODSON

19 THE ENTERPRISE LAW GROUP
        Attorneys for Defendants
20 BY:  LAWRENCE WITTELS
        IRA BLANK
21

22

23

24

25

F5KAMCG1ps

```
1              (Trial resumed; jury present)

2              THE COURT:  Good morning, ladies and gentlemen.  Thank

3    you so much for your patience.  Sometimes matters come up that

4    I have to deal with on an emergency basis, and I really

5    appreciate it.  But you could have spent the time in the

6    morning; the Yankees lost, so there was a compensation.

7              All right.  So plaintiff will please call your next

8    witness.

9              MR. BHANDARI:  Thank you, your Honor.  The plaintiffs

10   call Michael McGlone.

11    MICHAEL McGLONE,

12        the plaintiff herein,

13        having been duly sworn, testified as follows:

14   DIRECT EXAMINATION

15   BY MR. BHANDARI:

16   Q.  Mr. McGlone, is it possible to either move that microphone

17   a little bit closer to you or make sure that you're closer to

18   the microphone.

19   A.  Yes.  Can you hear me?

20   Q.  Yes.  Great.  Thank you.

21             Good morning.

22   A.  Good morning.

23   Q.  And how do you know the defendants, Contract Callers

24   Incorporated?

25   A.  I was employed by them.
```

F5KAMCG1ps                    McGlone - direct

1    Q.   When were you employed by CCI?

2    A.   2009 to 2010.

3    Q.   And are you a plaintiff in this case?

4    A.   Yes.

5    Q.   So we're going to talk about your time in CCI in a few

6    moments, but first let's talk about your background.  Where do

7    you live?

8    A.   In Oakdale, New York.

9    Q.   And where is that located?

10   A.   Suffolk County.

11   Q.   How long have you lived in Oakdale, New York?

12   A.   21 years.

13   Q.   Who do you live with, if anybody?

14   A.   My wife, my children, and my mother-in-law.

15   Q.   And how many children do you have?

16   A.   Three.

17   Q.   And how many do you live with?

18   A.   Two.

19   Q.   And how old are your kids?

20   A.   The youngest is 21, 24, and 26.

21   Q.   Before you were working at CCI, what did you generally do?

22   What was your general occupation?

23   A.   I was a carpenter.

24   Q.   Excuse me?

25   A.   A carpenter.

F5KAMCG1ps                    McGlone - direct

1    Q.  And so going back, all the way back to -- where did you

2    grow up and go to high school?

3    A.  Farmingdale Senior High.

4    Q.  And what was the highest grade level that you achieved?

5    A.  11th.

6    Q.  And then what did you do after 11th grade?

7    A.  I joined the Marine Corps.

8    Q.  And what was your rank when you joined the Marine Corps?

9    A.  Private.

10   Q.  And how long did you serve in the Marine Corps?

11   A.  Six years.

12   Q.  What were your general duties when you were in the Marine

13   Corps?

14   A.  I was a gas, diesel, and multi-fuel mechanic.

15   Q.  And after six years, what were the circumstances of your

16   discharge?

17   A.  Honorable.

18   Q.  After you finished the six years in the Marines, did you

19   tin your education?

20   A.  Yes.

21   Q.  What did you do?

22   A.  I got my GED.

23   Q.  After you got your GED, what general field did you work in?

24   A.  Carpentry, general contracting.

25   Q.  And so how long have you been working in carpentry and

1    general contracting?

2    A.  35 to 40 years.

3    Q.  So immediately before you started at CCI -- and when did

4    you start at CCI?

5    A.  In 2009.

6    Q.  And do you remember what month you started in?

7    A.  I forget.

8    Q.  If I could draw your attention to an exhibit that's been

9    previously entered into evidence, Defendant's Exhibit SS --

10            MR. BHANDARI:  Your Honor, may I approach the bench?

11            THE COURT:  Yes.

12            MR. BHANDARI:  Excuse me -- the witness.

13    Q.  There you go.  So, Mr. McGlone, do you see your name on

14    this list?

15    A.  Yes.

16    Q.  According to this document, when was your start date?

17    A.  5/29/09.

18    Q.  So May 19, 2009.

19    A.  Correct.

20    Q.  And when did you stop working at CCI?

21    A.  7/8/2010.

22    Q.  So you worked there for a little bit over a year?

23    A.  Yes.

24    Q.  Now, going back to May of 2009, where were you working

25    immediately before you started working at CCI?

F5KAMCG1ps                    McGlone - direct

1    A.  I was working at Local 1456.

2    Q.  What is Local 1456?

3    A.  It's a carpenters union.

4    Q.  And you were working for a carpenters union -- do you get

5    jobs directly from the union itself?

6    A.  Correct.

7    Q.  And what kinds of jobs were you working on right before

8    CCI?

9    A.  I was working on a form job.

10   Q.  A what?

11   A.  Form.

12   Q.  Form job?

13   A.  Forms.

14   Q.  OK.  For what company were you working for?

15   A.  Enrico & Sons.

16   Q.  So now let's talk about CCI.  How did you hear about the

17   job at CCI?

18   A.  From my nephew.

19   Q.  Who was your nephew?

20   A.  Charles Loguidici.

21   Q.  Loguidici.  And what did Mr. Loguidici tell you about the

22   job?

23   A.  That they were going to be looking for people to do --

24   install water meters.

25   Q.  And did you apply for that job?

F5KAMCG1ps                    McGlone - direct

1   A.  Yes.

2   Q.  How did you apply for it?

3   A.  I went down to the Weirfield office and filled out an

4   application.

5   Q.  And when you say Weirfield, that's the street that the

6   office is on?

7   A.  Correct.

8   Q.  And do you know what borough that office was in?

9   A.  Ridgewood, Queens.

10  Q.  So you went down to the office, and after you applied, what

11  happened next?

12  A.  Shortly after, I was told I was hired.

13  Q.  And who told you that you were hired?

14  A.  James Olson and Charlie Loguidici.

15  Q.  And how do you know James Olson?

16  A.  He is my nephew as well.

17  Q.  And how are you related?  How are they your nephews?

18  A.  They're my sister's children.

19  Q.  How many sisters do you have?

20  A.  Nine.

21  Q.  And how many siblings do you have in total?

22  A.  15.

23  Q.  So you have a lot of nephews and nieces?

24  A.  Correct.

25  Q.  So after you were accepted in the job did you start working

1   at CCI?

2   A.  Yes.

3   Q.  And when you started, was there a training program?

4   A.  Yes.

5   Q.  And what sort of things did they cover in the training

6   program?

7   A.  Some types of installations and what tools were needed, and

8   procedures.

9   Q.  And when you started in May 2009, were there people who had

10  already been working on the job before?

11  A.  Correct.

12  Q.  Did you go on training, did you do any training with any of

13  the people who were previously employed by CCI?

14  A.  Well, we were paired up with somebody that was hired

15  previously.

16  Q.  Who were you paired up with, if you remember?

17  A.  Ariel Peniche.

18  Q.  Excuse me?

19  A.  Ariel Peniche.

20  Q.  He was the first person you were paired up with?

21  A.  Correct.

22  Q.  When you got there, were you told what the general hours

23  were supposed to be?

24  A.  Yes.

25  Q.  What were the hours supposed to be?

F5KAMCG1ps                          McGlone - direct

1    A.  8 to 4:30.

2    Q.  Who told you that?

3    A.  Angelo, Charlie, Jimmy.

4    Q.  And did they tell what you time you were expected to come

5    to the office?

6    A.  No.

7    Q.  What time would you get to the office, in the morning?

8    A.  I'd be at the office generally before 7 every day.

9    Q.  Why would you come so early?

10   A.  Well, to get my truck prepared for the day's work.

11   Q.  Did anybody tell you that you needed to get your truck

12   prepared for the day's work before 8 a.m.?

13   A.  Yes.

14   Q.  Who told you that?

15   A.  Angelo.

16   Q.  And did he explain why?

17   A.  Yeah.  Because he wanted us on the road no later than 8

18   o'clock.

19   Q.  So when you first got to CCI, you did a little bit of

20   training.  Do you recall when you started going out in the

21   field as a regular employee of CCI?

22   A.  It was probably a week after I was hired.

23   Q.  And when you got there, did you -- how did you keep track

24   of your time when you were at CCI?

25   A.  They had a time sheet that you had to fill out.

F5KAMCG1ps                    McGlone - direct

1    Q.  Where was the time sheet located?

2    A.  On the wall between the bathroom and Angelo's office, in

3    the warehouse.

4    Q.  I'd like to show you a document that's been previously

5    entered in evidence, Exhibit 70.  If we could pull up May 28th.

6    Or actually pull up May 27th.

7            So looking at May 27, 2009, this is the first page of

8    the sign-in sheet, you don't see your name on this page of the

9    sign-in sheet, do you?

10   A.  No, sir.

11   Q.  OK.  We can go to the second page.  There is no second

12   page.  So May 27, 2009, you did not sign in at CCI, correct?

13   A.  Correct.

14   Q.  Now let's look at May 28, 2009.  Do you see your name on

15   the first page of the sign-in sheet?

16   A.  No, sir.

17   Q.  We can go to the second page.  Do you see your name?

18   A.  Yes, I do.

19   Q.  And is that your signature next to your name?

20   A.  Yes.

21            (Continued on next page)

22

23

24

25

F5kWmcg2                          McGlone – direct

1   BY MR. BHANDARI:

2   Q.  And is that the last four digits of your Social Security

3   number?

4   A.  It is.

5   Q.  And is that your handwriting for the Social Security number

6   and the time in and time out?

7   A.  It appears to be.

8   Q.  So what time did you sign in on May 28, 2009?

9   A.  8:00.

10  Q.  And what time did you actually get to the office on May 28,

11  2009, if it was a typical day?

12  A.  7:00, quarter to seven.

13  Q.  So you get to the office, to Weirfield Street, on a typical

14  day, is that correct?

15  A.  Correct.

16  Q.  And what time would the gates to the office open?

17  A.  At seven.

18  Q.  And so between 6:45 and seven, what would you do?

19  A.  I would sit in the car and listen to the radio.

20  Q.  And then what would you do at 7:00?

21  A.  Get out and go into the shop.

22  Q.  And when you went into the shop, what would be the first

23  thing you would do when you go in the shop?

24  A.  Go into the back room and start preparing for work.

25  Q.  In order to prepare for work, did you have to pick any

1   things up?

2   A.  Yes.

3   Q.  What are the things you had to pick up?

4   A.  Meters, seal wires, seals, heads, pins for the heads.

5   MTUs.

6   Q.  And would you get a CN3?

7   A.  Correct.

8   Q.  What is a CN3?

9   A.  It's a handheld device to program the MTUs.

10  Q.  And would you pick up any documents in the morning?

11  A.  A route sheet.

12  Q.  After you picked up the route sheet, would you do anything

13  after reading the route sheet?

14  A.  Yeah.  I'd route myself.

15  Q.  And what does that mean?  What does it mean to route

16  yourself?

17  A.  Well, we had, we didn't want to go over the same job that

18  we did yesterday because generally, it could have the same jobs

19  that you did the day prior, so you'd want to put them later on

20  in the, in the day and try to get to some fresh work.

21  Q.  Earlier you testified that you would gather meters and MTUs

22  and other equipment, is that correct?

23  A.  Correct.

24  Q.  And what would you do with that equipment after you

25  gathered it?

1    A.   Load it into the car.

2    Q.   And approximately how many trips would you make back and

3    forth between your car and the office between seven and 8 a.m.

4    on a typical day?

5    A.   Five trips.

6    Q.   On May 28, 2009, when you first started work, who was your

7    partner?

8    A.   Ariel Peniche.

9    Q.   What time would you guys typically leave the CCI offices to

10   start going out into the field?

11   A.   About 7:30.

12   Q.   And were there sometimes morning meetings when you got

13   there?

14   A.   Yes.

15   Q.   Approximately how frequently were the morning meetings?

16   A.   I'd say once a week, at least once a week.

17   Q.   And what time would the morning meetings be scheduled for?

18   A.   They would vary.

19   Q.   What was the range of time that the morning meetings would

20   be scheduled before?

21   A.   It was generally before eight.

22   Q.   What was the earliest that they would be?  The range of

23   times, if you can remember?

24   A.   Generally, it was around 7:30.

25   Q.   And were they sometimes a little later than that?

F5kWmcg2                        McGlone - direct

1   A.  Correct.

2   Q.  Were the morning meetings ever after 8:00?

3   A.  They never started after eight, no.

4   Q.  So the latest they would ever start would be 8:00, is that

5   correct?

6   A.  Correct.

7   Q.  But sometimes they would start earlier?

8   A.  Most of the time earlier.

9   Q.  So going back to that time sheet that we were looking at

10  again --

11          MR. BHANDARI:  Could we put it up, Mr. Glunt.

12  Q.  -- it looks here like you signed in at 8 a.m.

13  A.  Correct.

14  Q.  But why would you sign in at 8 a.m. if you started doing

15  work at 7 a.m.?

16  A.  Because that's what we were told to sign in.

17  Q.  Who told you to do that?

18  A.  Mr. Solimine, Mr. Loguidici.

19  Q.  And when do you remember them telling you to do that?

20  A.  When we were, during those training days.

21  Q.  If we could go to May 29, the next sign-in sheet, do you

22  see your name on the first page?

23  A.  No.

24  Q.  Do you see your name on the second page?

25  A.  Correct.

1    Q.  Now, is that your signature?

2    A.  Yeah.  I believe so.

3    Q.  And is that your Social Security number?

4    A.  Yes.

5    Q.  Looking at the sign-in sheet, what time does it appear to

6    say that you signed the time in?

7    A.  It looks as though it was 7:30.

8    Q.  Well, what time does it say on the top?  What time do you

9    think it intends to read?

10   A.  What time on top?  8:00.

11   Q.  So looking at it closely, do you believe that it says a

12   different, that that was altered?

13   A.  Oh, yes.

14   Q.  Do you have a recollection as to who altered that time?

15   A.  I couldn't tell you.

16   Q.  Do you know why it was altered?

17   A.  No.

18   Q.  But on that day, did you try and sign in at 7:30?

19   A.  Yes.

20   Q.  But ultimately, what time were you signed in for, for May

21   29?

22   A.  8:30 -- 8:00.

23   Q.  Now, let's look at the next day that you were in the

24   office.  Now, it's not May 30.  You're not on this list,

25   correct?

1    A.  No.

2    Q.  So if we can go to the next exhibit, which is Exhibit 71,

3    now, if we look at June 1 of 2009, this is the first page of

4    Exhibit 71, you're not on this page either, correct?

5    A.  No.

6    Q.  On June 1, go to the next page, that's your name, but you

7    didn't work on June 1, it appears, correct?

8    A.  No.

9    Q.  Let's go to June 2.

10   A.  No.

11   Q.  Let's take a look.  June 2, are you on this list?

12   A.  Oh.  No.

13   Q.  And did you sign in on June 2?

14   A.  No.

15   Q.  Now if we could go to June 3, are you on this list?

16   A.  No.

17   Q.  Go to the next page.  Did you sign in on June 3?

18   A.  Yes.

19   Q.  Now, what time does it appear that you signed in?

20   A.  It looks as though it's 7:00.

21   Q.  And does it appear that that time was changed?

22   A.  Correct.

23   Q.  Why did you try and sign in at 7 a.m. on June 3?

24   A.  Because that was the time I started working.

25   Q.  And were you allowed to record your time for when you

1    started working on June 3?

2    A.  No.  I was told that it had to be 8:00.

3    Q.  And so subsequent to June 3, 2009, did you ever sign in

4    before 8:00?

5    A.  Yes.

6    Q.  And what would happen when you would sign in before 8:00?

7    A.  I was told that there was no signing in prior to 8:00.

8    That they didn't pay for overtime.

9    Q.  And who told you that?

10   A.  Mr. Solimine.

11   Q.  Did you ever complain to Mr. Solimine about that?

12   A.  Yes.

13   Q.  What did you say to him?

14   A.  I told him that it wasn't fair that we were doing work that

15   we weren't getting paid for.

16   Q.  And what was his response?

17   A.  That it wasn't their policy to pay overtime.

18   Q.  And did you complain to him on more than one occasion?

19   A.  Yes.

20   Q.  Did you complain to anybody else?

21   A.  Yes.

22   Q.  Who else did you complain to?

23   A.  Mr. Loguidici, Mr. Olson.

24   Q.  Why did you complain to Mr. Olson?

25   A.  Because Mr. Olson was the second in command to Charlie.

1    Q.  How did you know that?

2    A.  We were told at meetings.

3    Q.  And what would Mr. Olson say to you when you complained?

4    A.  Just go along with it.

5    Q.  What's that?

6    A.  Just to go ahead and go along with it.

7    Q.  But did you continue to complain after June of 2009?

8    A.  Yes.

9    Q.  Now, that's in the mornings.  Let's talk about the

10   afternoons.  Here, on June 3, 2009, you signed out at 6:30

11   p.m., is that correct?

12   A.  Correct.

13   Q.  And so when you were signing out at 6:30 p.m., what was

14   your normal shift in terms of the days per week you were

15   working and the hours that you were supposed to sign in and

16   out?

17   A.  We were on a four tens.

18   Q.  What do you mean by four tens?

19   A.  Four workdays, ten hours a day.

20   Q.  So now on the days that you were doing the four workdays

21   ten hours a day, you were supposed to sign out at 6:30 p.m.,

22   correct?

23   A.  Correct.

24   Q.  And sign in at 8 a.m., correct?

25   A.  Correct.

1   Q.  Did you ever get back to the office after 6:30 p.m. on a

2   day that you were doing four ten-hour days?

3   A.  Regularly.

4   Q.  What time would you normally get back to the office on a

5   day when you were doing your four ten-hour shifts?

6   A.  Somewheres around 6:30.

7   Q.  And sometimes would you get back later?

8   A.  Correct.

9   Q.  And how much later would you get back sometimes?

10  A.  Twenty to, quarter to.

11  Q.  So how frequently would you come back, so you're saying you

12  would come back at 6:40 or 6:45, correct?

13  A.  Correct.

14  Q.  In a normal week, four days would be the weeks when you

15  were doing four ten-hour days, how frequently would you come

16  back at 6:40 or 6:45?

17  A.  Most of the time.

18  Q.  And would you ever come back after 6:45?

19  A.  It could happen, yes.

20  Q.  And do you remember if it ever did happen?

21  A.  I can't recall.

22  Q.  On days when you would do five eight-hour shifts, would you

23  ever come back after 4:30 p.m.?

24  A.  Yes.

25  Q.  And what would be the average time when you would come back

1    to the office when you were doing five eight-hour shifts?

2    A.   Oh, somewheres at 4:30 or after 4:30.

3    Q.   When you say after 4:30, what time?

4    A.   Give or take five or ten minutes.

5    Q.   You would normally get back at about 4:35 or 4:40, is that

6    correct?

7    A.   Correct.

8    Q.   So when you would get back to the office at around 4:40 or

9    6:40 or 6:45, in that general range where you would get back to

10   the office, what would you do before you would leave to go

11   home?

12   A.   We would have to unload the car with the multiple meters

13   that we replaced during the day.  They would have to be recoded

14   and put in bins, as well as any wire or any other debris that

15   we had accumulated during the installations and throw that in

16   the trash, of course, but that would require quite a few trips

17   to the car.

18   Q.   And approximately how long would it take you at the end of

19   the day to do whatever you needed to do before you could leave

20   to go home?

21   A.   Twenty minutes to a half hour.

22   Q.   Did you ever complain about the fact that you were leaving

23   the office -- so what time on average would you be leaving the

24   office on a typical day?

25   A.   Five, 5:15.

F5kWmcg2                    McGlone - direct

1    Q.  Did you ever complain that you had to sign out at 6:30 or

2    4:30, but you were working until five or 5:15 or seven or 7:15?

3    A.  Yes.

4    Q.  Who did you complain to?

5    A.  Charlie, Jimmy, Angelo.

6    Q.  And what was their response?

7    A.  That, once again, it was company policy and pretty much if

8    I liked my job, I'd just keep doing it.

9    Q.  Now, did you ever get paid for overtime?

10   A.  Yes.

11   Q.  What would be the circumstances under which you would get

12   paid for overtime?

13   A.  Well, somebody would have to call in and get a prior

14   approval.

15   Q.  And were there times when you were out in the field and

16   someone called in, but you did not get approval for overtime?

17   A.  Yes.

18   Q.  And did you ever get approval for overtime for the time

19   that you were checking out at the end of the day?

20   A.  No.

21   Q.  So what are the types of circumstances under which you

22   would get approval for overtime?

23   A.  If a pipe burst and we were out there at 4:30 and we knew

24   we were going to be out there for a longer time, then we'd have

25   to call in, you know, to tell them we had a problem and get the

F5kWmcg2                         McGlone – direct

1    overtime approved.

2    Q.  And would there be other times when you were just stuck in

3    traffic coming back to the office knowing that you would get

4    back after 4:30?

5    A.  Yes.

6    Q.  Would you get overtime for that?

7    A.  No.

8    Q.  Now, when you got back to the office at the end of the day,

9    who was there; who would you see there?

10   A.  One of the, Angelo's guys, Ralphie or Carey, one of them.

11   Q.  And would Angelo or Charlie ever be there at the end of the

12   day?

13   A.  Very random.

14   Q.  Sorry.  What did you say?

15   A.  It was more often that they weren't there.

16   Q.  Were there times when they were?

17   A.  Correct.

18   Q.  So were there times when you saw them in the office after 5

19   p.m.?

20   A.  Yes.

21   Q.  And they saw you?

22   A.  Yes.

23   Q.  Did you speak to them?

24   A.  Angelo would shut his door when he saw us come in; me,

25   anyhow.

1    Q.  So let's talk a little bit about your day.  When you were

2    out in the field, did you work with partners the entire time

3    that you were there?

4    A.  Yes.

5    Q.  And do you remember any of your other partners?

6    A.  Yes.

7    Q.  Who were the other partners you had?

8    A.  Joe Frische, Thomas Murphy, James Olson and Domenic

9    Fanelli.

10   Q.  And how would the partners get selected; would you pick

11   your partner?

12   A.  No.

13   Q.  Who would tell you who you would be partnered with?

14   A.  Charlie or Angelo.

15   Q.  And did you ever have a company car?

16   A.  Yes.

17   Q.  Did you have a company car the entire time you were there?

18   A.  No.

19   Q.  When did you first get a company car, approximately how

20   long after you started?

21   A.  Oh, it had to be six months.

22   Q.  And when you had a company car, did you do any maintenance

23   on that car?

24   A.  Yes.

25   Q.  What did you do?

F5kWmcg2                          McGlone - direct

1    A.  We had to change the oil, we had to wash the car once a

2    week.  You know, wiper blades, battery.

3    Q.  How often would you change the oil?

4    A.  I'd say every three weeks, four weeks.

5    Q.  And how often would you wash the car?

6    A.  Every, every week.

7    Q.  And how long would it take you to wash the car?

8    A.  Ten, 15 minutes, 20 minutes.

9    Q.  How long would it take you to change the oil?

10   A.  The same.

11   Q.  And did you get, when did you do it?

12   A.  On my own time.

13   Q.  What do you mean by your own time?

14   A.  Well, we were told before we came in on Monday that they

15   wanted to see them clean.  They would look to see if they were

16   clean.

17   Q.  And so when would you do the cleaning?

18   A.  I would go to the car wash.

19   Q.  On a weekend?

20   A.  Yes.

21   Q.  When you were working at CCI?

22   A.  No.  On my own time.

23   Q.  So going to the days when you were working with the

24   partners, did you eat food every single day?

25   A.  No -- oh, yeah.  Eat food, yes.

F5kWmcg2                    McGlone - direct

1   Q.  And would you prepare your own food, or would you go to a

2   restaurant or pick something up?

3   A.  No.  My wife would prepare my food the night before.

4   Q.  What would you bring your food to work in?

5   A.  I had a cooler.

6   Q.  And why would you bring your food in to work every day?

7   A.  Because some places it was really hard to even find a place

8   to eat.

9   Q.  And why was that important to you, that you had to eat

10  regularly?

11  A.  I take medications, I have to eat regularly.

12  Q.  When you would eat the food, would you -- excuse me.  Let

13  me ask a different question.  Withdrawn.

14      During the day, would you sometimes take a break for a

15  half hour where you would do nothing else and you would just

16  eat your meal?

17  A.  Sometimes, yes.

18  Q.  So in a regular week, how many times would you just take a

19  break, not do any work, not drive from one place to another,

20  and eat your meal?

21  A.  Maybe once a week.

22  Q.  And so for the other four days a week, what would you do;

23  when would you eat your meal?

24  A.  We would eat it on the run.

25  Q.  What do you mean by that?

1    A.  Well, we'd eat our food.  I mean, I generally, it depend on

2    whether I drove or not.

3    Q.  And if you drove, what would you do?

4    A.  If I drove?

5    Q.  Yeah.

6    A.  We'd stop in between clients' houses and wolf down my lunch

7    and then we'd get back to work.

8    Q.  And if you were with somebody else, who was driving?

9    A.  Generally, I'd eat and maybe do some more routing or

10   paperwork, try to catch up while we were on the road.

11   Q.  Now let's talk about when you stopped working at CCI.  What

12   was the date when you stopped?  You can look at Exhibit SS

13   again, if you'd like.

14   A.  It was 7/8, 2010.

15   Q.  So July 8, 2010?

16   A.  Correct.

17   Q.  Do you remember how you found out that you would no longer

18   be working for CCI?

19   A.  Well, I was told by Mr. Olson and Mr. Loguidici.

20   Q.  Where were you when they told you?

21   A.  At Mr. Olson's house.

22   Q.  And were you by yourself with those guys?

23   A.  No.

24   Q.  Who else was with you?

25   A.  Mr. Murphy.

1   Q.  And what did they, what did Mr. Olson or Mr. Loguidici tell

2   you?

3   A.  As far as?

4   Q.  As far as you not working for CCI anymore.

5   A.  They told me I was being laid off.

6   Q.  Did they tell you why you were being laid off?

7   A.  No.  I couldn't get an answer to that.

8   Q.  Did you ask?

9   A.  Yes.

10  Q.  What did you ask?

11  A.  I asked what was the reason for me being picked to be laid

12  off.

13  Q.  And what was their response?

14  A.  They didn't give me an answer.

15  Q.  And when you were laid off, were you told that you might be

16  able to be rehired?

17  A.  Well, I just assumed that being laid off meant that you

18  would be hired back when the job was available.

19  Q.  Was Mr. Murphy hired back eventually?

20  A.  Yes.

21  Q.  Were you ever hired back?

22  A.  No.

23  Q.  Now, before you were laid off, had you spoken to

24  Mr. Loguidici or Mr. Solimine about not getting paid for all

25  the hours you worked?

1    A.  Several times.

2    Q.  And what was their response?

3    A.  The same thing, that they don't pay overtime.

4    Q.  All right.  Just so that we can summarize and make sure

5    we're clear on this, Mr. McGlone, in the mornings, what time

6    would you start work?

7    A.  7:00.

8    Q.  And what time would you sign in?

9    A.  I signed in at eight.

10   Q.  O.K.  So every morning on average you worked approximately

11   one hour where you did not get paid, is that correct?

12   A.  Correct.

13   Q.  In the afternoons, what time did you say that you would

14   typically leave the CCI office, on a typical day?

15   A.  Generally between five and a quarter after.

16   Q.  So that would be, if we could do that, if we could just cut

17   it right in the middle, that would be 5:07 and 30 seconds,

18   let's just say 5:06 for the purposes of the math, that would

19   come to a half hour, plus six minutes, and so that's .4.

20   Excuse me.  That's .6.  A half hour is half an hour, so that's

21   .5 and then six minutes is one-tenth of an hour, so that's 20,

22   correct?

23   A.  Correct.

24   Q.  In the afternoons, if we take it, that's .6.  And then you

25   said before how many days a week would you actually take a full

F5kWmcg2                         McGlone - direct

1    half hour for your meal break?

2    A.  One.

3    Q.  And so four days a week you would not take a full half hour

4    for your meal break?

5    A.  Correct.

6    Q.  And you would eat while you were working?

7    A.  Correct.

8    Q.  So that's two hours, which is 120 minutes, and so that's,

9    as we've done this math before, 24 minutes per day which comes

10   to .4 of an hour.  So 24 minutes on average would be .4.  So if

11   we add those things up, that comes to one hour in the morning,

12   correct?

13   A.  Correct.

14   Q.  .6 in the afternoon?

15   A.  Correct.

16   Q.  .4 on average every day for the amount of lunch you weren't

17   getting, correct?

18   A.  Correct.

19   Q.  And then that comes to two hours.  Is that the

20   approximate -- excuse me.

21       Is that the total unpaid hours per day that you would have

22   on average while you were working at CCI?

23   A.  Yes.

24   Q.  Now let's talk about when you were laid off.  You've been

25   sitting in the court every day, correct?

F5kWmcg2                                    McGlone - direct

1    A.  Yes.

2    Q.  And you heard the opening statements, is that correct?

3    A.  I might have missed a little of it.

4    Q.  Did you hear the defendants' counsel say that there were

5    some mistakes being made with the prevailing wage that was

6    first being paid on the job?

7    A.  Correct.

8    Q.  Now, did you hear the defendants' counsel say that CCI paid

9    all of the employees that amount of prevailing wage subsequent?

10   A.  Correct.

11   Q.  Now, did you ever get paid an amount that was supposed to

12   make you whole for the prevailing wage you did not receive at

13   the beginning?

14   A.  No.

15   Q.  So while you were working there, did you eventually start

16   getting paid the proper prevailing wage?

17   A.  No.

18   Q.  Do you know what the prevailing wage was supposed to be,

19   approximately?

20   A.  Approximately between 46 and 47 an hour.

21   Q.  And you never got paid any of the overtime; you never got

22   paid any overtime for any of the days, for any of the time you

23   calculated where you would come in early, work late, and not

24   have your lunch, correct?

25   A.  No, sir.

1    Q.  One other question.  Did you ever sign a break sheet saying

2    that you were taking a lunch?

3    A.  I don't know what that is.

4    Q.  So did you ever sign such a thing?

5    A.  No.

6           MR. BHANDARI:  All right.  No further questions.

7    Thank you, Mr. McGlone.

8           THE COURT:  Cross-examination.

9           MR. WITTELS:  Thank you, your Honor.

10   CROSS-EXAMINATION

11   BY MR. WITTELS:

12   Q.  If I understand your testimony here today, Mr. McGlone, you

13   testified that on average you took a lunch break, a *bona fide*

14   meal break, once a week, is that correct?

15   A.  Correct.

16          MR. WITTELS:  Judge, may I approach with the

17   deposition, please.

18          THE COURT:  Yes.

19   Q.  Mr. McGlone, do you remember sitting in Ms. Dodson's office

20   back in 2013 and having your deposition taken by me?

21   A.  Yes, sir.

22   Q.  And did you testify at that point in time under oath that

23   you never ever took a meal break during your entire time --

24          THE COURT:  Sustained.  First of all, counsel, that's

25   not the way we do it.  You first put a question to him, if his

1    answer is inconsistent or arguably inconsistent with his

2    deposition testimony.  Then, having of course given a copy to

3    the Court, which you haven't yet, you identify the page and

4    lines that you propose to read.  If plaintiffs' counsel thinks

5    that there's no way they could be construed as inconsistent, he

6    says the one word "objection," and I will review it.  If it is

7    arguably inconsistent, a determination that will ultimately be

8    for the jury, but if it's arguably inconsistent and there is no

9    objection or I overrule the objection, then you may read it.

10   So the first thing you need to do is give me a copy of the

11   deposition.

12             MR. WITTELS:  Judge, I would be happy to do that.  I

13   think we all presubmitted as part of the pretrial submission.

14             THE COURT:  That's fine and it's sitting down where

15   your pretrial submissions are, in my office.  Let's have a copy

16   now.

17             MR. WITTELS:  Judge, I don't have -- I have the

18   original and I don't have another copy.

19             THE COURT:  We'll see if there is an objection, but

20   right now you haven't even laid the foundation, so let's start

21   again.

22             MR. WITTELS:  Thank you, Judge.

23   Q.  Did you at one point say that you never took a lunch break?

24   A.  I don't recall.

25             THE COURT:  Page and lines.

F5kWmcg2                        McGlone - cross

1   Q.  I'd ask you to turn to deposition page 49, line 6.

2              MR. WITTELS:  Judge, would you like me to read the

3   question I asked and him the answer?

4              THE COURT:  No.  I first want to find out if we're

5   going to get a yes or no.

6              MR. BHANDARI:  I think it's not inconsistent with what

7   he just said, and I can read it.

8              THE COURT:  I don't want colloquy, I told you.  If you

9   think it's not inconsistent, you say the one word "objection."

10             MR. BHANDARI:  Objection.  I can show you.

11             THE COURT:  Let me see this.  Where do you want to

12  read from, six to where?

13             MR. WITTELS:  Six to 18.

14             THE COURT:  All right.  I will allow that.

15             Ladies and gentlemen, you should understand a couple

16  of things.  First, before any trial, the parties get to take

17  what they call a deposition; that is to say, they get to take

18  the testimony of the witnesses under oath in their offices.

19  There is no judge there, but the witness is under oath.  If the

20  witness gives testimony here that is arguably inconsistent with

21  something said in the deposition, then the relevant parts of

22  the deposition can be read.  You first have to determine

23  whether it really is inconsistent or not; maybe it is, maybe it

24  isn't.  If it isn't, that's the end of that.  If it is

25  inconsistent, then you have to determine whether what he said

F5kWmcg2                         McGlone - cross

1    at the deposition was the truth, what he says here is the

2    truth, or whether neither is the truth.  So those are all your

3    jobs.  My job is first to see whether it's arguably

4    inconsistent.  I'm making no determination whether it is

5    inconsistent, just whether it's arguably inconsistent.

6              MR. BHANDARI:  Your Honor, may I approach the bench

7    for a moment.

8              THE COURT:  No.

9              MR. BHANDARI:  Is it possible to approach?  I don't

10   want to say anything in front of the jury, but can we please

11   approach the bench.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

F5kWmcg2                         McGlone – cross

 1              (At the sidebar)

 2              THE COURT:  Go ahead.  I've got it.

 3              MR. BHANDARI:  I don't think it can be arguably

 4    inconsistent because it says, "Isn't it your testimony that

 5    during your employment with CCI, you never took a meal break?"

 6    He's asking is it his testimony that he never took a meal

 7    break, and he says no.  That's consistent with what he just

 8    said, that he took it one day a week.

 9              THE COURT:  No.  The "no" there is ambiguous.  That's

10    why I wanted to know what lines he was going to read.  But he

11    goes on to say:

12    "Q. And just to make sure the record is clear, your answer of

13    no means it was your testimony that you never took such a

14    break, correct?

15    "A. Not to my recall, no."  So he clarified that the "no" meant

16    that he never took a break.

17              MR. BHANDARI:  O.K., not to his recollection.

18              THE COURT:  All right.

19              MR. BHANDARI:  That's fine.  Thank you.

20              (Continued on next page)

21

22

23

24

25

1              (In open court)

2    BY MR. WITTELS:

3    Q.  Do you have the deposition in front of you?

4    A.  Yes, sir.

5    Q.  And on line 6, I asked you --

6              THE COURT:  Just say question, answer, read the whole

7    thing, and then you can ask him if that was his testimony.

8    BY MR. WITTELS:

9    Q.  Line 6:

10   "Q. It is your testimony that during your employment with CCI,

11   you never took a meal break?

12   "A. A *bona fide*?"

13        Line 12:

14   "Q. A *bona fide* meal break."

15   "A. No."

16        Line 14:

17   "Q. And just to make sure the record is clear, your answer of

18   no means it is your testimony that you never took such a break,

19   correct?"

20        Line 18:

21   "A. Not to my recall, no."

22        Was that your testimony back in 2013?

23   A.  Yes.

24   Q.  Yet you testified you were a union carpenter prior to

25   working for CCI, is that right?

1    A.  Correct.

2    Q.  And during your time in the union, you had been a shop

3    steward, correct?

4    A.  Correct.

5    Q.  And part of the duties, your duties as a shop steward was

6    managing pay issues, is that right?

7    A.  Managing what?

8    Q.  Pay issues.

9    A.  Correct.

10   Q.  From almost day one, if I understand your testimony, from

11   almost day one on the job you felt that you were not being paid

12   correctly, correct?

13   A.  Correct.

14   Q.  And fair to say that you felt you were being cheated out of

15   hours?

16   A.  Correct.

17   Q.  During your time at CCI, did you maintain any record of

18   your own hours worked?

19   A.  No.

20   Q.  So from day one, you thought you were being cheated, but

21   you kept no hours, no record of the actual hours you now claim

22   you worked, correct?

23   A.  Correct.

24   Q.  You knew you were entitled to a meal break every day,

25   correct?

F5kWmcg2                        McGlone - cross

1   A.  Correct.

2   Q.  And you kept no record of the times that you didn't take a

3   meal break, correct?

4   A.  Correct.

5   Q.  You testified that there were times that you were allowed

6   and took overtime, correct?

7   A.  Correct.

8   Q.  And you were paid for the overtime, correct?

9   A.  Correct.

10  Q.  Were there times during your employment with CCI that you

11  didn't work 40 hours in a week?

12  A.  I don't recall.

13          MR. WITTELS:  Judge, may I approach the witness again.

14          THE COURT:  Yes.

15  Q.  Let me ask you to turn to Plaintiffs' Exhibit 4.  Are you

16  there?

17  A.  Yes.

18  Q.  And these are certified payroll records, is that correct?

19  A.  Correct.

20  Q.  If you'll turn to page 20 of that Exhibit 4, is that for

21  the week of June 14 to June 20, 2009?  Look across the top,

22  perhaps; it has the dates.

23  A.  Yes.

24  Q.  And I apologize that I can't bring it up on the screen, but

25  it's a Plaintiffs' Exhibit that I don't have control of.  Can

1    you find your name on page 20?

2    A.  Yes.

3    Q.  How many hours of work were you paid for in that week?

4    A.  It appears to be 31.

5    Q.  31?

6    A.  Yeah.

7              MR. WITTELS:  Judge, may I approach.

8              THE COURT:  Yes.

9    A.  Oh, hours.

10   Q.  Hours.  Do you see it now?

11   A.  Yeah.  34.

12   Q.  34.  So in that week, you worked 34 hours, correct?

13   A.  Correct.

14             MR. BHANDARI:  Objection.

15   Q.  You were paid for 34 hours, correct?

16   A.  Yes, yes.

17   Q.  You don't know how many hours you worked that week, do you?

18   A.  No.

19   Q.  Let's turn to, same book, Exhibit 10.  Are you there?

20   A.  Yes.

21   Q.  O.K.  If you'll turn to page 74 of Exhibit 10, that is the

22   certified payroll record for the week of December 20 through

23   December 26, 2009, correct?

24   A.  It appears so.

25   Q.  Can you find your name on that page?

321

F5kWmcg2                        McGlone - cross

1    A.   Yes.

2    Q.   And how many hours were you paid for in that week?

3    A.   In the regular hours?

4    Q.   Both regular and overtime, if you earned.

5    A.   O.K.  42.5.

6    Q.   Total of 42.5 hours, correct?

7    A.   Correct.

8    Q.   And you were paid 40 hours of straight time and two and a

9    half hours of overtime?

10   A.   Correct.

11   Q.   Now, if you move that book to your side a little bit and go

12   to the next notebook and open it to Exhibit 77.

13   A.   O.K.

14   Q.   And if you'll turn, that's the sign-in/sign-out sheet that

15   you testified to before, correct?

16   A.   Correct.

17   Q.   And it was your responsibility to sign in and sign out each

18   day that you worked at CCI?

19   A.   That's what we were told.

20   Q.   If you'll turn to page 427 of that exhibit.

21   A.   O.K.

22   Q.   Can you find your name on the sign-in/sign-out sheet?

23   A.   Yes, I can.

24   Q.   How many hours did you sign in and sign out for on that

25   day?

F5kWmcg2                          McGlone - cross

1   A.  Nine hours.

2   Q.  Nine hours.  Can you turn to page 429.  And tell the jury

3   what day, what calendar day that is.

4   A.  December 22, '09.

5   Q.  How many hours did you sign in and sign out for?

6   A.  Well, I don't know.  It's --

7   Q.  Is it blank?

8   A.  It's written over.

9        MR. WITTELS:  If I may, Judge.

10       THE COURT:  Yes.

11  Q.  All right.  What does it appear to you on that page?

12  A.  It's either 4:30 or 5:30.

13  Q.  O.K.  So it's either sign out at 4:30 or 5:30, correct?

14  A.  Correct.

15  Q.  So it's either eight and a half or nine and a half hours,

16  correct?

17  A.  Correct.

18  Q.  All right.  You can turn to page 431.  And what day of the

19  calendar is that?

20  A.  12/23/09.

21  Q.  All right.  Find your name?

22  A.  Yes.

23  Q.  How many hours were you signed in and out for?

24  A.  It says here eight to five.

25  Q.  Eight to five, so eight and a half hours, correct?

F5kWmcg2                          McGlone - cross

1   A.  Correct.

2   Q.  All right.  Turn to page 433.  What day of the week is

3   that?

4   A.  It's 12/24.

5   Q.  And what is your sign in and sign-out time?

6   A.  8:00 to 4:30.

7   Q.  So eight hours?

8   A.  Correct.

9   Q.  Page 435.

10          MR. BHANDARI:  Objection.  Mischaracterizes.

11          THE COURT:  Sustained.

12  BY MR. WITTELS:

13  Q.  Eight and a half hours is the time between your sign in and

14  sign-out time?

15  A.  Right.

16  Q.  Turn to page 433.

17  A.  I'm on 433.

18  Q.  O.K.  What day of the week is that?

19  A.  December 24.

20  Q.  And is there a sign in and sign-out time for you on that

21  day?

22  A.  Yes.  That day, yes.

23          MR. BHANDARI:  Objection.  Asked and answered.

24  BY MR. WITTELS:

25  Q.  I apologize.  435.  I'm sorry.  Page 435.

1   A.  Yes.

2   Q.  Find your name?

3   A.  Yes.

4   Q.  Sign-in/sign-out time?

5   A.  There is none.

6   Q.  None, zero?

7   A.  Yes.

8   Q.  It's a holiday, Christmas Day, correct?

9   A.  12/25/09.

10  Q.  Turn to 437.  So you'll agree with me you didn't work on

11  Christmas Day?

12  A.  No.

13  Q.  No, you don't agree with me, or you didn't work?

14  A.  I didn't work.

15  Q.  Turn to page 437.

16  A.  O.K.

17  Q.  Find your name?

18  A.  Yes, I do.

19  Q.  What was your sign in and sign-out time?

20  A.  It says here none.

21  Q.  So you didn't work on December 26, 2009, correct?

22  A.  Correct.

23  Q.  So in that week, you worked four days, correct?  Page 427,

24  429, 431, and 433.

25  A.  Correct.

1    Q.  And you worked, your sign-in/sign-out time was nine hours,

2    nine hours, and eight and a half hours and eight and a half

3    hours, we already went through, correct?

4    A.  Yes.

5    Q.  You got paid for 40 hours of straight time for that week,

6    correct, looking back at Exhibit 10?

7            MR. BHANDARI:  Which week are we talking about?

8            MR. WITTELS:  December 20 through 26.  Exhibit 10.

9    A.  Correct.

10   Q.  All right.  So you got paid 40 hours straight time plus two

11   and a half hours overtime for that week?

12   A.  Correct.

13   Q.  You'll agree with me that hours paid doesn't always equal

14   hours worked, correct?

15   A.  Correct.

16   Q.  So during your time at CCI, there were weeks that you took

17   vacation days, got paid for them, correct?

18   A.  Correct.

19   Q.  But those aren't days worked or hours worked, correct?

20   A.  Correct.

21   Q.  There were days that there was no work because of bad

22   weather.  Do you recall any of those?

23   A.  I always went in to work.

24   Q.  Was the shop ever closed because of snow or horrible

25   weather, to your recollection?

F5kWmcg2                          McGlone - cross

1    A.  I don't, I don't, I don't recall.

2    Q.  Were there days that the shop closed early, that you

3    recall?

4    A.  I don't recall.

5    Q.  Let me ask you to turn to Exhibit 12, plaintiffs' No. 12.

6    Are you there?

7    A.  Yes.

8    Q.  Page 13 of Exhibit 12.

9    A.  Yes.

10   Q.  How many hours were you paid for in that week of February

11   7, 2010, to February 13, 2010?

12   A.  36.

13   Q.  36 hours.  Now, if I can ask you to turn to Exhibit 79,

14   back in the other notebook.

15   A.  O.K.

16   Q.  Page 14 of that exhibit.

17   A.  All righty.

18   Q.  What's the date of that sign-in/sign-out sheet?

19   A.  It says eight to 4:30.

20   Q.  No.  What's the date.

21   A.  Oh, the date.  February 8, 2010.

22   Q.  All right.  And your sign-in/sign-out time is, I think you

23   already said, eight to 4:30, correct?

24   A.  Correct.

25   Q.  Turn to page 18.

1   A.  O.K.

2   Q.  The date of that sign-in/sign-out sheet?

3   A.  2/10/10.

4   Q.  And how many hours were you signed in and signed out for

5   that?

6   A.  It says here eight to 12:00.

7   Q.  And so did you sign yourself out at 12:00 in the afternoon?

8   A.  I'd have to say yes.

9   Q.  Are there other people that day that signed out at 12:00?

10  A.  Yes.

11  Q.  So for that day, you recorded four hours of work, correct?

12  A.  Correct.

13  Q.  If you'll turn to page 20 of that exhibit.

14  A.  O.K.

15  Q.  What's the date on that exhibit?

16  A.  February 11, 2010.

17  Q.  And what was your sign-in/sign-out time on that day?

18  A.  It says sick day.

19  Q.  So you didn't come to work that day at all, correct?

20  A.  Not if I was sick.

21  Q.  So on that day you worked zero hours, correct?

22  A.  Correct.

23  Q.  Somebody, do you know who wrote in sick day for you?

24  A.  I don't know.

25  Q.  Turn to page 22.  What's the date of that sign-in/sign-out

1    sheet?

2    A.   December 12, 2010.

3    Q.   And how many hours are you signed in for that day?

4    A.   Eight to 4:30.

5    Q.   And if you'll turn to page 24.

6    A.   O.K.

7    Q.   The date of that page?

8    A.   2/13/10.

9    Q.   And how many hours are you signed in for that day?

10   A.   I'm not.

11   Q.   None?

12   A.   No.

13   Q.   So zero, correct?

14   A.   Correct.

15   Q.   So we went through five days; you took a sick day on one,

16   correct?

17   A.   Correct.

18   Q.   No time on another, correct?

19   A.   Correct.

20   Q.   Half a day on another?

21           MR. BHANDARI:  Objection.

22           THE COURT:  Overruled.

23           MR. BHANDARI:  Mischaracterizing.

24   Q.   Half day, eight to 12, on the third?

25   A.   Correct.

F5kWmcg2                          McGlone - cross

1   Q.  You got paid for 36 hours of work, you got paid for 36

2   hours in that week, correct?

3   A.  Correct.

4   Q.  But you worked two and a half days that week, correct?

5   A.  Correct.

6   Q.  So you worked 20 hours, correct?

7   A.  Correct.

8   Q.  Are there instances where you recall signing out on a

9   sign-out sheet indicating that you worked more than eight and a

10  half hours a day?

11  A.  Yes.

12  Q.  And did you always get paid for that overtime when you

13  worked more than eight and a half hours a day?

14  A.  If it was prior approved.

15          THE COURT:  Counsel, we're going to need to give the

16  jury their midmorning break, if this is a good time.

17          MR. WITTELS:  It's up to you, Judge.  Fine.

18          THE COURT:  O.K.  Ladies and gentlemen, we'll take a

19  15-minute break at this time and we'll resume.

20          (Jury excused)

21          THE COURT:  Mr. McGlone, you can step down.

22          (Witness excused)

23          THE COURT:  Counsel, I'm taking two other matters now,

24  so you need to vacate, but you can leave your stuff there.

25          (Recess)

F5K3MCG3                    McGlone - cross

1          (In open court; jury present)

2          THE COURT:  Counsel.

3   BY MR. WITTELS:

4   Q.  Mr. McGlone, nobody at the Queens office told you to be at

5   work at 7 o'clock, correct?

6   A.  No.

7   Q.  No, not correct, or no, no one told you to be there?

8   A.  No, no one told me I had to be there at seven, but they

9   told me I had to be there prior to eight.

10  Q.  You were commuting from Long Island?

11  A.  Correct.

12  Q.  There were times that you got there at 6:45 and waited in

13  your car and listened to music, correct?

14  A.  Correct.

15  Q.  Is it your testimony that your morning routine took you

16  between a half hour and 45 minutes every day?

17  A.  Not every day.  But, could be, yes.

18  Q.  On average, how long did it take you to load your vehicle

19  and get your CN3 and get your paperwork?

20  A.  Thinking about it yes, it could be about 45 minutes, yes.

21  Q.  And the whole time you worked there, you worked a two-man

22  team?

23  A.  Yes.

24  Q.  So it took two men 45 minutes to get their CN3, get their

25  paperwork, and get their meters and supplies for the day and

F5K3MCG3                              McGlone - cross

1   load up the truck?

2   A.  Yes.

3   Q.  After you got back, I believe your testimony was it took

4   you 20 to 30 minutes to unload your truck, and to turn in the

5   paperwork and your CN3?

6   A.  Correct.

7   Q.  That again is a two-man team, correct?

8   A.  Correct.

9   Q.  You're both unloading, correct?

10  A.  No.

11  Q.  So only one of you is doing the work?

12  A.  No, we were both doing separate things.

13  Q.  What would you normally do?

14  A.  I would load the truck, do the meters, make sure we had all

15  the necessary things to do the job.

16  Q.  What would your partner do?

17  A.  He would be taking care of our paperwork we couldn't

18  possibly do during the day.

19  Q.  So it is your testimony that you couldn't keep up with the

20  paperwork during your daily routine?

21  A.  Not with the schedule they gave us.

22  Q.  Your testimony that you were told CCI didn't pay overtime,

23  that's your testimony, that's what you were told by Charlie and

24  Jimmy and Angelo, right?

25  A.  Correct.

F5K3MCG3                    McGlone - cross

1    Q.  But they did pay overtime, correct?

2    A.  Only if you called in first.

3    Q.  Called it in, got authorized, they paid you for the time

4    that you were out in the field?

5    A.  Correct.

6    Q.  Where on -- I think you said Suffolk County?

7    A.  Yes.

8    Q.  How long was your commute back and forth each day?

9    A.  From my house to work?

10   Q.  Yes.

11   A.  About 40 minutes.

12   Q.  How many miles?

13   A.  I couldn't tell you.

14   Q.  When you did get issued a company vehicle, you took the

15   vehicle home at night and brought it back in the morning,

16   correct?

17   A.  Correct.

18   Q.  I think you testified that you were told you were no longer

19   employed while at your cousin's house by your nephew, correct?

20   A.  Correct.

21   Q.  Mr. Wertz didn't notify you that you were no longer

22   employed by CCI?

23   A.  No.

24   Q.  And Mr. Maguire didn't tell you that, correct?

25   A.  No.

1    Q.  Neither one of them hired or interviewed you, correct?

2    A.  No.

3    Q.  No, not correct, or no, they didn't hire or interview you?

4    A.  No, they didn't personally hire me.

5    Q.  Did they assign you your route during the day?

6    A.  No.

7    Q.  Who did that?

8    A.  Who assigned it?  I don't know.  But I was given to by

9    Rafael Soto or whoever was working for Angelo that day.

10   Q.  So somebody in the warehouse or in the office would hand

11   you a CN3?

12   A.  Correct.

13   Q.  This was a prevailing wage rate job, correct?

14   A.  Yes.

15   Q.  Wages were set by the City of New York.

16   A.  I don't know who set them.

17   Q.  Did you ever receive a direct command from either Mr. Wertz

18   or Mr. Maguire?

19   A.  No.

20   Q.  Did you ever receive a direct instruction from Mr. Wertz or

21   Mr. Maguire?

22   A.  No.

23   Q.  Who is Mr. Maguire?

24   A.  Charlie's friend's brother.

25   Q.  Do you know what his role in the company is?

F5K3MCG3                          McGlone - cross

1    A.  Vice president.

2    Q.  Do you know what he's in charge of?

3    A.  No.

4    Q.  Who is Mr. Wertz?

5    A.  I believe he's the CEO.

6    Q.  Any other titles or anything else that you know of?

7    A.  Not that I am aware of.

8    Q.  Is he an owner of the company?

9    A.  Yes.

10   Q.  You were asked about whether you got a payment at any time

11   to make up for a missed calculation.  I believe your testimony

12   was you did not receive any such payment, correct?

13   A.  Correct.

14   Q.  Did Angelo ever discuss a payment like that with you?

15   A.  Yes.

16   Q.  Did you refuse to sign a receipt agreeing to the amount

17   that he calculated was due to you?

18   A.  Yes.

19   Q.  That's why you weren't given the check, correct?

20   A.  Three times.

21   Q.  So on three separate occasions, you refused and therefore

22   weren't paid?

23        MR. BHANDARI:  Objection.  Calls for speculation.

24   A.  No.

25        THE COURT:  Hold on there is an objection.  Ground?

1          MR. BHANDARI:  Speculation, the "therefore."

2          THE COURT:  Sustained.

3    Q.  Three times you refused to sign the document requesting

4    your signature regarding those benefits?

5    A.  Correct.

6    Q.  And you were not paid that money.

7    A.  Correct.

8          MR. WITTELS:  That's all.  No further, Judge.

9          THE COURT:  Redirect?

10   REDIRECT EXAMINATION

11   BY MR. BHANDARI:

12   Q.  Mr. McGlone, do you recall being asked some questions about

13   the certified payroll during Christmas week of 2009?

14   A.  Yes.

15   Q.  You got paid for Christmas Day, even though you didn't work

16   on Christmas Day, correct?

17   A.  Correct.

18   Q.  Do you have an understanding of why you were paid on

19   Christmas Day even though you didn't work on Christmas Day?

20   A.  Yes, because I had sick and vacation time.

21   Q.  What do you mean you had sick and vacation time?

22   A.  I had sick time that they had owed me.

23   Q.  When you say they owed you, why did they owe it to you?

24   A.  I worked for it.

25         MR. BHANDARI:  I'd like to have marked as Plaintiff's

F5K3MCG3                        McGlone - redirect

1      Exhibit 128 a document marked for identification, your Honor.

2      May I approach the bench and give it to the witness?

3              THE COURT:  All right.

4              MR. BHANDARI:  Here is a copy for Mr. Wittels.

5      Q.  So before I ask you a question about this document,

6      Mr. McGlone, you said you had worked for vacation time and sick

7      time, correct?

8      A.  Correct.

9      Q.  Christmas Day would have been a vacation time or would it

10     have been sick time?

11     A.  It would have been vacation.

12     Q.  Then do you remember being asked some questions about

13     February of 2010 where you were paid for days that you did not

14     work?

15     A.  Correct.

16     Q.  For those two days during that week where did you not work

17     but you were paid, what was the reason why you were paid for

18     those days even though you didn't work them?

19     A.  I don't recall.

20     Q.  Do you remember seeing the sheets?

21     A.  Yes.

22     Q.  They say that they were sick days?

23     A.  Yes.

24     Q.  So you recall seeing that, correct, during Mr. Wittels'

25     testimony?

1    A.  Yes.

2    Q.  So now, looking at this document, which is Plaintiff's

3    Exhibit 128.

4              MR. BHANDARI:  Your Honor, I'd like to have this

5    introduced into evidence as an admission of CCI.

6              THE COURT:  Any objection?

7              MR. WITTELS:  As a what?

8              MR. BHANDARI:  As a party admission.

9              MR. WITTELS:  Well, Judge, I would object as a party

10   admission.  I don't know if --

11             THE COURT:  Well, what he means, he is just flagging

12   for you any objection on a hearsay ground.

13             MR. BHANDARI:  Yes.

14             MR. WITTELS:  I would object.

15             THE COURT:  Ground?

16             MR. WITTELS:  Hearsay and no foundation by this

17   witness.

18             THE COURT:  Are you challenging the authenticity?

19             MR. WITTELS:  I'm challenging --

20             THE COURT:  Excuse me.  Answer my question, counsel.

21             MR. WITTELS:  No, I'm not challenging the

22   authenticity.

23             THE COURT:  Okay.  Then the objection is overruled.

24   128 is received.

25             (Plaintiff's Exhibit 128 received in evidence)

F5K3MCG3                          McGlone - redirect

1          MR. BHANDARI:  May I publish to the jury?  I have

2     copies for the jury as well.

3          THE COURT:  Yes.

4          MR. BHANDARI:  There might be more than eight copies

5     here, so feel free to put them at the end.

6     Q.  While this is being passed to the jury, Mr. McGlone, can

7     you go to the second page of this document which is Bate

8     stamped 43.  Go back to the first page.

9          Do you recognize this document, Mr. McGlone?

10    A.  No.

11    Q.  It is a memorandum from CCI, correct?

12         MR. WITTELS:  Judge, I'll object since he indicates he

13    does not, there is no foundation.  He does not recognize the

14    document.

15         THE COURT:  Well, the objection to the immediate

16    question is sustained.

17    Q.  Looking at this document, is the date on this document

18    July 28, 2009?

19    A.  Correct.

20    Q.  Were you working at CCI at that time?

21    A.  Yes.

22    Q.  Were you an employee of Contract Callers Inc. at that time?

23    A.  Yes.

24    Q.  So the field of this document says two employees of

25    Contract Callers Inc. New York MIU project.  Do you know what

1    the New York MIU project was?

2    A.  No.

3    Q.  Do you know who Milton Simmons was?

4    A.  Yes, I know him.

5    Q.  Who is Milton Simmons?

6    A.  I believe, like it says here, he was the human resources

7    manager.

8    Q.  Mr. McGlone, I am going to ask you just read the first

9    paragraph of this document, if you could.  Read it to yourself.

10          (Pause)

11   A.  Okay.

12   Q.  Have you finished reading it?

13   A.  The first sentence?

14   Q.  Sorry, the first paragraph.  And look up when you're done.

15   A.  Correct.

16   Q.  Does this refresh your recollection, were you working on

17   the MIU project?

18   A.  Yes.

19   Q.  The MIU project was the meter infrastructure upgrade

20   project, is that correct?

21   A.  Yes.

22   Q.  Looking at this document, does it refresh your recollection

23   on whether or not you were given a document by CCI about what

24   the supplemental benefits you were receiving from CCI were?

25   A.  Yes.

F5K3MCG3                          McGlone - redirect

1           MR. WITTELS:  Objection.  Leading, Judge.

2           THE COURT:  Sustained.

3    Q.  What are supplemental benefits?

4    A.  Vacation, sick time, medical.

5    Q.  If you look at the second page of this document, what does

6    this document say that the hourly wage was?

7    A.  31.64.

8    Q.  What was the supplemental?

9    A.  14.65.

10   Q.  Were you to receive that entire 14.65?

11   A.  Yes.

12   Q.  Did CCI provide you with certain benefits which they

13   deducted out of that 14.65?

14   A.  Not me, but other people, yes.

15   Q.  If you look at this, do you see the annual supplemental

16   benefits provided by CCI?

17   A.  Yes.

18   Q.  What are the supplemental benefits that were provided by

19   CCI?

20   A.  Holidays.

21   Q.  Paid holidays?

22   A.  Yes.  Vacation and sick.

23   Q.  How much did you pay out of every hour of supplemental

24   benefits for the paid holidays you received?

25   A.  97 cents.

F5K3MCG3                      McGlone – redirect

1   Q.  So for every hour you worked for CCI, they deducted how
2   much from your pay for paid holidays?
3   A.  97 cents.
4   Q.  For every hour you worked for CCI, they deducted how much
5   from your pay for sick days?
6   A.  61 cents.
7   Q.  How many sick days were you supposed to get each year?
8   A.  Five.
9   Q.  So in February of 2010, when you saw the certified payroll
10  sheets that Mr. Wittels showed you, had you paid for those sick
11  days?
12  A.  Correct.
13          MR. WITTELS:  Objection.
14          THE COURT:  Was there an objection?
15          MR. WITTELS:  There is, Judge.
16          THE COURT:  Sustained.
17  Q.  How many sick days did you use in February 2010?
18  A.  I believe it was three.
19  Q.  Was it three or --
20          THE COURT:  Counsel.
21          MR. BHANDARI:  Sorry.
22  Q.  Going back, if we can look at the certified payroll for --
23  excuse me.
24          If we can look at the time sheet for February of 2010
25  which I believe is Exhibit 12.  Can we look at Exhibit 79.

F5K3MCG3                    McGlone - redirect

```
 1              MR. BHANDARI:  Can I approach the witness?
 2              THE COURT:  Yes.
 3   Q.  Looking at Exhibit 12, can you please turn to the page,
 4   that Bate stamped page 20.
 5   A.  20.
 6   Q.  20, yes.  No, but it is there in Exhibit 12, right.
 7              MR. BHANDARI:  Do you mind if I approach to make sure
 8   we are on the same page?
 9              THE COURT:  Yes.
10   Q.  Looking at page -- sorry.  This is a different document.
11   You can put that down.
12              What is the document you're looking at, what type of
13   document is that?
14   A.  It is a sign-in sheet.
15   Q.  A sign-in sheet, correct?
16   A.  Correct.
17   Q.  It is not the certified payroll, correct?
18   A.  No.
19   Q.  What is the date of that sign-in sheet?
20   A.  February 11, 2010.
21   Q.  What does it say for your entry?
22   A.  It says sick day.
23   Q.  If you can go to page 22.  What is the date of page 22 of
24   Exhibit 12?
25   A.  February 12, 2010.
```

1   Q.  What does it say for your entry on February 12, 2010, in

2   your signature block?

3   A.  It says sick day.

4   Q.  So how many sick days did you take that week?

5   A.  Two.

6   Q.  If you can go to page 18.  What are the hours you signed

7   in?

8   A.  Eight to 12.

9   Q.  And when you saw the certified payroll for that week, do

10  you remember seeing the certified payroll?

11  A.  Correct.

12  Q.  How many hours were you paid for that day?

13  A.  36 I believe.

14  Q.  For that week.  How many were you paid for that day that

15  you're looking at when you worked from eight to 12?

16  A.  Oh, I don't remember.

17  Q.  If we can go to the binder which is right next to it.  I

18  think you should be in Exhibit 79.  Is that right?  Or excuse

19  me.  Exhibit 12.

20  A.  Correct.

21  Q.  Do you see that week of February 13?

22  A.  Yes.

23  Q.  If you look to the day, what is the date on the time sheet

24  that Mr. Wittels showed you before, what is the date on the

25  time sheet where you worked from eight to 12?

F5K3MCG3                        McGlone - redirect

```
1    A.  2/10.

2    Q.  How many hours were you paid for that day?

3    A.  Four hours.

4    Q.  So were you paid the correct amount that you were supposed

5    to be paid that week?

6    A.  No.

7    Q.  Taking into account sick days -- why not?

8    A.  Because I should have got the extra in sick time.

9    Q.  Well, did you take a sick day that day?

10   A.  No.

11   Q.  So do you remember exactly what happened on that day?

12   A.  No.

13   Q.  So based on your sign-in sheets, and the certified payroll,

14   did you get paid the correct amount for that week?

15   A.  Yes.

16   Q.  So you didn't get paid extra that week, did you?

17   A.  No.

18   Q.  Okay.  You testified before on cross-examination that you

19   would get to Weirfield sometime between 6:45 and 7 a.m. on most

20   days, correct?

21   A.  Correct.

22   Q.  You would sit in the car to listen to music, correct?

23   A.  Correct.

24   Q.  Are you seeking any compensation for the time you were just

25   sitting in your car waiting for the gates to open?
```

```
 1   A.  No.

 2              MR. BHANDARI:  I have no further questions.  Thank

 3   you.

 4              THE COURT:  All right.  Anything else?

 5              MR. WITTELS:  Yes, Judge.  Thank you.

 6   RECROSS EXAMINATION

 7   BY MR. WITTELS:

 8   Q.  Mr. McGlone, did you receive this letter, Exhibit 128?

 9   A.  Yes.

10   Q.  Did you ever deal with Milton Simmons?

11   A.  No, other people did.

12   Q.  Other people dealt with -- other plumbers dealt with Milton

13   Simmons?

14   A.  Correct.

15   Q.  You've been in the union a long time, right?

16   A.  Yeah, a bit.

17   Q.  There is always benefit supplements that you get as part of

18   your pay, correct?  As part of your union wage or prevailing

19   wage?

20   A.  Correct.

21              MR. BHANDARI:  Objection as to form.

22              THE COURT:  Overruled.

23   Q.  You can either take the full benefit paid in cash, right?

24   That's an option?

25   A.  In the union?
```

F5K3MCG3                         McGlone - recross

1    Q.  Let's talk about this job.  You could take the full benefit

2    package in cash if you elected to.

3    A.  Yes.

4    Q.  Or you could take the benefits or some of the benefits

5    which were then deducted from the benefit package.  Correct?

6    A.  Correct.

7    Q.  On those dates that Mr. Bhandari just went through with

8    you, you got paid for those days.  Your sick days, your

9    vacation days.  You got paid, correct?

10   A.  I got paid for some, yes.

11   Q.  But you did not work on those days.  Correct?

12   A.  Correct.

13              MR. WITTELS:  Nothing further, Judge.

14              THE COURT:  Okay.  Anything else?

15              MR. BHANDARI:  No, your Honor.

16              THE COURT:  Thank you so much.  You may step down.

17              (Witness excused)

18              THE COURT:  Please call your next witness.

19              MR. GLUNT:  In that case we would call Joe Frische to

20   the stand.

21              (Continued on next page)

22

23

24

25

F5K3MCG3

1           (At the sidebar)

2           THE COURT:  I'm unclear, and so the jury may be

3    unclear.  Did Mr. McGlone choose to have the sick pay deduction

4    from his paycheck, his regular paycheck, or not?

5           MR. BHANDARI:  It was mandatory.  Only the health care

6    was optional.

7           THE COURT:  Pardon?

8           MR. BHANDARI:  It was mandatory.  Only the health care

9    was optional.

10          THE COURT:  He did not choose it as his sick pay?

11          MR. BHANDARI:  He did not, no.  It was mandatory.  It

12   was deducted.

13          THE COURT:  What was deducted?

14          MR. BHANDARI:  The sick pay.

15          THE COURT:  So at some point, I think you need to

16   clarify for the jury one way or the other through a witness or

17   somehow.  Because I think if I'm confused, maybe they are.

18          MR. WITTELS:  Judge, if I could.  I think some of the

19   confusion here is that the benefits package was not the only

20   thing deducted in the benefits package was the health

21   insurance.  Part of the benefits package was the sick time,

22   vacation time, etc.  That's part of the pay.  So it wasn't

23   like, oh, we're deducting money from your pay so that you can

24   have a sick day.  And I don't even know if it is relevant.  The

25   only thing that's relevant here are the hours worked, not the

F5K3MCG3

1    hours paid necessarily.

2              THE COURT:  Whether it is relevant or not I don't

3    know, because neither side raised a relevance objection.

4              MR. WITTELS:  I think I might now.

5              THE COURT:  To the extent you think it is relevant,

6    someone ought to clarify it.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F5K3MCG3

1              (In open court)

2              (Witness sworn)

3         THE DEPUTY CLERK:  Please be seated.  State your name

4     and spell it slowly for the record.

5         THE WITNESS:  Joseph W. Frische.  F-R-I-S-C-H-E.

6     JOSEPH FRISCHE,

7          called as a witness by the Plaintiff,

8          having been duly sworn, testified as follows:

9     DIRECT EXAMINATION

10    BY MR. GLUNT:

11    Q.  Good afternoon, Mr. Frische.

12    A.  Good afternoon.

13    Q.  Do you know the defendant in this case Contract Callers

14    Inc.?

15    A.  Yes, sir.

16    Q.  How do you know them?

17    A.  I worked for them.

18    Q.  Are you a plaintiff in this case?

19    A.  Yes, sir, I am.

20    Q.  When you worked at Contract Callers, did they pay you for

21    every hour that you worked?

22    A.  No, sir.

23    Q.  What did you do for a living before you came to work at

24    CCI?

25    A.  I owned a commercial construction company based in

F5K3MCG3                          Frische - direct

1    Manhattan.

2    Q.   What was the name of that commercial construction company?

3    A.   Building Works Construction.

4    Q.   For how many years did you operate Building Works

5    Construction?

6    A.   From 1994 of August until just before this -- I was hired

7    on this project.

8    Q.   When about was that?

9    A.   I was hired around the middle of February, I interviewed.

10   Q.   Of what year?

11   A.   2009.

12   Q.   What kind of work did you do for Building Works

13   Construction?

14   A.   Commercial general contractor, everything from the windows

15   in.  Doors, drywall, electrical, plumbing, paint, everything

16   but the carpet we did.

17   Q.   I think you said commercial contractor?

18   A.   All commercial, in Manhattan here.

19   Q.   Was this for commercial buildings?

20   A.   Yes, sir.

21   Q.   Did you do any buildings around here?

22   A.   32 Broadway I did quite a bit of work for.  I did work in 7

23   Penn Plaza.  853 Broadway, 841 Broadway. 257 Park Avenue South.

24   We worked for a larger organization.

25   Q.   Did you do any plumbing work while you were operating

F5K3MCG3                           Frische - direct

1   Building Works Construction?

2   A.  Yes, sir.

3   Q.  What kind of plumbing work did you do?

4   A.  We would redo common bathrooms, make them ADA accessible.

5   Which is American Disabilities Act.

6   Q.  While you were operating Building Works Construction, did

7   you have any employees?

8   A.  Yes, sir.

9   Q.  How many employees did you have?

10  A.  Usually I worked with another mechanic and there was two

11  helpers.

12  Q.  Why did you stop working for Building Works Construction,

13  your company, to work for CCI?

14  A.  After 2001, 9/11, it got really bad.  And it was sort of

15  struggling.  The big money was gone.  In 2008 with the

16  economic, you know, downturn, with banks failing, nobody had

17  any money.  So my wife was adamant, get a good job and just

18  take a paycheck.

19  Q.  How did you find out about the CCI job?

20  A.  Rocco Ceparano.

21  Q.  What did you understand the job to be?

22  A.  Originally he told me that we were going to be installing

23  water meters.

24  Q.  Did you interview before you received this job?

25  A.  Yes, sir.

F5K3MCG3                        Frische - direct

1    Q.  Who interviewed you?

2    A.  Angelo Solimine, Charles Loguidici.

3    Q.  When did you start work on the project?

4    A.  I interviewed around the middle of February.  They called

5    me a day later, told me I was going on their A team sent to

6    D.E.P. training, and about a week later I was working.

7    Q.  Did you receive any training before you started work?

8    A.  Yes, sir.

9    Q.  Who conducted that training?

10   A.  We went over to Brooklyn and Mike Roche, the head of the

11   project was training us, David Costa, an inspector.  Gentleman

12   named Willy, and Ken, they were also inspectors.

13   Q.  You've given us some names of some individuals.  What

14   organization did those people work for?

15   A.  Mr. Roche is the project manager who ran the MTU project.

16   David Costa, Willy and Kenny, they were D.E.P. inspectors.

17   Q.  Mr. Roche, what company did he work for?

18   A.  He's a big shot at D.E.P.

19   Q.  Let's talk about your typical day of work at CCI.  Where

20   was CCI's office located?

21   A.  It was on Weirfield Street between Cypress and Wyckoff.

22   Q.  What borough was that?

23   A.  It's in -- well, the end of the street on Wyckoff is

24   Brooklyn.  And the Cypress is Queens.

25   Q.  Where were you living at the time?

1   A.   Syosset, New York.

2   Q.   That's on Long Island?

3   A.   Yes, sir.

4   Q.   When you worked on the CCI project, when would you leave

5   your house to go to work in the morning?

6   A.   Depends.  I carpooled with some of the men.  I was issued a

7   company vehicle.

8   Q.   If you were going by yourself, when would you leave your

9   house?

10  A.   Ten after six the latest.

11  Q.   If you were carpooling with someone else, when would you

12  leave then?

13  A.   Depends.  With Mike McGlone, Mike was at my house at 10 to

14  six.  When I was with Mr. Murphy, he was at my house at six.

15  Q.   You mentioned a couple of people that you carpooled with.

16  Did you carpool with anyone else?

17  A.   Rocco Ceparano originally.

18  Q.   When you carpooled with any of those people, when would you

19  pick them up for work?

20  A.   Mr. Murphy and Mr. McGlone came directly to my house.

21  Mr. Ceparano lives about two and a half miles east of me, so I

22  would just go and grab him.

23  Q.   About what time in the morning would you go grab him?

24  A.   I would alert him at 5:45.  That meant I was on my way to

25  come and get you and be ready.

F5K3MCG3                       Frische - direct

1   Q.  Were you trying to make sure he was awake?

2   A.  Yes.

3   Q.  When would you arrive at the Ridgewood office?

4   A.  My goal was 7:15.  Sometimes it was a little early,

5   sometimes it was a little late.  But never later than 7:30.

6   Q.  When you arrived at the Ridgewood office, where would you

7   park this company truck?

8   A.  On the street.

9   Q.  Would it always be right in front of the office?

10  A.  No.

11  Q.  When did the doors actually open on the Ridgewood office?

12  A.  They were open by seven.

13  Q.  What time is the shift supposed to begin?

14  A.  8 o'clock we signed in.

15  Q.  Once the doors opened, what was the first thing you would

16  do when you got into the CCI offices?

17  A.  I would go to the back conference room, I would grab my CN3

18  and my paperwork, see if they had scheduled appointments for

19  me, look over the route, and make sure I had every scrap of

20  material I needed to do my job.

21  Q.  You mentioned that you would get every scrap of material

22  that you would need to do your job.  What kind of material

23  would you need to ensure that you had?

24  A.  In the beginning of the project, we were a little short on

25  certain types of register heads, so if I knew there was a

F5K3MCG3                            Frische - direct

1   project or an appointment, I would make sure I had just what --

2   what I needed for that appointment.  So sometimes you would ask

3   other guys, hey, look, there is none in the back.  Do you have

4   one on your truck?  Could I borrow it?  I need it for this job.

5   Q.  What is a register head?

6   A.  The top of the meter that actually registers the usage.

7   There is a magnet inside with an impeller that spins and that's

8   what makes the dial click.

9   Q.  Other than register heads, what other kinds of material

10  would you get for your job?

11  A.  Extra lengths of wire, we always tried to keep 100-foot run

12  on the truck.  Made sure I had register head pins, because when

13  you change the register head, you knock the pin out.  Quarter

14  turn, take the head off, put a new head on, spin it, push a new

15  pin in.

16  Q.  What were you installing for CCI?

17  A.  Water meters and MTU boxes.

18  Q.  Would CCI provide the water meters and the MTU boxes?

19  A.  Yes.

20  Q.  Would you ensure you had those in your truck as well?

21  A.  Yes, my truck was heavily stocked.

22  Q.  To be clear, how many different types of meters would you

23  need to keep on your truck?

24  A.  10.

25  Q.  10 different types of meters?

F5K3MCG3                          Frische - direct

1    A.  Yes.

2    Q.  What kind of sizes?

3    A.  Well, we had AMCO Elster was replacement meters, they were

4    the manufacturer.  There was five-eighths, three-quarters, one

5    inch, inch and a half, two inch.

6            Then there was high demand meters called single jets.

7    Two inch, inch and a half, one inch, three-quarter short

8    spread, only this far apart, three-quarter long spread, this

9    far apart, and that was it.

10           So there was 10 different types of meters.

11   Q.  Did each of the meters require its own set of other

12   materials to install properly?

13   A.  Yes, there was.  With the larger meters, I saw that you

14   showed the other day, you needed gaskets, you needed bolt kits,

15   some of the single jet meters required, they called spacers.

16   It actually looked like a dumbbell, piece of brass with flanges

17   to make up the space.  If we took out, say, like, the meter you

18   showed the other day, and we replaced with a single jet.  So

19   you'd to make up the size because the single jet was a shorter

20   meter.

21   Q.  How long would it take you to load up your truck with all

22   this different equipment on an average day?

23   A.  It all depends on how much you went through, if you were

24   working with a partner or you working alone.

25   Q.  Did you work exclusively with a partner, exclusively alone,

F5K3MCG3                        Frische - direct

1   or a mix of the two?

2   A.  A mix of the two.  Primarily alone though.

3   Q.  If you were by yourself, how long would it take you to load

4   up the truck?

5   A.  About 15 minutes.  20 minutes.

6   Q.  Before you left the Ridgewood office, did you need to punch

7   a clock or sign in in any way?

8   A.  I would sign in.

9   Q.  What time would you sign in each morning?

10  A.  8 o'clock.

11  Q.  Mr. Frische, was that accurate?

12  A.  That's when I was told to sign in.

13  Q.  Was that the time you had started working?

14  A.  No.

15  Q.  Why did you sign in at 8 o'clock if you had started working

16  earlier?

17  A.  That was the rule.  Sign in 8 o'clock.

18  Q.  Did someone tell you that rule?

19  A.  Yes.

20  Q.  Who told you that rule?

21  A.  Angelo Solimine.

22  Q.  Were you told that on your first day of work or some time

23  after that?

24  A.  We were told that in the beginning.

25              (Continued on next page)

F5kWmcg4                          Frische - direct

1    BY MR. GLUNT:

2    Q.  Now, did you think it was right for you to sign in 45

3    minutes before you actually started, 45 minutes after you

4    actually started work?

5    A.  No, I didn't think it was right.

6    Q.  Why did you do it?

7    A.  I needed that job.

8    Q.  Mr. Frische, would you have signed in 45 minutes after you

9    started work if you had not been told to?

10             MR. WITTELS:  Objection, Judge.

11             THE COURT:  Let me have the last question read.

12             (Record read)

13             THE COURT:  Overruled.

14   BY MR. GLUNT:

15   Q.  You can answer.

16   A.  Would I have signed in?  Normally I would not have.

17   Q.  Did you benefit in any way from signing in 45 minutes after

18   you actually started work?

19   A.  Yeah, I kept my job.

20   Q.  Other than keeping your job, did you get paid any more

21   money for doing that?

22   A.  No.

23   Q.  Did you get paid less money for doing that?

24   A.  In the long run, yes.

25   Q.  Now, did you attend meetings while working at CCI?

F5kWmcg4                          Frische - direct

1    A.  Yes, sir.

2    Q.  And when did those meetings take place?

3    A.  Usually when all the men were there, they would put us in

4    the back room, Mr. Loguidici would say, We're having a meeting,

5    get in the back room, we're waiting for whoever, and we're

6    going to have a meeting.

7    Q.  And how did you find out about the meetings?

8    A.  Mr. Loguidici or Mr. Solimine.

9    Q.  Was attendance mandatory at these meetings?

10   A.  Absolutely.

11   Q.  Now, would these meetings take place before 8:00 or after

12   8:00?

13   A.  Before 8:00.

14   Q.  And what time would you sign in if you attended one of

15   these meetings?

16   A.  8:00.

17   Q.  Even if the meeting had started before 8:00?

18   A.  That was the routine, 8:00 sign in.

19   Q.  How frequently did these meetings take place?

20   A.  In the beginning, there was quite a few.

21   Q.  Over time, were there fewer?

22   A.  Yes.

23   Q.  Who ran these meetings?

24   A.  Charlie Loguidici would run some, Angelo would run some, a

25   combination of both.

F5kWmcg4                          Frische - direct

1    Q.  Did you ever see Mr. Solimine or Mr. Loguidici in the

2    office before 8:00?

3    A.  Yes.

4    Q.  And did you ever speak to Mr. Solimine in the office before

5    8:00?

6    A.  Sure.

7    Q.  Now, let's look at a document that's already in evidence,

8    Exhibit 76.  Mr. Frische, do you recognize this?

9    A.  Sure.  It's a daily sign-in sheet.

10   Q.  And whose signature is at the very bottom of this time

11   sheet under contractor representative?

12   A.  I couldn't tell you who signed that.  That's just an

13   initial scribble.

14   Q.  Well, whose name is listed as the general manager?

15   A.  Angelo Solimine.

16   Q.  Did Mr. Solimine ever tell you he couldn't sign one of

17   these sheets because he knew you were in there before 8:00?

18   A.  No, sir.

19   Q.  Now, assuming there was no meeting, what time would you

20   leave the Ridgewood office to go out into the field?

21   A.  My routine was to come in, get ready, and I would say, Is

22   there a meeting, and if they say no meeting, I'd get out of

23   there.

24   Q.  And would you get out of the office before 8:00 some days?

25   A.  Oh, as much as I could.

F5kWmcg4                      Frische - direct

1    Q.  You mentioned in your testimony a moment ago that sometimes

2    it would take you more time to load up your truck and sometimes

3    it would take you less time to load up your truck.  Is that

4    correct?

5    A.  Yes.

6    Q.  If you got there on a given day and it wouldn't take you as

7    long to load up your truck, would you hang around the office,

8    or would you leave the office and get to work?

9    A.  I always asked if there was a meeting or something going

10   on.  Sometimes I would wait to speak to Mr. Solimine about an

11   issue in the field, and if not, I was out the door.

12   Q.  Even though you'd already signed in at 8 a.m.?

13   A.  Yup.

14   Q.  Now, what were your responsibilities once you left the

15   Ridgewood facility?

16   A.  If I had appointment, make sure I did all my appointments.

17   Once they were done, start canvassing.  The goal was to get as

18   much work as I could get done in a day.

19   Q.  What was the earliest that your appointments could be

20   scheduled?

21   A.  We had 8:00 appointments.  There were some time-specific,

22   eight to 8:15, 8:15 to 8:30, be there at ten.

23   Q.  So if you had an eight to 8:15 appointment, what time did

24   you need to get to that appointment to be on time for it?

25   A.  That's why I would come in early, to check my appointment

F5kWmcg4                    Frische – direct

1    sheet, and if I had to go, I had to go.  We worked anywhere

2    from Shea Stadium to the East River, so you never knew where

3    you were going.  It could take you a half hour, 40 minutes to

4    get there.

5    Q.  So you had an eight to 8:15 appointment, could you make

6    that appointment if you didn't get to the Ridgewood facility

7    until 8:00 in the morning?

8    A.  Not without a helicopter.

9    Q.  Mr. Frische, if you were working by yourself, how many

10   water meters would you replace in a day?

11   A.  On a good day, I could turn ten.

12   Q.  And when you replaced a water meter, would you also always

13   install an MTU?

14   A.  Yes, sir.

15   Q.  Did you ever install an MTU without replacing a water

16   meter?

17   A.  Yes, sir.

18   Q.  And how many MTU-only jobs would you do on the average day

19   by yourself?

20   A.  They weren't very profitable, so they would discourage to

21   go after those.

22   Q.  Well, how many on average would you do on a given day?

23   A.  Just MTUs alone?

24   Q.  Yes.

25   A.  Five, six, maybe.

F5kWmcg4                         Frische - direct

1    Q.  You say that they weren't very profitable.  How did you

2    know they weren't very profitable?

3    A.  Mr. Solimine told us.

4    Q.  Did Mr. Solimine tell you what jobs you needed to do to

5    ensure that you were profitable?

6    A.  Working alone six and two was good, except on a Monday or a

7    Saturday.

8    Q.  Let's break that down a little.  When you say six and two,

9    what do you mean?  Six of two and two of what?

10   A.  Six meters with MTUs and just two MTU boxes alone.  That

11   was profitable for them.

12   Q.  Is that the quota that you were given?

13   A.  Yeah.  That was, that was the comfortable number that they

14   liked.  Five and three was O.K.  But six and two was better.

15   Seven and one was even better.

16   Q.  And I think you said except on a Saturday or except on a

17   Friday.  What do you mean by that?

18   A.  On a Monday.

19   Q.  I'm sorry.  Except on a Monday.  What do you mean by that?

20   A.  Charlie Loguidici usually worked from Tuesday to Saturday,

21   so he was off on Monday.  Mr. Solimine was there, so by the

22   grace of whatever, if you were able to get to incentive, you

23   would call in, it was always, Give me one more, give me two

24   more.  And Saturday, Mr. Solimine said, You're getting paid

25   more money, you have to do more work.

F5kWmcg4                    Frische - direct

1    Q.   Did you ever have difficulty meeting the quota that

2    Mr. Solimine had given you?

3    A.   Yeah, there were days.

4    Q.   And what happened to you if you didn't meet your quota?

5    A.   It was really based on the week.  So if you had a bad day,

6    you would make it up.

7    Q.   How would you make it up?

8    A.   Just, you just run.  You just run all day long.

9    Q.   And what would happen if on a given week you didn't meet

10   your quota?

11   A.   If you were close, it wasn't a big deal.  If it was a

12   repetitive problem, there were consequences.

13   Q.   What kind of consequences would there be?

14   A.   The threats were they would take your company vehicle.

15   Then you would, when you weren't in charge of a vehicle, it was

16   sort of a demotion, and then after that, your fate was whatever

17   it was.

18   Q.   And what do you mean your fate was whatever it was?

19   A.   The handwriting was on the wall, they were going to fire

20   you.

21   Q.   And did you feel that if you didn't meet your quota on a

22   regular basis, you would be fired?

23   A.   Oh, absolutely.

24   Q.   Now, Mr. Frische, did you take lunch breaks while you were

25   working at CCI?

F5kWmcg4                    Frische - direct

1   A.  Yes, sir.

2   Q.  Now, did you know what your lunch break was supposed to be

3   when you were working at CCI?

4   A.  Originally in training, they told us we could get a half

5   hour.

6   Q.  And how many days on an average week would you take a full

7   half-hour lunch break.

8   A.  Probably twice a week.

9   Q.  Now, why wouldn't you take your full 30-minute lunch break

10  every day?

11  A.  Usually there was no time, and what I would do is I would

12  work very hard Monday through Wednesday so I knew my numbers

13  were close for the week, and then I was able to sort of say,

14  O.K., I could take a lunch today, and I always took it on

15  Friday.

16  Q.  Now, did you eat anything on days that you didn't take a

17  full lunch break?

18  A.  I ate every day.

19  Q.  And on the days that you didn't take a full lunch break,

20  how long on average would you spend eating?

21  A.  Maybe 15 minutes.  I would eat a sandwich and I'd call a

22  customer and try and move an appointment up further so I could

23  clear that off my schedule.

24  Q.  So if you were taking a full 30-minute lunch break on

25  average two days a week, how many days a week were you not

1    taking that full 30-minute lunch break?

2    A.  Probably three.

3    Q.  Now, were you required to document your lunch breaks in any

4    way?

5    A.  That documentation didn't come in until very late into the

6    project.

7    Q.  So originally, you weren't required to do any

8    documentation?

9    A.  No, sir.

10   Q.  I think you said a second ago that sometime later in the

11   project that changed.  Is that right?

12   A.  Yes, sir.

13   Q.  And what documentation arose later in the project?

14   A.  They introduced a break sheet into the project.

15   Q.  What was a break sheet?

16   A.  Well, they informed us that we were entitled to a 15-minute

17   break, which we never knew about before, and that they wanted

18   us to document the time when we took our lunch.

19   Q.  So I understand you, Mr. Frische, prior to you seeing your

20   first break sheet, did you know that there was a 15-minute

21   morning break?

22   A.  No.

23   Q.  Did anyone ever tell you there was a 15-minute morning

24   break?

25   A.  No, sir.

1   Q.  Were you taking a 15-minute morning break?

2   A.  No, sir.

3   Q.  Can you just speak into the mike?

4   A.  No, sir.

5   Q.  Now, the break sheets that you submitted for CCI, were

6   those accurate?

7   A.  No, sir.

8   Q.  Why did you fill out the break sheets if they weren't

9   accurate?

10  A.  Mr. Loguidici would come in on Tuesday, and the rule was

11  you had to hand your break sheets to him.  If you didn't, you

12  weren't allowed to go out into the field.  So I would just

13  write up a break sheet and make it look good and hand it in.

14  Q.  Were you permitted to turn in a break sheet that did not

15  state that you had taken a 30-minute lunch every single day?

16  A.  I don't know what everybody else turned in.

17  Q.  Did you ever do that?

18  A.  Less than a 30-minute lunch break?

19  Q.  Yes.

20  A.  No.  I'm smart enough to know what, how long I get for

21  lunch.

22  Q.  Now let's talk about the evenings.  On average, when would

23  you return to the Ridgewood office at the end of the day?

24  A.  Twenty to five, quarter to five.

25  Q.  And when you returned, where would you park your truck?

F5kWmcg4                    Frische - direct

1    A.  Double park in front, double park four or five cars back.

2    Maybe get a spot, but that was very rare.

3    Q.  You say double park.  Obviously, if there was parking, you

4    would take an available space?

5    A.  Yeah, if there was, but it usually never was there.

6    Q.  To be clear, did CCI have a parking lot or any reserve

7    parking for the cars?

8    A.  They had a warehouse with a huge overhead door, 14-foot

9    high, 10-foot wide, with one spot, for Mr. Solimine.

10   Q.  How many company cars did CCI have for this project?

11   A.  I would think there was probably ten.

12   Q.  So they had ten company cars but no parking spots for them?

13   A.  No, sir.

14   Q.  And did you ever get a ticket, Mr. Frische?

15   A.  In front of the shop, yes, I got two or three.

16   Q.  And who paid those tickets, Mr. Frische?

17   A.  I paid two of them.  Later on, gentlemen would complain

18   and -- other installers, and Mr. Solimine, he paid one of them

19   for me.

20   Q.  What's the first thing you did when you got back to the

21   office at night?

22   A.  If I worked alone, I would unload all my meters, fill out

23   my meter sheet, lock up my truck, and bring all my meters in

24   and put them on the ground with my meter sheet.

25   Q.  Now, how many meters would you unload on average per day?

1    A.  Myself, maybe six.  Alone.  If I was alone.

2    Q.  If you were alone.  If you were working with someone else,

3    how many meters on average would you unload on a given day?

4    A.  Myself and Robert Gandolfo would turn 12, 15, without

5    thinking twice.

6    Q.  How many day trips back and forth to your car would it take

7    you to unload all the meters?

8    A.  It all depends on the size.

9    Q.  Let's assume for the second you were unloading two-inch

10   meters like that big one we saw the other day.  How many trips

11   would it take you to unload six two-inch meters?

12   A.  Six two-inch meters, well, probably three trips and my

13   hands would be killing me and my back would be screaming.

14   Q.  Would you frequently be unloading six two-inch meters

15   though?

16   A.  No, I'd usually do one at a time, I would bring them in.

17   Q.  And you mentioned a moment ago a meter sheet.  What is a

18   meter sheet?

19   A.  It was an inventory sheet that documented the serial number

20   on the meter that we took out, the size, the manufacturer.

21   Someone in the shop, the night guy, he would verify that all

22   the meters were collected and save those sheets and then put

23   them in a scrap bin.

24   Q.  And would you have to fill out a meter sheet for every

25   meter that you took out?

1    A.  It was just one long sheet with all the meter numbers,

2    manufacturers and sizes.

3    Q.  Other than meter sheets, what other paperwork did you need

4    to fill out for your job at CCI?

5    A.  You had your daily worksheet.  You had to save a meter

6    ticket with the serial number on it.  We would tear them off

7    after the install and initial them.  If you had any defective

8    register heads, you'd fill out the AMR report.  If you had any

9    MTUs that wouldn't program, you had to fill out a card so they

10   would go back to Aclara to be, you know, checked out, what was

11   wrong with them.

12   Q.  You said Aclara a second ago.  Who is Aclara?

13   A.  Aclara is the manufacturer of the MTUs.

14   Q.  You mentioned daily worksheets a moment ago.  What were

15   daily worksheets?

16   A.  When you went to a job, you would write down the address,

17   and then you would take the old serial number off the meter,

18   the new number and everything that you programmed into the

19   handheld CN3 computers.

20   Q.  And you mentioned a second ago an MTU card.  What is an MTU

21   card?

22   A.  Well, the MTU card was only used if you had a defective

23   meter, a defective MTU.  Excuse me.  So sometimes you would put

24   it on, you would wire it and it would not program.  And you

25   would troubleshoot the whole new thing, you'd change all the

1    wiring, you'd do everything conceivable and it wouldn't work,

2    so we would take it, then mark it and then we would have to

3    surrender it back to the manufacturer.

4    Q.  Did you hear any of the other witnesses describe something

5    called a seal card?

6    A.  Yes.  A seal card was done, seals were given out in boxes

7    of ten, and there may have been maybe 20 slots on a seal card,

8    so what you would do is you would write all your seals, lock

9    block and everything down, and when the sheet, when the card

10   was finished, you would turn it in.

11   Q.  Now, Mr. Frische, did CCI keep track of the mileage that

12   you were putting on the company car every day?

13   A.  Yes, sir, every day.  In and out we'd sign the mileage.

14   Q.  You would sign the mileage.  What would you sign that on?

15   A.  There was a sheet right next to the sign-in sheet where

16   we'd log our miles when we came in in the morning, and we'd log

17   our miles when we came after that day of work, and every day we

18   did that.

19   Q.  Did CCI keep track of the register heads you replaced?

20   A.  Yes, sir.

21   Q.  How did they keep track of that?

22   A.  We would have to fill out paperwork on there and then we

23   would actually write the address on it, tag it with a piece of

24   wire and we'd leave it in the back room in a box with the

25   report, the form, wrapped around with a rubber band.

1   Q.  And did CCI keep track of any problems that occurred with

2   installations?

3   A.  Well, aside from defective equipment or other things like

4   that, not really.

5   Q.  What about defective equipment; did CCI keep track of

6   defective equipment that you identified in the field?

7   A.  That was their, all we did was we turned it in and we left

8   it there for management to deal with.

9   Q.  Did you ever fill out something called an incident report?

10  A.  Yeah.  There were incident reports.

11  Q.  What were incident reports?

12  A.  It could vary.  You could go to a house and go to do,

13  change a water meter and the people were smart enough and took

14  the register head off so there was never a reading.  Could be

15  the meter wasn't there anymore.  It could be that you faced a

16  very hostile person and you ran into trouble, which I did.

17  Q.  Now, how long would it take you on an average day to fill

18  out all these forms?

19  A.  It really all depended on what came your way, but it was --

20  you know, you could sit there for 40 minutes doing paperwork at

21  the end of the night.

22  Q.  Mr. Frische, could you have stopped work in the middle of

23  the day and taken 40 minutes to fill out all this paperwork?

24  A.  No, no.

25  Q.  Why not?

1   A.  You were too busy.  You were, you know, there was, there

2   was constant pressure, the radio was going off.  This guy needs

3   something over here; Charlie's calling, how's your numbers,

4   O.K., Charlie, I have this; Do me a favor, give me one more

5   job, I want to put it on so-and-so's paperwork, he's got a

6   really bad route.  You would go and do a job and give it to

7   another gentleman.  Charlie wanted balance throughout the crew.

8   Q.  After you filled out your paperwork and unloaded your

9   truck, on average, what time would you finally leave work at

10  the end of the day?

11  A.  I don't believe I really ever left before 5:30.

12  Q.  And on average, if you take all the times you left before

13  5:30, all the times you left well after 5:30, on average, what

14  time do you think you left?

15  A.  Pretty close to 5:30, because I wouldn't leave the field

16  until 20 after.

17  Q.  Now, did you sign out before you left?

18  A.  Yes, sir.

19  Q.  What time would you sign out?

20  A.  4:30.

21  Q.  Why would you sign out at 4:30 if you weren't leaving

22  before 5:30?

23  A.  Because I needed my job.

24  Q.  And did you feel that your job would be in jeopardy if you

25  didn't sign out at 4:30?

F5kWmcg4                         Frische - direct

1    A.  Oh, yes.

2    Q.  Did anyone ever tell you to sign out at 4:30 even if you

3    stayed later?

4    A.  If I signed out after 4:30, there had to have been

5    management approval.

6    Q.  Now, you mentioned management approval.  Were there

7    circumstances in which you signed out after 4:30?

8    A.  Yes, sir.

9    Q.  Under what circumstances would you sign out after 4:30?

10   A.  I was stuck on a job, I called Charlie, Charlie would come

11   by and say, Yeah, it's O.K., call Angelo, he would approve it.

12   Q.  Under those circumstances, would you sign out after 4:30?

13   A.  Yes, sir, whenever they told me.

14   Q.  And would you be paid overtime on those occasions?

15   A.  Yes, sir.

16   Q.  Now, are you familiar, Mr. Frische, with an incentive plan

17   that CCI offered?

18   A.  Yes, sir.

19   Q.  What was the incentive plan?

20   A.  They said the company really didn't offer any kind of bonus

21   for the men, so Angelo and Charlie devised the incentive

22   program to give us a reason to try and work a little harder and

23   go home earlier.

24   Q.  And did you ever go home early on the incentive plan?

25   A.  Less than five times.

F5kWmcg4                        Frische - direct

1    Q.  Mr. Frische, I want you to give me a sense of scale.  How
2    many days were you working for CCI every week?
3    A.  Five to six.
4    Q.  And how many days per month were you working for CCI on
5    average?
6    A.  Well, 30 days in a month, minus eight, you know, 22, 23
7    days a month.
8    Q.  And how many months out of the year?
9    A.  12.
10   Q.  So in a given year, is it fair to say that you were working
11   more than 250 days for CCI?
12   A.  That's the math.
13   Q.  And how long did you work on the CCI project?
14   A.  From the end of February to the middle of September.
15   Q.  Middle of September of?
16   A.  '11.
17   Q.  So February of what year?
18   A.  '09.
19   Q.  To September of what year?
20   A.  '11.
21   Q.  So that's over two and a half years?
22   A.  32, 33 months, around there.
23   Q.  So for over two and a half years, hundreds of days, how
24   many times did you go home early?
25   A.  On incentive plan, five or six.

F5kWmcg4                          Frische - direct

1    Q.  Now, Mr. Frische, were you ever asked to redo a time sheet

2    after you filled it out?

3    A.  Yes, sir.

4    Q.  And how many times were you asked to redo a time sheet?

5    A.  Once or twice.

6    Q.  And who asked you to redo the time sheets?

7    A.  Angelo.

8    Q.  And did Mr. Solimine tell you why you were redoing the time

9    sheets?

10   A.  Yes, sir.

11   Q.  And what did he say?

12   A.  First time was, I believe, the Buffalinos made a mistake,

13   so we had to clean it up.

14   Q.  O.K.  And what about the second time?

15   A.  The second time, Robert Gandolfo came into work, he was

16   suspended, but he had signed in because he got there early, and

17   Angelo said, I want everybody to come back and redo the time

18   sheets.

19   Q.  Now, Mr. Frische, we were just talking about time sheets.

20   Were there any days you worked for CCI when you didn't sign in

21   at all?

22   A.  Yes, sir.

23   Q.  How many days was that?

24   A.  Two.

25   Q.  And why didn't you sign in on those two days?

1   A.   Angelo had a group meeting in the back, said the company

2   was losing money and he wanted all of us to pitch in and take

3   one for the team.

4   Q.   What did you understand that to mean?

5   A.   He wanted us to go out and work in the field to correct

6   problems for free.

7   Q.   And what kind of problems were occurring in the field at

8   that time?

9   A.   The jobs were not going through to DEP, so they could be

10   processed for payment.  He wanted guys to go out and correct

11   the issues.

12   Q.   So what do you mean when you say that the jobs were not

13   going through to DEP; can you describe that a little bit?

14   A.   Yes, there was a certain amount of times after you

15   installed an MTU on a meter under an inch and a half it would

16   send six signals out a day with the reading.  They had to

17   receive X amount of signals over X amount of days and then they

18   would deem the job was done.  On a two-inch meter, it was a

19   high, it would put out a reading every hour and they had the

20   same process.  Certain amount of readings over a certain amount

21   of days, the job was completed, processed for payment.

22   Q.   I think you said a second ago the DEP wasn't getting the

23   right signals, is that right?

24   A.   Yeah, the towers were not working correctly in the

25   beginning.  There were glitches, little gremlins in the project

F5kWmcg4                          Frische - direct

1    to start with.

2    Q.  And what did you understand Mr. Solimine to be asking you

3    to do to fix those problems?

4    A.  Go out and correct them.

5    Q.  And did you understand him to want you to go out and

6    correct them during your normal shift?

7    A.  No.  When he said take it for the team, that means you go

8    out and you work for nothing to help the company out.

9    Q.  Now, did you end up doing that?

10   A.  Yeah, he sort of put a little pressure on me.

11   Q.  When you say sort of put a little pressure on you, what

12   pressure, what did he say?

13   A.  He pulled me aside, he goes, Some of these rejections are

14   probably yours, you know, Frische.  So I spoke with Michael

15   Ceraldi who was working with me at the time and I said, Come

16   on, let's give him a day, let's fix the problems.

17   Q.  What was the first time that you worked without signing in?

18              THE COURT:  Counsel, I think maybe we better break at

19   this point for lunch and we'll pick up here after lunch.

20              Ladies and gentlemen, we'll take our lunch break now

21   and we'll resume at 2:00.

22              JUROR:  Your Honor, you said 2:00?

23              THE COURT:  2:00.

24              (Jury excused)

25              THE COURT:  Mr. Frische, you can step down.  We'll see

F5kWmcg4                          Frische - direct

1    you at 2:00.

2              THE WITNESS:  Yes, sir.

3              (Witness excused)

4              THE COURT:  Anything counsel need to address with the

5    Court?

6              MR. BHANDARI:  Yes, your Honor.  There was one issue.

7    We received a copy of the contracts between CCI and the DEP

8    yesterday.  When we reviewed the contract, the contract states

9    that overtime must be paid for everybody working on this

10   project.  If they ever worked more than eight hours a day.  It

11   doesn't matter if they worked 40 hours a week or not, so the

12   earlier instruction I was given that said that if people got

13   unpaid hours would be paid minimum wage, that's not correct

14   under New York Labor Law.  If there's a contract that states

15   people are supposed to be paid a particular wage for overtime,

16   more than eight hours a day, they're actually supposed to be

17   paid that wage for the unpaid time, not just the minimum wage.

18   I don't know if the Court wants briefing on that particular

19   issue or if it's something more suitable to bring up during the

20   jury instruction stage.

21             THE COURT:  Since you didn't object to that at the

22   time, I don't think we need to bother the jury about it now,

23   but we want to get it right, of course, so we'll discuss it

24   during the charging conference and resolve it then.

25             (Luncheon recess)

```
 1                          AFTERNOON SESSION

 2                              2:00 p.m.

 3              (In open court; jury present)

 4              THE COURT:  Counsel.

 5    BY MR. GLUNT:

 6    Q.  Good afternoon, Mr. Frische.

 7    A.  Hello.

 8    Q.  Are you aware that you are still under oath to tell the

 9    truth?

10    A.  Yes, sir.

11    Q.  Before we left, you were just telling me about the two days

12    that you worked completely off the clock.  Is that right?

13    A.  Yes, sir.

14    Q.  Now, remind me.  Why did you work two days without signing

15    in?

16    A.  A lot of the jobs we had done were not going through to DEP

17    to be processed.  Mr. Solimine had asked the entire group of

18    men, they should take one for the team, go out in the field and

19    correct all these projects.

20    Q.  And what did you understand "take one for the team" to

21    mean?

22    A.  To work for free.

23    Q.  What is the first time that you worked for free?

24    A.  Right after that meeting, Mr. Solimine came to me and said,

25    You know, Frische, most of these rejections are yours, and I
```

1    went to my partner at the time, which is Michael Ceraldi, and I

2    said, Mike, we can give them a day, so Mike agreed and we went

3    out to work shortly after that.

4    Q.  Was this a day that other workers were also working in the

5    field?

6    A.  Yes.  We were on a four-ten schedule, so it was, I guess

7    you'd consider our fifth day.

8    Q.  And when you came in on that day, did you see

9    Mr. Loguidici?

10   A.  Sure.

11   Q.  And did he know that you were scheduled, whether you were

12   scheduled to come in that day?

13   A.  I don't know.

14   Q.  And how many hours did you work on that day?

15   A.  Mike Ceraldi and myself put an eight-hour day in.

16   Q.  Were you paid for that eight-hour day?

17   A.  No, we didn't sign in.

18   Q.  What's the second time that you came in, that you worked

19   without signing in?

20   A.  I was still on the four-ten schedule, and it was the Friday

21   before Memorial Day, 2009, and would have worked out a four-day

22   weekend for me, and Mr. Solimine said there were a lot of

23   rejections and he wanted them fixed.

24   Q.  And did you have any plans for that four-day weekend?

25   A.  Yeah, I planned to go to see my dad in Florida.

1    Q.  Did you end up going to see your dad in Florida?

2    A.  No.

3    Q.  What did you end up doing instead?

4    A.  Mr. Solimine said he wanted them fixed before Monday.

5    Q.  Did you come in over the weekend and fix them before

6    Monday?

7    A.  He told me to come in and work on Friday.

8    Q.  This was the Friday before Memorial Day?

9    A.  Yes, sir.

10   Q.  Did you sign in that day?

11   A.  No, sir.

12   Q.  Is it fair to say that you remember that pretty clearly?

13   A.  Yes, sir.

14   Q.  How many hours did you work on that Friday before Memorial

15   Day?

16   A.  Full eight-hour shift.

17   Q.  Were you paid anything for that eight-hour shift?

18   A.  No, sir.

19   Q.  Mr. Frische, what kind of vehicle did you use when you were

20   working for CCI?

21   A.  Company issued us Suzuki XL7s.  They were small SUVs.

22   Q.  Did you drive to and from work each day?

23   A.  Yes, sir.

24   Q.  Did you do any maintenance on that company car?

25   A.  Yes, sir.

1    Q.   What maintenance did you do?

2    A.   Oil changes and I washed the car every Sunday.

3    Q.   And why did you wash it every Sunday?

4    A.   Monday morning was inspection.

5    Q.   Who would do the inspection?

6    A.   Angelo or Charlie.

7    Q.   And were you ever told you had to wash that car?

8    A.   Yes.  They were white vehicles.  They, it's hard to keep a

9    white car clean.

10   Q.   And who told you that you had to wash the car?

11   A.   Angelo.

12   Q.   Now, when would you wash the car during the week?

13   A.   Sunday, 4:00.

14   Q.   Were you paid for that time?

15   A.   No, sir.

16   Q.   How often would you change the oil in the car?

17   A.   I read the owner's manual and it said I had to put 530

18   synthetic in.  I took it to Jiffy Lube the first time.  They

19   charged me $84.  Angelo screamed, Don't ever do that again, oil

20   changes are $20.  So from then on, I would go to Wal-Mart, buy

21   the oil, the filter, and do it in my driveway.

22   Q.   How long would it take you to change the oil in your

23   driveway?

24   A.   Half hour.

25   Q.   And were you paid for that time?

F5kWmcg4                          Frische - direct

1    A.  No, sir.

2    Q.  Did you ever fill out any time sheets for the time you

3    spent maintaining that car?

4    A.  No, sir.

5    Q.  Did you maintain personal records of the hours you were

6    actually working?

7    A.  No, sir.

8    Q.  Did anyone ever tell you that you had to maintain personal

9    records of the times you were actually working?

10   A.  No, sir.

11   Q.  Did it ever occur to you to maintain personal records of

12   the times that you were working?

13   A.  No, sir.

14   Q.  Had you ever met Tim Wertz, the president of CCI?

15   A.  He came up one time and introduced himself to the men in a

16   group meeting in the back of the room, but I never met him.  I

17   saw him.

18   Q.  Have you ever spoken to him personally?

19   A.  No, sir.

20   Q.  Have you ever met Mike Maguire, vice president of CCI?

21   A.  Yes, sir.

22   Q.  When did you meet him?

23   A.  A few times when I came back from the field, he was there

24   with a gentleman named Dennis McCabe; they were up to oversee

25   what was going on.

F5kWmcg4                          Frische - direct

1   Q.  Who was Dennis McCabe?

2   A.  I really don't know what his position was.

3   Q.  Did you understand him to be a person affiliated with CCI?

4   A.  Yes.

5   Q.  Did Mr. Solimine or Mr. Loguidici ever tell you who their

6   bosses were?

7   A.  Yes.  Mr. Maguire was their boss and Mr. Wertz.

8   Q.  Did you ever complain to Mr. Solimine or Mr. Loguidici that

9   you weren't being paid for all the hours that you worked?

10  A.  I mentioned it to Charlie Loguidici.  He realized what was

11  going on with me, and --

12          MR. WITTELS:  I object to his speculation.

13          THE COURT:  Sustained.

14  Q.  Mr. Frische, if you could, just tell us what he said to you

15  after you made a complaint.

16  A.  He would try and make it up to me.

17  Q.  And did he tell you how he was going to try to make it up

18  to you?

19  A.  No.

20  Q.  Did he ever make it up to you in any way?

21  A.  No.

22  Q.  Mr. Frische, when did you stop working for CCI?

23  A.  Approximately the middle of September.

24  Q.  Of what year?

25  A.  '11.

F5kWmcg4                    Frische - direct

1    Q.  And did you quit?

2    A.  No, sir.

3    Q.  Were you laid off?

4    A.  Yeah, they were downsizing the project.

5    Q.  Now, at the time that you were downsized, was anybody else

6    downsized?

7    A.  Anthony Buffalino and myself only.  Oh, and a gentleman

8    named Campbell.

9    Q.  Now let's talk about an average week when you were coming

10   in to see if we can come up with a total amount of time.

11   Remind me, Mr. Frische.  What time would you get to work in the

12   morning on an average day?

13   A.  I would try for 7:15.

14   Q.  What time were you signing in?

15   A.  8:00.

16   Q.  So were you signing in then 45 minutes before your shift

17   actually started?

18   A.  Yes, sir.

19   Q.  Sorry.  45 minutes after you actually started work?

20   A.  Yes, sir.

21   Q.  You agree with me that's .75 hours?

22   A.  Yes, sir.

23   Q.  And what time were you leaving on an average day at the end

24   of the day?

25   A.  5:30.

F5kWmcg4                         Frische - direct

1  Q.  5:30.  And what time were you signing out?

2  A.  4:30.

3  Q.  Is that one hour after you --

4  A.  Yes, sir.

5  Q.  Now let's talk about lunch.  How often during the week were

6  you taking the full 30-minute lunch break?

7  A.  Twice a week.

8  Q.  So how many days does that mean that you were not taking a

9  full 30-minute lunch break?

10 A.  Three days.

11 Q.  So three days a week, how much time were you taking as a

12 break?

13 A.  Maybe 15 minutes.

14 Q.  So if you were taking 15 minutes three times a week, does

15 that average to about .15 hours per day?

16 A.  .1 -- yes, sir.

17 Q.  So for a total then, does that mean that on an average day,

18 you were working approximately 1.9 hours for which you were not

19 being paid?

20 A.  It sounds about right.

21           MR. GLUNT:  I have no further questions at this time.

22           THE COURT:  Cross-examination.

23           MR. WITTELS:  Thank you, your Honor.

24 CROSS-EXAMINATION

25 BY MR. WITTELS:

F5kWmcg4                         Frische - cross

1    Q.  Mr. Frische, you were one of the plumbers that liked

2    appointments, correct?

3    A.  Yes, I liked appointments.

4    Q.  Over the canvass method, where you would just go out in the

5    field and try to find your own jobs?

6    A.  Yes.  I liked them.

7    Q.  Is it your testimony that during your work at CCI, CCI's

8    Queens office had no policy regarding overtime?

9    A.  They had a policy regarding overtime.

10   Q.  And what was that policy?

11   A.  That with management approval you could get overtime.

12   Q.  And management approval was either Charlie or Angelo?

13   A.  It, you would call Charlie and he would run it by Angelo

14   and Angelo would have to O.K., make the final decision.

15   Q.  Now, you were asked about if you kept records of your time,

16   and you said no, correct?

17   A.  No, sir.

18   Q.  You did keep records of your work?

19   A.  Yes, sir.

20   Q.  Every day after work, you would make copies of all your

21   worksheets, correct?

22   A.  Yes, sir.

23   Q.  And you kept them in your truck?

24   A.  Yes, sir.

25   Q.  That was not something the company or Mr. Loguidici or

F5kWmcg4                        Frische - cross

```
 1    Mr. Solimine required, you to make copies of your work,
 2    correct?
 3    A.  No, sir.
 4    Q.  You did it for your benefit?
 5    A.  No, sir.
 6    Q.  It wasn't for your benefit?
 7    A.  No, sir.
 8    Q.  How many other plumbers waited in line at the copy machine
 9    to make copies of their records for their use?
10    A.  Every driver or man who did the paperwork made copies.
11    Q.  And you turned in the originals?
12    A.  Yes, sir.
13    Q.  To the office, correct?
14    A.  Yes, sir.
15    Q.  And you kept these copies?
16    A.  Yes, sir.
17    Q.  Prior to going to work for CCI, you owned your own
18    construction business, correct?
19    A.  Yes, sir.
20    Q.  And at some point in time, there was a downturn and you
21    decided to get a job paying you by the hour, correct?
22    A.  Steady paycheck, yes, sir.
23    Q.  When you owned your own business, you made payroll for your
24    employees?
25    A.  Yes, sir.
```

F5kWmcg4                          Frische - cross

1    Q.  You understood the rules about overtime?

2    A.  Yes, sir.

3    Q.  You understood the reporting requirements of overtime?

4    A.  Yes, sir.

5    Q.  So from day one on this job, did you feel that you were

6    being cheated out of time?

7    A.  I was more concerned about keeping my job than fighting for

8    overtime, sir.

9    Q.  Did you feel you were being cheated from day one?

10   A.  Somewhat, yes, sir.

11   Q.  And yet you kept no records of your time?

12   A.  No, sir.

13   Q.  You knew how records could be kept because you kept them

14   when you were an employer, right?

15   A.  I kept time cards for my employees.

16   Q.  You were aware that this lawsuit had been filed while you

17   were still working for CCI?

18   A.  Yes, sir.

19   Q.  And knowing that Mike McGlone had filed this lawsuit,

20   somebody, I think you testified, that you carpooled with,

21   right?

22   A.  Yes, sir.

23   Q.  You still didn't keep any records of your time after

24   learning that he had filed the lawsuit?

25   A.  I didn't know what the lawsuit was about.

389

1   Q.  Did you understand that the sign-in sheets, I think you've

2   been shown a few, were sent to DEP?

3   A.  Yes, sir.

4   Q.  And it was your responsibility to sign in and out each day,

5   correct?

6   A.  Yes, sir.

7   Q.  Nobody could sign in for you, nobody could sign out?

8   A.  No, sir.

9   Q.  You couldn't sign in for anybody else?

10  A.  No, sir.

11  Q.  And you understood that DEP relied upon those

12  sign-in/sign-out sheets?

13  A.  I would assume so, sir.

14  Q.  During some of your time, you were, in fact, required to

15  sign the break sheet, correct?

16  A.  Later on in the project.

17  Q.  And you've looked at a few of those today, correct?

18  A.  I haven't seen any of the break sheets, but I'm familiar

19  with the form.

20          MR. WITTELS:  Judge, if I may approach.

21          THE COURT:  Yes.

22          MR. WITTELS:  Judge, these are in one of the binders.

23  If you want a loose copy, I can give you that.

24          THE COURT:  That's all right.

25  Q.  I've handed you what is marked Defendants' Exhibit K.  Have

1  you seen that sheet before?

2  A.  Sure.

3  Q.  Are these your break sheets from when you worked at CCI?

4  A.  Just thumbing through them quickly, if I signed them, yes,

5  sir, they're my break sheets.

6  Q.  So they're the break sheets that you turned in, I believe

7  your testimony was to Charlie, once a week?

8  A.  On Tuesday morning, sir.

9  Q.  And it's your testimony that they are incorrect and

10  inaccurate, correct?

11  A.  Yes.  It was a means to an end, just hand them the

12  paperwork.

13  Q.  Some of the time, some of the days that you reflect that

14  you took a break, you actually took a break?

15  A.  Yes, for lunch.  The lunchtimes, yes, sir.

16  Q.  The lunchtime break?

17  A.  Yes, sir.

18  Q.  Now, on the 15-minute morning break, CCI didn't deduct 15

19  minutes from your pay on a daily basis for that break, did

20  they?

21  A.  No, sir.

22  Q.  Some of the information on the meal break portion, your

23  testimony, is inaccurate?

24  A.  Yes, sir.

25             (Continued on next page)

F5k3mcg5                          Frische - cross

1    Q.  You knew it was inaccurate when you turned it into the

2    company?

3    A.  Yes, sir.

4    Q.  You tried to arrive by 7:15, is that right?

5    A.  That was the time I would shoot for.

6    Q.  During the entire time you worked for CCI, did you always

7    carpool?

8    A.  No, sir.

9    Q.  When you carpooled, if you were finished and your riders

10   weren't, you had to wait around for them, correct?

11   A.  No, when they carpooled, they were my partner in the

12   vehicle.

13   Q.  Only your partner?

14   A.  Only my partner.

15   Q.  You had meetings before 8 o'clock, correct?

16   A.  Yes, sir.

17   Q.  Was it Charlie or Angelo's policy to wait for all the men

18   to be there to have a meeting?

19   A.  Yes, sir.  Charlie would call on a radio and ask whoever

20   was late where are you.  Sometimes we would start without them.

21   Q.  Were there some employees who didn't show up prior to right

22   at 8 o'clock?

23   A.  No.  It was most every man was there before the scheduled

24   start time.

25   Q.  Was it most every man or was every man there?

1   A.  Every man was there.

2   Q.  Most of the jobs that you installed were the five-eighths

3   and one inch meters, isn't that correct?

4   A.  No, sir.

5   Q.  What would you say is the majority of the meters that you

6   installed?

7   A.  Three-quarter, one inch.

8   Q.  Three-quarter, one inch?

9   A.  Five-eighths was a very small section of the project.

10  Q.  As was the two inch?

11  A.  Obviously there's not as many big buildings as there are

12  residential properties.

13  Q.  How many two inch meters did you install the entire time

14  you worked for CCI?

15  A.  I couldn't tell you.  All my worksheets are present.

16  Q.  You have no idea?

17  A.  Maybe 50.

18  Q.  In the entire two-and-a-half years?

19  A.  It could be 100.  I have no idea.

20  Q.  A good day for you was 10 meters, correct?

21  A.  Working solo, 10 meters.

22  Q.  At the end of the day, it took you 40 minutes to wrap up

23  your work once you got back to the Ridgewood office, is that

24  right, half hour, 45 minutes?

25  A.  No, sir.  I would leave the field at 20 after.  With

F5k3mcg5                    Frische - cross

1   traffic I would get back, I could get back at 20 to, quarter

2   to.  It is a very busy time of day in Queens and then I would

3   start my week.

4   Q.  Did Angelo ever tell you that you needed to be back so that

5   you could clock out at 4:30?

6   A.  No, sir.  Angelo was never there.

7   Q.  So Angelo wasn't there to see that you worked past 4:30?

8   A.  Mr. Solimine was not there when we got back at 4:30,

9   5 o'clock.

10  Q.  Was Charlie there?

11  A.  Charlie left directly from the field and was rarely back in

12  the shop.

13  Q.  So neither one of your supervisors, according to your

14  testimony, knew that you were leaving past 4:30 because they

15  weren't there to see it?

16          MR. GLUNT:  Objection.

17          THE COURT:  Sustained.

18  A.  On most occasions.

19          THE COURT:  No, I sustained the objection.

20  Q.  You're crystal clear that Mr. Solimine wasn't there past

21  4:30 when you would get back past 4:30?

22  A.  Most of the times.

23  Q.  Neither was Mr. Loguidici?

24  A.  He would leave from the field a majority of the time, sir.

25  Q.  You testified that Mr. Solimine required you, made you,

F5k3mcg5                          Frische - cross

1    take two for the team, is that right?

2    A.  Yes, sir, he did.

3    Q.  And besides Mr. Solimine, did you ever complain about this?

4    A.  I complained to Mr. Loguidici.

5    Q.  What did Mr. Loguidici tell you?

6    A.  The day I worked alone by myself, he came out to help me

7    and told me I didn't have to do this.  I told him I needed my

8    job.

9    Q.  You testified about washing the car, changing the oil.  Did

10   you ever submit time slips to anybody at CCI asking to be paid

11   for the time that you took care of the car?

12   A.  Only the receipts for materials, sir.

13   Q.  So you never asked anybody to pay you for time?

14   A.  No, sir.

15   Q.  As part of having the car you got a gas card, right?

16   A.  Yes, sir, with a limit.

17   Q.  That gas card was only valid between the hours of eight and

18   four, wasn't it?

19   A.  Yes, sir.

20   Q.  So you could only fill up between eight and four if you

21   were going to charge it to the company, right?

22   A.  Yes, sir.

23           Later when we worked on the --

24           MR. WITTELS:  Objection.  There is no question in

25   front of him.

1          THE COURT:  Yes.

2     Q.  You knew you were allowed a half hour for lunch.

3     A.  Yes, sir.

4     Q.  There was no set time for you taking your lunch, right?

5     A.  When you had time.

6     Q.  So you had the discretion to take your break whenever you

7     felt like it during the day?

8     A.  Yes, sir.

9     Q.  It is your testimony that on the incentive to go home

10    early, maybe five or six times during your career, correct?

11    A.  Yes, sir.

12    Q.  Do you agree that there is a difference between hours

13    worked and hours paid?  There may be a difference between hours

14    worked and hours paid?

15    A.  Yes, sir.

16    Q.  You got paid days off, correct?

17    A.  My money.  It was my money.

18    Q.  You were paid for days that you didn't come in if you chose

19    to get paid, correct?

20    A.  Yes, sir.

21    Q.  On those days that you got paid for taking the day off, you

22    did not work.

23    A.  Yes, sir.

24    Q.  Did you avail yourself of health insurance or did you waive

25    that?

F5k3mcg5                        Frische - cross

```
 1   A.  I waived it.  It was not worth it.

 2              MR. WITTELS:  Nothing further, Judge.

 3              THE COURT:  Redirect?

 4              MR. GLUNT:  Very briefly, your Honor.

 5   REDIRECT EXAMINATION

 6   BY MR. GLUNT:

 7   Q.  Mr. Frische, you were asked about the 15 minute morning

 8   break that's reflected on your break sheets.  Do you remember

 9   that?

10   A.  Yes, sir.

11   Q.  You were asked whether CCI deducted that 15 minutes from

12   your paycheck, correct?

13   A.  Yes, sir.

14   Q.  Are you seeking compensation for that 15 minutes in this

15   case?

16   A.  No, sir.

17   Q.  You were also asked about receipts for the materials that

18   you used in oil changes, do you remember that?

19              MR. WITTELS:  Judge, I'll object.  I don't believe

20   that accurately --

21   A.  He didn't ask me.  He asked me if I kept track of time for

22   when I did that.

23   Q.  Oh.  Well, did you submit receipts for the oil changes that

24   you performed on company cars?

25   A.  Yes, sir.  For the material, yes, sir.
```

1    Q.   Did you submit receipts that had the date and time on them

2    as well?

3    A.   Yeah, the Walmart receipt says the date and the time when

4    you purchase the material.

5    Q.   You submitted that to CCI, correct?

6    A.   Yes.

7    Q.   You were asked about the days off that CCI paid you,

8    correct?

9    A.   Yes, sir.

10   Q.   I believe that when you were asked about that, you said

11   something to the tune of "it was my money."  Do you remember

12   that?

13             THE COURT:  No, you may recall there was an objection

14   so that's not in evidence.

15             MR. GLUNT:  Okay.

16   Q.   Mr. Frische, did CCI deduct money from your paycheck to

17   account for the amount that it paid you for the days that you

18   were off?

19   A.   Yes, sir.

20   Q.   Did it deduct a certain amount from every day that you

21   worked to make it whole for the money it was paying you on the

22   days that it gave you off?

23   A.   Yes, sir.

24             MR. GLUNT:  I have nothing further, your Honor.

25             THE COURT:  Anything else?

F5k3mcg5                         Frische - redirect

1           MR. WITTELS:  No recross, Judge.

2           THE COURT:  Thank you very much.  You may step down.

3           THE WITNESS:  Yes, sir.

4           (Witness excused)

5           THE COURT:  Please call your next witness.

6           MR. GLUNT:  Plaintiffs call Joseph Frangiosa.

7           (Witness sworn)

8           THE DEPUTY CLERK:  Please be seated.  State your name

9    and spell it slowly for the record.

10          THE WITNESS:  My name is Joseph Frangiosa.

11   F-R-A-N-G-I-O-S-A.

12          THE COURT:  I think in your case, maybe we can push

13   that a little.

14          THE WITNESS:  I apologize, your Honor.  Sorry about

15   that.

16    JOSEPH FRANGIOSA,

17        called as a witness by the Plaintiff,

18        having been duly sworn, testified as follows:

19   DIRECT EXAMINATION

20   BY MR. GLUNT:

21   Q.  Good afternoon, Mr. Frangiosa.  Mr. Frangiosa, do you know

22   the defendant Contract Callers?

23   A.  Yes, I do.

24   Q.  How do you know them?

25   A.  I worked for them.

1    Q.  Are you a plaintiff in this case?

2    A.  Yes, I am.

3    Q.  Mr. Frangiosa, do you have any plumbing experience?

4    A.  Yes, I do.

5    Q.  How much plumbing experience do you have?

6    A.  Over 25 years.

7    Q.  In that time, have you ever been a member of a plumbers

8    union?

9    A.  Yes, I have.  Local Union Number 1, New York City.

10   Q.  Have you ever been a member of any other unions?

11   A.  Yes, I have.

12   Q.  What unions have you been a member of?

13   A.  The machinists union.

14   Q.  Have you received any formal training or attended any

15   schools for plumbing?

16   A.  Yes, I have.

17   Q.  What formal training or schooling have you received?

18           Can you push the mic down a little bit.

19   A.  Is that better?  Is that better?

20   Q.  That's better.

21   A.  Sound check.  I'm sorry.

22           I just have -- yeah, back to the training.  Through

23   the union, I went through a five-year apprenticeship program.

24   During that time, I was schooled in my skills both on-the-job

25   and off-the-job training.  Also, I went to Berk Trade School

1  which was a school I paid for privately to further my skills in

2  regards to plumbing.  And I'm also cross trained in HVAC, which

3  is heating and air conditioning.  That was an additional

4  450-hour course that I took on my own.

5  Q.  Have you received any plumbing certifications?

6  A.  Yes.  I have at least over 20 something certificates in

7  order for me to work every day.

8  Q.  How did you find out about the CCI job?

9  A.  I was looking for work, and my wife actually found the ad,

10  and she said they're looking for a plumber to work on a water

11  meter project, and they were looking for someone that was

12  bilingual.

13  Q.  Are you bilingual?

14  A.  I'm actually trilingual.  I speak Spanish and Italian.

15  Q.  Did you apply to the CCI job?

16  A.  Yes, I did.

17  Q.  Did you receive the CCI job?

18  A.  Yes, I did.

19  Q.  Who interviewed you for the CCI job?

20  A.  The initial person was Charlie Loguidici.  I went to their

21  office in Ridgewood, Queens, located on Weirfield, did an

22  interview, and I was hired on the spot.

23  Q.  What did you understand the job to be?

24  A.  From what they gave me from the rough description, it was

25  to be dealing with the public, and sensitive information about

1    them, removal and installation of a water meter, and also

2    removing the old manual type of reading the meters and

3    installing these new computer devices.

4    Q.  When did you start work for CCI?

5    A.  I believe in February of '09.

6    Q.  Did you receive any kind of additional training before you

7    started work?

8    A.  Yes, we did.  We were trained by Michael Roche who was the

9    project manager for D.E.P., in regards to this project in

10   Brooklyn.  Along with inspectors, there was either three or

11   four of them in the classroom with us.

12   Q.  Mr. Frangiosa.

13   A.  Yes.

14   Q.  Have you ever been arrested?

15   A.  Yes, I have.

16   Q.  When did that occur?

17   A.  September of '08.

18   Q.  What were you arrested for?

19   A.  For bribery.

20   Q.  Was that for receiving a bribe or --

21   A.  Receiving.

22   Q.  Where were you working when that happened?

23   A.  Plumbing supervisor for the federal prison, the

24   Metropolitan Correctional Center.

25   Q.  How did you plead in response to those charges?

F5k3mcg5                              Frangiosa - direct

1    A.  Guilty.

2    Q.  After you pled guilty, did you ultimately tell CCI?

3    A.  Yes, I did.

4    Q.  Did you serve any prison time?

5    A.  Yes, I did.

6    Q.  How long did you serve in prison?

7    A.  Five days.

8    Q.  Five days?

9    A.  Five days.

10   Q.  Did you tell Mr. Solimine about that?

11   A.  Mr. Solimine and Charlie were aware of it.

12   Q.  Why did you tell them?

13   A.  I told them because I needed to go and serve my prison

14   term, and when I put in my vacation slip they asked me why, and

15   I told them because I need to go to prison for five days.

16   Q.  Did you do that while you were on the CCI job?

17   A.  Yes.

18   Q.  Prior to your arrest in 2008, had you ever been arrested

19   for anything else?

20   A.  No, counselor.

21   Q.  After your arrest, in 2008, have you ever been arrested for

22   anything since?

23   A.  No, counselor.

24   Q.  Mr. Frangiosa, you swore an oath to tell the truth today.

25   A.  Yes, sir.

F5k3mcg5                          Frangiosa - direct

1    Q.  Are you aware it is also a crime to give false testimony

2    under oath?

3    A.  Yes.

4    Q.  Do you intend to tell the truth today?

5    A.  Yes, I do.

6    Q.  Let's talk about your typical day of work for CCI.  Where

7    was CCI's office located?

8    A.  Ridgewood, Queens, on Weirfield.

9    Q.  Where were you living at the time?

10   A.  West Hempstead, Long Island.

11   Q.  When you worked in the CCI project, when would you leave to

12   go to work in the morning?

13   A.  I would leave between 6 a.m. to 6:30 a.m. in the morning.

14   Q.  Did you ever carpool with anyone else?

15   A.  Yes, I did.  I had a partner.

16   Q.  Who was your partner?

17   A.  Sal Fischetti.

18   Q.  Would you pick him up for work?

19   A.  Yes, I would leave my home in Nassau County and drive into

20   Queens where he lived.

21   Q.  Where did he live?

22   A.  He lived Springfield, Bayside, Queens.

23   Q.  When would you arrive at the Ridgewood office?

24   A.  We would plan to arrive at the Ridgewood office anywhere

25   around seven, 7:15 the latest.

F5k3mcg5                           Frangiosa - direct

1    Q.  Where would you park when you got there?

2    A.  If there was no proper parking spaces, we would double park

3    on the street.

4    Q.  What time did the doors open to the Ridgewood office?

5    A.  Any given day it was somewhere around 7 o'clock.

6    Q.  What time was the shift scheduled to start?

7    A.  We were told to start at 8 a.m.

8    Q.  What was the first thing that you do when you arrive at the

9    CCI facility?

10   A.  If it was when we arrived first thing on a Monday morning,

11   our vehicles would be checked to make sure they were clean.

12   Then we would begin preparing for the day.

13   Q.  Who would check your vehicles to make sure they were clean?

14   A.  If Angelo was in that day, it would be Angelo.  If Charlie

15   was there, it would be Charlie.  Or they would have one of

16   their warehouse supervisors, a gentleman by the name of I think

17   his name was Kelly.  I don't really remember anything else

18   about him.

19   Q.  You said Monday morning.  Would they check your vehicles

20   every day or just on Monday morning?

21   A.  Just Monday mornings, to make sure it was clean for the

22   week.

23   Q.  Apart from the vehicle inspections on Monday, every other

24   day, what would be the first thing you did when you arrived at

25   the office?

F5k3mcg5                            Frangiosa - direct

1    A.  Oh, we would go and retrieve our CN3, which was our

2    handheld computer for the daily route sheet.  And then

3    sometimes we were given an additional computer if we had

4    appointments that day.  And it was our responsibility to make

5    sure that all our paperwork and the computers matched so that

6    we could plan out our day accordingly and how we would run our

7    route with appointments if we had appointments.  And if it was

8    canvassing, we would try to figure out the best way to canvass,

9    to knock on doors.  And on top of that, we would figure out

10   roughly what difference size extra meters, if we needed.  We

11   had to require wiring, because in order to connect the device

12   to the meter we needed a certain wire, we had to make sure we

13   had all our tools and anything that went with it, like long

14   drill bits, anything that we needed that we would deplete

15   during the week, we would have to restock on Monday and every

16   day after that.

17   Q.  So let's take that a piece at a time.  You mentioned

18   checking the CN3s and the route sheet?

19   A.  Yes.

20   Q.  Were there any problems when the CN3 didn't match the route

21   sheets?

22   A.  Yes.

23   Q.  What would have happened if you hadn't checked the CN3

24   against the route sheet before you went in the field?

25   A.  What did happen is you would go in thinking that you're on

1    a private home doing an install, and it would turn out that

2    these people now were getting the job that would be for the

3    building around the corner.  And when they received the $25,000

4    water bill, they weren't happy about it.  So it was up to us to

5    verify and check and make sure that residentials were

6    residentials and the proper sizes, and commercial were

7    commercials.  And after a while, we even recognized that if it

8    was meters that were going to be completely replaced or

9    partially replaced.

10   Q.  Was it pretty important that you check the CN3s and the

11   route sheets?

12   A.  Yes.

13   Q.  You also mentioned loading up your truck?

14   A.  Yes.

15   Q.  You mentioned tools.  What kind of tools would you load

16   into your truck?

17   A.  If we had to go and do the larger meters, it would require

18   to make sure we had saws to cut the old rusted bolts, they were

19   a lot larger unit.  Also we had drills with 2 foot to like 3

20   foot bits that we would drill through concrete to run new

21   wiring if they were damaged.

22          And we also had a machine that would, if the valve

23   wasn't working, it was called a freeze machine.  And you would

24   actually be able to place it on the pipe, and after a certain

25   amount of time, after you were trained in how to use it, you

1     would be able to freeze the line to go and replace a valve and

2     install the new meter.

3              Every day, as needed, these were certain items and

4     tools that you needed to load on the vehicle.

5     Q.  You mentioned drill bits.  Why would you have to drill

6     through a wall?

7     A.  Well, on a residential home, pretty much, you just going

8     straight in.  The thickness of a house wall is 12 inches,

9     16 inches depending.  But we had -- I did a lot of commercial

10    properties, where you would have meters that would be maybe two

11    or three floors underground.  And you would have to come in on

12    an angle and drill two or three feet to get from the sidewalk

13    or from the actual foundation wall into where you would be able

14    to drop the wire in, and then wire to these meters and these

15    locations.

16    Q.  What were you wiring all the way down to that meter?

17    A.  The actual -- an actual physical wire, the size of, you

18    know, like a regular wire that would actually attach to the

19    meter, and the other end was connecting to the electronic

20    device.

21    Q.  The electronic device, where would you put that?

22    A.  Outside the building.

23    Q.  So you would run a wire from the outside of the building

24    with the electronic device, all the way down into the water

25    meter?

1  A.  Yes.

2  Q.  How long would it take you to load up your truck, check

3  your routes and get your CN3?

4  A.  About 45 minutes to an hour.

5  Q.  If you finished early, if it only took you 25 or 30 minutes

6  that day, would you wait around the office until 8 o'clock or

7  would you leave early to get started on your routes?

8  A.  No.  The key thing was, we were told by Angelo and Charlie

9  that we needed to be out in the field and have our first job

10  started by eight.

11  Q.  Before you left the Ridgewood office, did you have to punch

12  a clock or sign in in any way?

13  A.  No.

14  Q.  Did you ever sign in?

15  A.  I signed in.  Yes, I'm sorry.  Yeah, we would sign in on a

16  time sheet.

17  Q.  What time would you sign in each morning?

18  A.  8 a.m.

19  Q.  Was that accurate?

20  A.  No.

21  Q.  Why did you sign in at 8 o'clock if it wasn't accurate?

22  A.  I was told by Charlie and Angelo that that's what I'm

23  supposed to do.

24  Q.  Were you told that on your first day of work or some later

25  time?

F5k3mcg5                          Frangiosa - direct

1  A.  After training, a couple of weeks after training when we

2  actually started the project, we were told this is your start

3  time.

4  Q.  Do you think it was right for you to sign in so long after

5  you got there?

6  A.  No.

7  Q.  Why did you do it?

8  A.  Because I was told to, and I needed the work.  Because, you

9  know, the economy was bad.

10  Q.  Did you write 8 o'clock on that time sheet to benefit

11  yourself in any way?

12  A.  No.

13  Q.  Would you have written 8 o'clock on that time sheet if

14  Mr. Solimine and Mr. Loguidici had not told you to do that?

15  A.  If they told me not to do it?

16  Q.  If they hadn't told you that you had to write 8 o'clock,

17  would you have done it anyway?

18  A.  No, I would have written in the correct time that I

19  arrived.

20  Q.  Did you make more money by writing in 8 o'clock rather than

21  seven or 7:15?

22  A.  No.

23  Q.  Did you ever attend meetings while working at CCI?

24  A.  Yes.

25  Q.  When did those meetings take place?

F5k3mcg5                         Frangiosa - direct

1    A.  In the morning.

2    Q.  How did you find out there was going to be a meeting?

3    A.  Usually Charlie would come in, and just at the spur of the

4    moment just tell everyone, oh, stay back, don't leave, we're

5    having a meeting.

6    Q.  Was attendance mandatory at those meetings?

7    A.  Yes.

8    Q.  What time would you sign in if you were attending one of

9    those mandatory meetings?

10   A.  8 a.m.

11   Q.  Did the meeting start before 8 a.m.?

12   A.  Yes.

13   Q.  Would you still sign in at 8 a.m.?

14   A.  Yes.

15   Q.  How frequently did these meetings take place?

16   A.  In the beginning they were more or less every few days when

17   the project was new.  And then after that, it became like a

18   weekly meeting, it was all the safety -- was called a safety

19   meeting.

20   Q.  Did you ever see Mr. Solimine in the office before

21   8 o'clock?

22   A.  Yes.

23   Q.  Did you ever see Mr. Loguidici in the office before

24   8 o'clock?

25   A.  Yes.

F5k3mcg5                          Frangiosa - direct

1   Q.  Did they ever speak to you in the morning?

2   A.  Sure, all the time.

3   Q.  Did Mr. Solimine ever tell you that he couldn't sign your

4   sign-in sheets because he knew that you had gotten in before

5   8 o'clock?

6   A.  No.

7   Q.  Assuming there was no meeting, what time would you leave

8   the Ridgewood office to go out in the field?

9   A.  I tried to get out of there as soon as possible.  7:30,

10  quarter to eight the latest, depending how far we had to go to

11  drive.

12  Q.  What time would you have signed in that morning?

13  A.  8 o'clock.

14  Q.  What were your responsibilities once you left the facility?

15  What did you have to do in the course of a day?

16  A.  If I had appointments, I would have to contact the customer

17  to make sure, to verify that it was still an appointment,

18  because we had instances that people would be on a list for

19  appointments and it was completely the wrong day or the wrong

20  time slot.  We had to safely drive the vehicle there.  Then get

21  to the job site or the first job.  And then we would go in,

22  start the process of doing a meter and MTU install.

23  Q.  You mentioned appointments and canvassing.  Did you have a

24  choice about whether you were going to do appointments or

25  canvassing?

1    A.  No.

2    Q.  Who decided whether you were going to do canvassing,

3    appointments, or some combination of the two?

4    A.  Whoever was doing the routing.  That would be the person

5    that would come in early in the morning, so it was either the

6    warehouse supervisor, or Angelo himself would figure -- they

7    would just say, well, who has appointments and who has

8    canvassing.  We had no choice in that.

9    Q.  How long would it take you to install a residential water

10   meter if everything went well?

11   A.  If everything went well, one person by themselves, start to

12   finish, somewhere between 20 minutes to a half hour.  That's on

13   a smaller meter.

14   Q.  What about one of those larger commercial meters, how long

15   would that take you to swap in and out?

16   A.  One person?  Depending on the location, you probably

17   talking about an hour and a half, two hours.

18   Q.  What was the earliest time that appointments were

19   scheduled?

20   A.  They had 8 o'clock, they had -- they had two time slots.

21   Eight to whatever, and then there was an afternoon.  But

22   sometimes some of them would be earlier than 8 a.m. on special

23   requests.

24   Q.  You testified earlier you worked in a team, is that right?

25   A.  In the beginning of the project, yes, with Sal Fischetti.

1    Q.   When you were working with Sal Fischetti, how many water

2    meters would you replace in a day?

3    A.   In order -- the monetary value they told us we needed to do

4    at least eight to 10 water meters, and a total of 16 completed

5    jobs.

6    Q.   The jobs that were not water meters were what kind of jobs?

7    A.   Would be just a computer job only, but which was involved

8    also.

9    Q.   What would you have to do on a computer job only?

10   A.   Well, we would have to do is -- even on all the jobs, you

11   would have to verify the serial number which is stamped on

12   every water meter.  You'd have to verify the seal cap, that's

13   the little round circle that actually seals the meter, and we

14   also have to verify that the meter read correctly, that all the

15   numbers were present.  And we had to make sure that it was also

16   wired correctly.  Because in order for the computer box to

17   work, three wires had to be connected to the actual top of the

18   water meter, and all of them had different wiring

19   configurations.

20   Q.   So, if you were working by yourself?

21   A.   Yes.

22   Q.   How many water meters would you replace in a day?

23   A.   Four to six.

24   Q.   Did you have any kind of quota or performance target that

25   you had to meet?

F5k3mcg5                    Frangiosa - direct

1    A.   Yes.

2    Q.   What was that quota or target?

3    A.   It was a minimum of eight jobs, and they said monetary wise

4    was the optimum would be five, five meters, five water meters

5    with the computer box, and three computers by themselves.  That

6    would just cover the day.  That's what we were told.

7    Q.   Did that quota change at any time?

8    A.   Yeah.  Yes.

9    Q.   Who told you what the quota was?

10   A.   Charlie and Angelo.

11   Q.   Do you ever have any difficulty in filling the quota?

12   A.   Yes.

13   Q.   Mr. Frangiosa, you have a lot of plumbing experience?

14   A.   Yes, sir.

15   Q.   Are you pretty good about swapping out meters pretty

16   quickly?

17   A.   Yes.

18   Q.   Have you had significant experience swapping out meters

19   quickly?

20   A.   Yes, sir.

21   Q.   What would happen to you if you didn't meet your quota?

22   A.   I would be verbally abuse.

23   Q.   By who?

24   A.   By Angelo and Charlie.

25   Q.   How long was your lunch break supposed to be when you

1    worked at CCI?

2    A.  30 minutes, half hour.

3    Q.  How many days a week would you take that full 30 minute

4    lunch break?

5    A.  I would try at least one or two days a week.

6    Q.  Why wouldn't you do it every day?

7    A.  Because of just a hectic schedule of trying to maintain

8    either a minimum of doing eight jobs or just trying to fill the

9    quota for the day.

10   Q.  How many days would you not take that full lunch break?

11   A.  Three -- three -- it would be three days on a five-hour

12   workweek, and when we worked six days, it was probably more

13   like four.

14   Q.  On days that you didn't take a full lunch break, would you

15   eat anything?

16   A.  Sure.  I would snack out of my lunch cooler.

17   Q.  Would you bring that cooler from home?

18   A.  Yes.

19   Q.  How long would it take you to eat the lunch you brought in

20   your cooler?

21   A.  I would be snacking as I'm driving.  So maybe a banana as

22   I'm driving to one place.  Maybe stop for a minute while I was

23   doing some paperwork and eat a yogurt.  Maybe eat a half a

24   sandwich.  Five minutes there, five minutes there.  I mean.

25   Q.  Fair to say about five or 10 minutes?

1    A.   Yeah.  Sure.

2    Q.   Did CCI require you to document your lunch breaks in any

3    way?

4    A.   Yes.

5    Q.   What documentation did you need to give CCI about your

6    lunch breaks?

7    A.   They came up with a break sheet they called it.

8    Q.   Who did you have to give a break sheet to?

9    A.   You had to give it to Charlie Loguidici who in turn would

10   give it to Angelo.

11   Q.   Were your break sheets that you submitted accurate?

12   A.   No.

13   Q.   Why weren't they accurate?  Why did you submit an

14   inaccurate break sheet?

15   A.   Because they were handed to us on a Tuesday morning where

16   Charlie would come in, he would just tell us to fill them out,

17   and if you didn't fill it out or refused to, he says he didn't

18   really care what was written on them, just write something so

19   that you can go to work.

20   Q.   Did you ever tell Mr. Solimine or Mr. Loguidici that you

21   were not taking a full lunch break?

22   A.   Yes, I did.

23   Q.   Who did you tell?

24   A.   I told actually both of them on many occasions.

25   Q.   Did they tell you anything in response?

1    A.  Yes.

2    Q.  What did they tell you?

3    A.  They said look at the size of you.  You can afford to lose

4    a few meals.

5    Q.  Which of them said that to you?

6    A.  Excuse me?

7    Q.  Which of them said that to you?

8    A.  Both of them.  Actually they were standing together when

9    that -- that one verbal came out of -- yeah.

10   Q.  What message did you take from that?

11   A.  I was like basically, you know what, okay.  So this is

12   falling on deaf ears, and I'll keep filling out your break

13   sheets.

14   Q.  After you told Mr. Solimine and Mr. Loguidici that you

15   weren't taking your lunch breaks, did they still take your

16   break sheet?

17   A.  Yes.

18   Q.  On average, when would you return to the Ridgewood office

19   at the end of the day?

20   A.  Probably it was usually always after 4:30, quarter of five.

21   Q.  Where would you park your truck when you arrived?

22   A.  Same thing that we would do in the morning.  If there was

23   no parking spot, we would have to double park on the street.

24   Q.  What was the first thing you did when you got back?

25   A.  First thing that we did when we got back was, priority was

F5k3mcg5                        Frangiosa - direct

1    to unload any water meters that we had replaced, and along with

2    that we had to document on one sheet, it was called a meter

3    replacement sheet I think.  And we had to document all the

4    meters with their serial numbers matched up to where we removed

5    them, we would have to go into the shop, lay them out, and then

6    wait for the supervisor to verify that the meters that we were

7    giving him were the ones that were on our paperwork.  Then,

8    only then were we allowed to continue, you know, finishing the

9    end of the day.

10   Q.  Do you know what CCI did with those meters?

11   A.  They used to put them in these big cardboard boxes.  They

12   were like these monster boxes, bigger than what I'm sitting in,

13   and they used to fill them up and they used to disappear and I

14   don't know where they went.

15   Q.  Then after you unloaded all of your meters and filled out

16   your meter sheets, what else would you do?

17   A.  I would have to hand in one or two computers and make sure

18   I told the warehouse person if something happened, and just

19   give them a little bit of a run down on if there was something

20   we couldn't do or if we found some bad addresses.  After we

21   were done with that, then we went to this back room, the

22   conference room, and then we would continue all our paperwork.

23   Just to fine tune all the paperwork from during the day.

24   Q.  On average, after you did all of that, when would you leave

25   work at the end of the day?

F5k3mcg5                              Frangiosa - direct

1    A.   I tried to get out about a quarter after five, 5:30.

2    Q.   Did you sign out before you left?

3    A.   Yes, I did.

4    Q.   What time would you sign out at?

5    A.   At 4:30.

6    Q.   If you were leaving at 5:15, why would you sign out at

7    4:30?

8    A.   Once again, Angelo and Charlie said that you're only going

9    to get paid between the hours of eight to 4, 30 and 4:30 is

10   when you're signing out.

11   Q.   Were there ever any circumstances in which you would sign

12   out after 4:30?

13   A.   Yes.

14   Q.   What sort of circumstances would that be?

15   A.   If it was an emergency repair or something had broken or to

16   go assist another crew, that was the only time that we were

17   able to stay late and work.

18   Q.   Under those circumstances, would you receive approval for

19   your --

20   A.   Yes, yes, Charlie -- we would ask Charlie who in turn would

21   ask Angelo and in turn we would get the -- if we did get the

22   approval.

23   Q.   Did he ever approve your overtime?

24   A.   Yes.

25   Q.   Was there any reason why he would approve -- why would you

1    do more of that than anybody else?

2    A.  Because a lot of times when things were broken, they needed

3    a plumber there that was experienced with doing the repairs in

4    a timely fashion, and also comfortable working around the old

5    plumbing systems.  So that's why they would ask me to go there.

6    Q.  Were you pretty comfortable working around those old

7    plumbing systems?

8    A.  Sure, sure.

9    Q.  Have you had a lot of experience working on the old

10   plumbing systems?

11   A.  Yes, yes.

12   Q.  How late would you get home if you were working until 5:15?

13   A.  5:15 --

14          MR. WITTELS:  Objection.  Relevance.

15          THE COURT:  Sustained.

16   Q.  Did you ever write down a time other than 4:30 without

17   receiving any authorization from Mr. Solimine?

18   A.  Yes.

19   Q.  What happened when you did that?

20   A.  I got verbally chastised over it.

21   Q.  Did anything else happen?

22   A.  I got -- I believe I got written up.  And we had to redo

23   the time sheets also.

24   Q.  Was being written up -- strike that.

25          Did the fact that you were written up for writing down

F5k3mcg5                    Frangiosa - direct

1    a time other than 4:30 factor into your decision to write down

2    4:30 on subsequent days?

3    A.   Yes.

4    Q.   Are you aware of an incentive program that CCI offered?

5    A.   Yes.

6    Q.   What was the incentive program?

7    A.   I wasn't too clear about it, because it never really was

8    explained to me.  It was in regards to if you did more than

9    eight jobs and more of the meter jobs, and it was above and

10   beyond what the daily quota was, you were allowed to leave

11   early.

12   Q.   Did you ever leave early under that incentive program?

13   A.   Nope, nope.

14   Q.   Never?

15   A.   Never.

16   Q.   Did other people sometimes go home early under the

17   incentive program?

18   A.   I guess so.

19   Q.   Did most people go home, to your knowledge, did most people

20   go home early on most days?

21   A.   I don't know.

22   Q.   Were you ever asked to redo a time sheet?

23   A.   Yes.

24   Q.   How many times?

25   A.   That I recall, at least two or three times.

F5k3mcg5                          Frangiosa - direct

1    Q.   Were you ever told why you were doing that?

2    A.   Yes.

3    Q.   What were you told?

4    A.   It was said that D.E.P. didn't like them faxing it over,

5    and that we had to sign from this day forward in blue ink

6    because D.E.P. wanted to check the sign-in sheet in the morning

7    after we started our day.

8    Q.   What kind of vehicle did you use when you were working for

9    CCI?

10   A.   A little Suzuki crossover.

11   Q.   Did you drive that truck to and from work every day?

12   A.   Yes, I did.

13   Q.   Did you do any maintenance on that truck?

14   A.   Yes.

15   Q.   What maintenance did you do?

16   A.   Washing it, oil changes, repaired a few flat tires.

17   Q.   How often would you wash that car?

18   A.   Once a week.  Mandatory.

19   Q.   You say it was mandatory.  Why did you do it every single

20   week?

21   A.   Because I was -- we were told that if the vehicle wasn't

22   clean on Monday morning, that you could just turn around and go

23   home.

24   Q.   How often would you change the oil in that car?

25   A.   I was -- at 3,000 miles I was probably changing it about

1    every three or four months.

2    Q.  Did you ever change the oil while you were signed in during

3    the week?

4    A.  No.

5    Q.  Did you ever wash the car while you were signed in during

6    the week?

7    A.  No.

8    Q.  Did you ever fill out time sheets for the time you spent

9    maintaining the company car?

10   A.  No.

11   Q.  Did it ever occur to you that they would accept time sheets

12   for the time you spent working on the car?

13   A.  I asked a few times and they told me don't even bother.

14   Q.  Who told you that?

15   A.  Angelo and Charlie.

16   Q.  Have you ever met Tim Wertz?

17   A.  Yes.

18   Q.  Have you ever met Mike Maguire?

19   A.  Yes.

20   Q.  Did Mr. Solimine or Mr. Loguidici ever tell who you their

21   bosses were?

22   A.  Yes.

23   Q.  Who were their bosses?

24   A.  Angelo and Charlie's direct boss was Mr. Maguire, who

25   was -- it was his project.  I guess project manager in charge

F5k3mcg5                          Frangiosa - direct

1    of the project that we were working on.  And then they said

2    after Mr. Maguire was Mr. Wertz, he was the owner of the

3    company.

4    Q.  Did you ever complain to Mr. Solimine or Mr. Loguidici that

5    you weren't being paid properly?

6    A.  Yes.

7    Q.  What did they tell you?

8    A.  That CCI doesn't really care about whatever.  We're going

9    to pay you what we feel like and just keep working.

10   Q.  Did you ever complain to Mr. Maguire that you weren't being

11   paid properly?

12   A.  Yes, I did.

13   Q.  How did you complain?

14   A.  I wrote a letter to him.  I found his information and

15   Mr. Wertz's information on their website, and I e-mailed them,

16   and brought up four points in regards to what was going on and

17   trying to help them and inform them of what a prevailing wage

18   job should entail.  And I also spoke to Mr. Maguire a few times

19   via telephone.  Company work phone.

20   Q.  How did you get Mr. Maguire's telephone number?

21   A.  It was given to us.

22   Q.  By who?

23   A.  By Charlie Loguidici.

24   Q.  Did he tell you why he was giving you Mr. Maguire's

25   telephone number?

F5k3mcg5                          Frangiosa - direct

1    A.  Well, he said that if you're not getting any answers with

2    Angelo, then you need to go to the next step.  And I said,

3    well, what is the next step?  And he gave me Mr. Maguire's

4    phone number.

5    Q.  I'd like you to take a look at Defendant's Exhibit OO.

6    A.  I see it.

7    Q.  Do you recognize this document?

8    A.  Yes, I do.

9    Q.  What is it?

10   A.  The e-mail that I sent to Mr. Maguire.

11           MR. GLUNT:  Permission to approach, your Honor?

12           THE COURT:  Yes.

13   Q.  There's two pages.

14   A.  Thank you.

15   Q.  Did you send this letter in connection with your job?

16   A.  Yes.

17   Q.  Was this letter an accurate account of the facts as you

18   understood them at the time?

19   A.  Yes.

20           MR. GLUNT:  We would like to move into evidence right

21   now Defendant's Exhibit OO.

22           MR. WITTELS:  No objection, Judge.

23           THE COURT:  Received.

24           (Defendant's Exhibit OO received in evidence)

25   Q.  Mr. Frangiosa, why did you write this letter?

1    A.   I wrote this letter because I saw that my moneys weren't

2    being paid correctly, I brought it to Mr. Solimine's attention.

3    And he basically told me it is what it is, and that this money

4    was being held up by D.E.P. and any virtual money.  And he said

5    that corporate was handling it.

6    Q.   How many issues did you raise in this letter?

7    A.   Four issues, sir.

8    Q.   What was the first issue that you raised?

9    A.   The first issue I raised was in regards to our supplemental

10   benefits.  That's separate from what we were being paid hourly.

11   Q.   What was the problem you raised about the supplemental

12   benefits?

13   A.   That it wasn't being distributed properly.

14   Q.   After you wrote this letter, did Mr. Maguire immediately

15   fix the problem with the supplemental benefits?

16   A.   No.

17   Q.   Did you have to take any other action to get supplemental

18   benefits fixed?

19   A.   Well, is it okay if I --

20   Q.   Yeah.

21   A.   What I had said was, at the end of the letter, that I said

22   that if I couldn't get it resolved, I would have to go by other

23   means.  Which I did.

24   Q.   What were those other means?

25   A.   I informally called up Mr. Roche at D.E.P. and informed him

F5k3mcg5                      Frangiosa - direct

1    in regards to that the wages weren't being paid properly.

2    Q.  After you informed D.E.P. that CCI wasn't paying its wages

3    properly, did that fix the problem?

4    A.  Yes.

5    Q.  What was the second issue you raised with Mr. Maguire?

6    A.  In regards to the retro money.

7    Q.  What do you mean by retro money?  Can you explain what that

8    issue was?

9    A.  Retro money was that they felt that the first day we

10   started working, we were just supposed to be paid a lower rate

11   of pay for training purposes.  But on a prevailing wage, the

12   day you started working, training or not training or whatever

13   it is, you're supposed to be paid the proper amount.

14   Q.  When you raised the issue of retro money with Mr. Maguire,

15   did he then immediately fix the issue?

16   A.  No.  That was more or less when I called him up.  He was

17   saying that his in-house accountants or human resources, that

18   they were handling it.  And they said no.

19   Q.  Did they handle it?

20   A.  Not that I am aware of.  I mean, it was handled.  But, not

21   until after I made my -- my one call again.  The one call that

22   I made to Mr. Roche, was -- I'm sorry if I'm jumping ahead.

23   But on all four points, I informed Mr. Roche about this.

24   Q.  So you complained about four different issues in this

25   letter, correct?

1    A.  Yes.

2    Q.  After you wrote this letter, you still felt it was

3    necessary to go to D.E.P. in order to solve those four issues,

4    is that right?

5    A.  Correct.

6    Q.  Mr. Frangiosa, when you wrote this letter, why didn't you

7    mention to Mr. Maguire that you were working hours before and

8    after your shift was scheduled?

9    A.  I didn't mention it to him because I knew that there would

10   be severe repercussions, and we had informally spoke about it.

11   Q.  With whom had you informally spoken?

12   A.  I had spoken to Angelo and Charlie about it, and

13   Mr. Maguire was aware of it.

14   Q.  Why did you think there would be serious repercussions if

15   you mentioned that to him in a letter?

16   A.  I would lose my job.

17   Q.  Why did you think you would lose your job if you complained

18   that you were working hours for which you weren't being paid?

19   A.  Just having worked with them for a while, I came to

20   understand that this overtime was a major issue that they

21   didn't want to address, and that they would do anything in

22   their power to not address it.

23   Q.  Why did you feel comfortable bringing up these four issues

24   if you didn't feel comfortable bringing up the overtime issue?

25   A.  Because these over here were the ones that were blatantly

1   happening.  And even with the overtime, it was just that trying

2   to get -- just trying to get guys to talk about it, a lot of

3   individuals were fearful, that they didn't want to say

4   anything.

5   Q.  When did you stop working for CCI?

6   A.  July of 2011.

7   Q.  At any time before that, did you learn that you were going

8   to be laid off?

9   A.  Yes.

10  Q.  How did you learn that?

11  A.  We came into work one morning and posted by Angelo's office

12  was a piece of paper that said these individuals, their last

13  day of work will be July of 2011.

14  Q.  So you literally saw the writing on the wall?

15  A.  Yes, yes.  Yes.

16  Q.  Did you speak to Mr. Solimine after you learned that you

17  were being laid off?

18  A.  Yes, I did, quite a few times.

19  Q.  What did you say to him?

20  A.  I said, well, you know what, in regards to that, I know

21  that my time with the project's coming to an end.  I said, it

22  would be nice if we can get in touch with Ms. Ann Wheeler at

23  human resources, I'd like to get the medical package for COBRA.

24  And other things, you know, like a departing package so I can

25  start the paperwork working.  Because I do have a wife and two

F5k3mcg5                          Frangiosa - direct

1    children, I wanted to make sure I could, A, know how much my

2    medical benefits would be to pay for COBRA, and also to receive

3    any vacation or sick time that I didn't take.

4    Q.   Did you speak to him about anything else?

5    A.   No.

6    Q.   What was his response after you spoke to him?

7    A.   He got quite irate with me.

8    Q.   What was he irate about?

9    A.   That why you bothering me, you're out of here, don't worry

10   about it.   And then he started off on a tangent in regards to

11   don't even think of trying to get to collect unemployment

12   because I make sure CCI doesn't have to pay a dime to anyone

13   that gets laid off or fired.   And you'll never see a dime.

14   Q.   Did you speak to him about the unpaid hours that you had

15   worked before and after work?

16   A.   Yes, I did, after he became irate with me.   I said, well,

17   Angelo, at least at the end of this project, I now have the

18   opportunity to figure out how I am going to try to get some of

19   the unpaid wages.

20   Q.   What did he say after he said that?

21   A.   He says good luck with that.   You're out of here.

22   Q.   He terminated you?

23   A.   Yes.

24   Q.   On the spot?

25   A.   On the spot.

1    Q.  Mr. Frangiosa, did you keep any personal records of the

2    time that you actually worked at CCI?

3    A.  No.

4    Q.  Did it ever occur to you to keep personal records of the

5    time that you actually worked at CCI?

6    A.  No.

7    Q.  Did anyone ever tell you it was your responsibility to keep

8    personal records of time?

9    A.  No.

10   Q.  Have you ever done that at any other job you ever worked?

11   A.  Aside from CCI?

12   Q.  Aside from CCI.

13   A.  Just keeping -- no.  Just keeping records of where I've

14   worked, but not the actual hours.

15   Q.  Let's talk about an average week when you were working for

16   CCI.  See if we can come to a total to the amount of hours that

17   you were working.  What time would you get in in the morning?

18   A.  Like I said, between seven and 7:15.  Try to get there at

19   least 45 minutes earlier.

20   Q.  If you got in at 7:15, you agree with me that's .75 hours,

21   three-quarters of an hour?

22   A.  Yeah.

23   Q.  All right.  On average, what time would you leave at the

24   end of the day?

25   A.  About 5:15, 5:30, so 45 minutes, .75.

F5k3mcg5                    Frangiosa - direct

1    Q.   Okay.

2    A.   Counselor, you're writing next to Scott Vaaler.  That's not

3    me.

4    Q.   Thank you.

5    A.   I'm about a foot shorter than him.

6    Q.   Very good.  Okay.

7         So you said .75 in the morning, correct?

8    A.   Yes.

9    Q.   You said .75 in the afternoon?

10   A.   Yes, sir.

11   Q.   What about lunch, so how frequently would you take a full

12   30 minute lunch break?

13   A.   I would try at least one to two days a week.

14   Q.   You're not seeking any recovery for the times that you took

15   your full 30 minute lunch break, right?

16   A.   No, not at all.

17   Q.   How many days a week would you not take your full 30 minute

18   lunch break?

19   A.   On a five hour workday, it would be three.

20   Q.   How much time would you spend eating on those days?

21   A.   Five to 10 minutes.

22   Q.   So if you spent 10 minutes eating lunch three days a week,

23   that comes to about .2 hours.  Do you agree?

24   A.   Correct.

25   Q.   So in total, you take .75, .75, and .2, that's about 1.7

F5k3mcg5                          Frangiosa - direct

1    hours a day, do you agree?

2    A.  Yes.

3            MR. GLUNT:  Thank you very much, Mr. Frangiosa.  I

4    have no further questions.

5            THE COURT:  We'll take our midafternoon break now,

6    ladies and gentlemen, for 15 minutes.

7            (Jury excused)

8            THE COURT:  We'll see you after the recess.

9            (Recess)

10           (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F5kWmgc6

1          MR. WITTELS:  Judge, if I may, before you bring in the

2     jury, may we approach.

3          THE COURT:  There's no need to approach.  We can do it

4     from here.

5          MR. WITTELS:  I'm looking at the time, five to four.

6     By agreement, we indicated to the plaintiff's attorney we would

7     make Angelo Solimine available today out of turn because that's

8     how they wanted to call it, and we had no problem with this, so

9     we arranged for him to be here.  He has told us he cannot be

10    here tomorrow or Friday because his wife is having surgery.  I

11    can't imagine that once we're done with Mr. Frangiosa --

12         THE COURT:  We'll take him out of order right now.

13         MR. BHANDARI:  O.K.

14         THE COURT:  This witness will step down and remain

15    available, and we'll finish with him either today or tomorrow.

16         MR. GLUNT:  I believe, your Honor, that Mr. Frangiosa

17    is actually starting a new job tomorrow.

18         THE COURT:  Then we will find the time to accommodate

19    him.  We're going to take the other witness out of order right

20    now.  Bring him in.

21         Please take a seat.

22         THE WITNESS:  Thank you, your Honor.

23         (Witness excused)

24         MR. BHANDARI:  Your Honor, I would like to just give

25    you a transcript of deposition testimony in case we need it.

F5kWmgc6

1    May I approach.

2              THE COURT:  O.K.

3              Bring in the jury, please.

4              MR. BHANDARI:  Will you explain to the jury what's

5    happening?

6              THE COURT:  I'll explain it to the jury.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F5kWmgc6

1              (In open court; jury present)

2              THE COURT:  Ladies and gentlemen, before we continue

3    with the previous witness, for logistical reasons to

4    accommodate this witness, we will take him now and then we will

5    return to the witness we were in the middle of.

6              Please swear in the witness.

7     ANGELO SOLIMINE,

8          called as a witness by the Plaintiffs,

9          having been duly sworn, testified as follows:

10   DIRECT EXAMINATION

11   BY MR. BHANDARI:

12   Q.  Good afternoon, Mr. Solimine.

13   A.  Good afternoon.

14   Q.  My name is Rishi Bhandari and I represent the plaintiffs in

15   this case.  Have we ever met before?

16   A.  No.

17   Q.  Have we ever spoken before?

18   A.  No.

19   Q.  Are you represented by any lawyers?

20   A.  Yes.

21   Q.  Who are you represented by?

22   A.  Ira Blank.

23   Q.  So you are represented by the same lawyers who are

24   representing CCI, is that correct?

25   A.  Yes.

F5kWmgc6                        Solimine

1    Q.  And you used to work for CCI, is that correct?

2    A.  That is correct.

3    Q.  You no longer work for CCI?

4    A.  That is correct.

5    Q.  Who do you currently work for?

6    A.  Verizon Communication.

7    Q.  How long have you been working for Verizon Communication?

8    A.  I actually start my employment this coming Tuesday.

9    Q.  You haven't yet started with Verizon?

10   A.  No.

11   Q.  When did you accept the job with Verizon?

12   A.  About, roughly about two and a half weeks ago.

13   Q.  Sorry.  What was that?

14   A.  Two and a half weeks ago.

15   Q.  When did you stop working for CCI?

16   A.  I stopped working for CCI last week.

17   Q.  You stopped working for CCI last week, correct?

18   A.  Yes.

19   Q.  And Mr. Blank and you entered into an agreement where he's

20   representing you in the hallway outside, correct?

21           MR. WITTELS:  Objection.

22           THE COURT:  Sustained.  Put some questions about the

23   facts to this witness, please.

24   BY MR. BHANDARI:

25   Q.  Mr. Solimine, when you worked for CCI, did you work on a

F5kWmgc6                           Solimine

1   project called the AMR project?

2   A.  Yes, sir.

3   Q.  And you were the general manager of the AMR project,

4   correct?

5   A.  Yes, I was.

6   Q.  And when you were the general manager of the AMR project,

7   your duties included setting hours, setting schedules for the

8   men, correct?

9   A.  Yes.

10  Q.  And your duties included monitoring the hours for the men,

11  correct?

12  A.  Yes.

13  Q.  And your duties included submitting the hours into the

14  certified payroll system, correct?

15  A.  Yes.

16  Q.  And your duties included, your duties included monitoring

17  the compensation schedule, including labor costs, correct?

18  A.  Yes.

19  Q.  And your duties included having full profit and loss

20  responsibility for the AMR project, correct?

21  A.  Yes.

22  Q.  The AMR project was a project with the city, with the

23  Department of Environmental Protection, correct?

24  A.  Yes.

25  Q.  And the total revenue to CCI was approximately $11 million

F5kWmgc6                          Solimine

1    for the AMR project, correct?

2    A.  I don't recall if that was the exact number.  Around, it

3    was around that.

4    Q.  Do you have a resume that was submitted online to a company

5    called slideshare.com?

6    A.  Excuse me?

7    Q.  Did you ever submit a resume online to a company called

8    slideshare.com?

9    A.  I have, I don't recall that at all, no.

10         MR. BHANDARI:  I'd like to have marked for

11   identification Plaintiffs' Exhibit 129.  May I approach, your

12   Honor.

13         THE COURT:  Yes.

14         MR. WITTELS:  We don't have a copy.

15   Q.  Do you recognize this document, Mr. Solimine?

16   A.  Absolutely.

17   Q.  What is this document?

18   A.  This is my resume and cover letter.

19   Q.  And did you submit this online?

20   A.  Online, yes, but not to slide -- I don't know what that Web

21   site is.

22   Q.  Where did you submit this?

23   A.  Career Builder, Monster, LinkedIn.

24   Q.  And is the information that's contained in this resume

25   accurate?

1    A.  Yes.

2           MR. BHANDARI:  Your Honor, I'd like to have this

3    entered into evidence.

4           MR. WITTELS:  No objection.

5           THE COURT:  Received.

6           (Plaintiffs' Exhibit 129 received in evidence)

7           MR. BHANDARI:  I'd like to publish a copy of this to

8    the jury.

9           THE COURT:  No.

10          MR. BHANDARI:  No?

11          THE COURT:  No.  I want to move with this witness.

12   Let's go.

13   Q.  Looking at the third page of your, this document --

14   A.  Yes.

15   Q.  -- does it say that you were the project manager, New York,

16   New York?

17   A.  Yes, it does.

18   Q.  And you were the project, and the years were 2008 to 2011,

19   is that correct?

20   A.  That is correct.

21   Q.  And you were the project manager for the AMR project,

22   correct?

23   A.  That is correct.

24   Q.  Does it say over here automatic meter readings $11 million?

25   A.  It does.

F5kWmgc6                       Solimine

1    Q.  Does that refresh your recollection that the total amount

2    of the contract with the DEP was approximately $11 million?

3    A.  Approximately.  Not exact.

4    Q.  Now, you testified a few moments ago that you had total

5    responsibility for the profit and loss of the AMR project for

6    CCI, correct?

7    A.  That is correct.

8    Q.  What does that mean?

9    A.  Managing the day-to-day operations to make sure we stay

10   within budget.

11   Q.  And you received budgets from the corporate office,

12   correct?

13   A.  Correct.

14   Q.  And those budgets included a budgeted amount for labor

15   costs, correct?

16   A.  Correct.

17   Q.  And you received those budgets every month from this, from

18   the corporate office, correct?

19   A.  No, that's not correct.

20   Q.  How frequently did you receive them?

21   A.  Yearly.

22   Q.  Oh.  You received them only once a year?

23   A.  Yes.

24   Q.  You never received updates on labor costs?

25   A.  As far as budgets are concerned, we did our budgets yearly.

F5kWmgc6                        Solimine

1    That was, that was a set cost that we put in there.

2    Q.  Did you ever receive communications from the CCI corporate

3    office about what the labor costs should be more frequently

4    than once a year?

5    A.  We got P&L statements roughly every month, if not every

6    other month.

7    Q.  So you received P&L statements every month from the

8    corporate offices, correct?

9    A.  Yes.

10   Q.  And on those P&L statement, they would include labor costs,

11   is that correct?

12   A.  Yes.

13   Q.  So every single month, you received from the CCI corporate

14   offices what the budget was expected to be for labor costs,

15   correct?

16   A.  Yes.

17   Q.  And it was your job to monitor the hours that your men were

18   working on labor, correct?

19   A.  On a day-to-day basis, yes.

20   Q.  And you tried to minimize overtime, didn't you?

21   A.  Yes.

22   Q.  And you told your men starting in April of 2009 that they

23   had to sign in every single morning for just one month, but

24   between April of 2009 and May 26 of 2009, you told the men that

25   they had to sign in every morning at 7:30 a.m., correct?

F5kWmgc6                        Solimine

1    A.  I don't recall.

2    Q.  I'd like to direct your attention to Exhibit 69.

3            MR. BHANDARI:  Can we put that up on the screen,

4    please.  Does everybody have that in front of them?

5    Q.  Mr. Solimine, do you recognize this document?

6    A.  Yes.

7    Q.  And this is an employee sign-in sheet?

8    A.  Yes.

9    Q.  Is that your signature at the bottom?

10   A.  Yes.

11   Q.  And did you regularly sign the employee sign-in sheets?

12   A.  At the bottom, yes.

13   Q.  And did you sign them almost every single day?

14   A.  Almost, yes.

15   Q.  Did you sign them every single day you were there?

16   A.  No.  I don't believe so.

17   Q.  If you were not there, who was supposed to sign the

18   employee sign-in sheet?

19   A.  Our administrative assistants helped out as well.

20   Q.  Who is the administrative assistant?

21   A.  We had a number of them.  Crystal Kinney was one, Diana

22   Nieves was another.

23   Q.  But every single time she had your name on the bottom where

24   it said Angelo Solimine, correct?

25   A.  I'm sorry?

F5kWmgc6                          Solimine

1    Q.  Do you see your name at the bottom?

2    A.  I do.

3    Q.  Next to your signature?

4    A.  I do.

5    Q.  Every single time she signed your name at the bottom,

6    correct?

7    A.  In the middle, yes, but sometimes she signed on contractor

8    representative line.

9    Q.  And she signed on your behalf?

10   A.  Yes.

11   Q.  Now, can you read the line above the signature?

12   A.  Yes.

13   Q.  What does it say?

14   A.  "I hereby certify that the above information is true and

15   correct and represents all persons employed by my firm on the

16   above project."

17   Q.  So, Mr. Solimine, you were certifying that the time in that

18   everybody signed in to was correct?

19   A.  That's correct.

20   Q.  And if you look at this April 1, 2009, sign-in sheet,

21   what's the time that every single person signed in?

22   A.  7:30.

23   Q.  Did every single person get to the CCI office at exactly

24   7:30 a.m. on April 1, 2009?

25   A.  I can't tell you if that is the case or not.  It's almost

F5kWmgc6                         Solimine

1   six years later.

2   Q.  Well, do you believe that that is the case?

3   A.  It's a strong possibility, yes.

4   Q.  O.K.  So there's a strong possibility that every single

5   person arrived on April 1, 2009, at exactly 7:30 a.m., is that

6   right?

7   A.  Correct.

8   Q.  Can we look at April 2.  Did you sign this sheet as well?

9   A.  I did.

10  Q.  Did every single person arrive at 7:30 a.m. according to

11  this sheet?

12  A.  I can't attest to that to be the 100 percent truth.  It's a

13  possibility.

14  Q.  Well, I'm asking.  Does the time in say 7:30 a.m.?

15  A.  It does.  Yes, it does.

16  Q.  Does this refresh your recollection that starting on April

17  1, 2009, you told the men that they needed to sign in at 7:30

18  a.m. every single day regardless of when they got in?

19  A.  No.

20  Q.  Let's look at April 3.

21  A.  O.K.  I see.

22  Q.  What time did everybody sign in on April 3?

23  A.  7:30.

24  Q.  Let's look at April 4.

25  A.  Eight a.m.

F5kWmgc6                              Solimine

1    Q.  April 4 appears to be a day that's different?

2    A.  Yeah.  Is that --

3    Q.  Only two people signed in that day, correct?

4    A.  It's possible it's a weekend.

5    Q.  Let's look at April 5 -- sixth.  Excuse me.  What time did

6    everybody sign in on April 6?

7    A.  7:30.

8    Q.  Let's look at April 7.  What time did everybody except for

9    Ariel Peniche sign in on April 7?

10   A.  Everybody signed in for 7:30.  7:30, except for Ariel

11   Peniche.

12   Q.  Now let's look at April 8.  What time did every single

13   person sign in?

14   A.  7:30.

15   Q.  Now, does this refresh your recollection that you told the

16   men that they were supposed to sign in at 7:30 a.m. every

17   single day?

18   A.  No.  I mean, it doesn't remind me of anything.  I mean, we

19   have start time of 7:30.  It's just a document with times on

20   it.  I don't know what was said back on April 8 of 2009.

21   Q.  So you don't remember telling the men at sometime prior to

22   April 8 of 2009 that the men are supposed to sign in at 7:30

23   a.m.?

24   A.  No.

25   Q.  If we can go to Exhibit 70, please, and if we can go to

F5kWmgc6                         Solimine

1    February, excuse me, May 26, towards the end of the month.

2    Now, looking at May 26, 2009, what time did every man seem to

3    sign in?

4    A.  Eight a.m.

5    Q.  Can we look at May 29.  Looking at May 29, what time did

6    everyone seem to sign in?

7    A.  Eight a.m.

8    Q.  Now looking at Exhibit 71, again, this appears to be a day

9    where there's fewer people working.  Did you have an

10   understanding of why there would be a day when only four people

11   were working?

12   A.  It's a possibility that it may be a weekend.  I don't know

13   what day six, June 1 of '09 is.

14   Q.  Go to the next day and the next, June 2.  What's the date

15   that everybody signed in on June 2?

16   A.  Sorry?

17   Q.  Excuse me.  What's the time that everybody signed in?

18   A.  Eight a.m.

19   Q.  Let's go to June 3.  What's the time that everybody signed

20   in on June 3?

21   A.  Eight a.m.

22   Q.  June 4.  What's the time everybody signed in on June 4?

23   A.  Eight a.m.

24   Q.  June 5.  What's the time everyone signed in on June 5?

25   A.  Eight a.m.

F5kWmgc6                          Solimine

1    Q.  Did you tell the men that starting on May 26, 2009, they

2    were supposed to sign in at 8 a.m. every single day?

3    A.  I don't recall telling them that.  I'm sure there might

4    have been, there may have been a change of procedure of some

5    sort.

6    Q.  You were responsible for setting the procedure for the CCI

7    office, correct?

8    A.  That is correct.

9    Q.  So if there was a change of procedure, you would be the

10   person who would change the procedure, correct?

11   A.  That's correct.

12   Q.  And did you change the procedure for the CCI office saying

13   that every man was supposed to sign in at 8 a.m.?

14   A.  That is correct.

15   Q.  When did you tell the men that they needed to start signing

16   in at 8 a.m.?

17   A.  I'm sorry, but I don't recall the exact date.

18   Q.  So did you tell the men that they were supposed to sign out

19   every single day at 4:30 p.m.?

20   A.  Yes.

21   Q.  Do you know if men were in the office doing work before 8

22   a.m.?

23   A.  No.

24   Q.  You don't know if men were doing work before 8 a.m.?

25   A.  No.  They weren't required to do work before 8 a.m.

1   Q.  Sorry.  I asked you a different question.  Do you know if,

2   did you ever see any of the plumbers who worked for CCI in the

3   CCI offices before 8 a.m.?

4   A.  Yes.

5   Q.  And did you see any of them pick up their CN3 handheld

6   computers before 8 a.m.?

7   A.  Yes.

8   Q.  Did you see them pick up their route sheets before 8 a.m.?

9   A.  Yes.

10  Q.  Did you see them pick up meters and load them onto their

11  truck?

12  A.  Yes.

13  Q.  Did you see them do paperwork in the mornings?

14  A.  No.

15  Q.  But you did see them pick up their route sheets, pick up

16  their CN3s and load their trucks before 8 a.m. in the morning,

17  correct?

18  A.  No.

19  Q.  You just testified a few moments ago you saw men loading --

20          THE COURT:  Sustained.

21  Q.  Did you have morning meetings?

22  A.  Yes.

23  Q.  And those morning meetings were called tailgates, correct?

24  A.  Yes.

25  Q.  And did those tailgates start before 8 a.m.?

F5kWmgc6                          Solimine

1    A.  Sometimes they did.

2    Q.  But the men had to sign in at 8 a.m. every single day even

3    if they came early for a tailgate, correct?

4    A.  Yes.

5    Q.  And the men had to sign in early every single day even if

6    they were loading their trucks before 8 a.m., correct?

7    A.  They weren't loading their trucks.

8    Q.  Nobody ever loaded their trucks in the morning?

9    A.  The trucks were loaded the night before.

10   Q.  Sorry.  My question is a little bit different.  Did anybody

11   ever load their trucks in the morning?

12   A.  Yes.

13   Q.  And they were instructed to sign in at 8 a.m. every single

14   morning even if they were loading their trucks before 8 a.m.,

15   correct?

16   A.  Yes.

17   Q.  And you expected the men to be at their very first job in

18   the field at 8 a.m., correct?

19   A.  That was a first requirement.  That changed.

20   Q.  That was a requirement that for a time men had to be out in

21   the field by 8 a.m.?

22   A.  By 8 a.m., yes.

23   Q.  In order to be in the field by 8 a.m., they had to drive

24   from the CCI office to the place where they would be working in

25   the field, correct?

F5kWmgc6                          Solimine

1    A.   Yes.

2    Q.   On average, how long would it take a person -- sorry.  Let

3    me withdraw that question.

4         Did you ever go out in the field yourself?

5    A.   Yes.

6    Q.   And you went to visit the men in the field, correct?

7    A.   Yes.

8    Q.   And you did audit checks on men in the field, correct?

9    A.   No, sir.

10   Q.   On average, how long did it take you to drive to a location

11   where you met a man in the field?

12   A.   Fifteen, 20 minutes.

13   Q.   So in order for a person to be at their first job by 8

14   a.m., on average, they would have to leave at 7:40 or 7:45

15   a.m., correct?

16   A.   Yes.

17   Q.   And they had to load their trucks before that, correct?

18   A.   No.

19   Q.   They had to pick up their CN3s before that?

20   A.   Yes.

21   Q.   They had to pick up their route sheets before then,

22   correct?

23   A.   Yes.

24   Q.   And if they did not load their trucks the night before,

25   they had to load up the trucks before then, correct?

F5kWmgc6                          Solimine

1   A.  No.  They were loaded the night before.

2   Q.  Let me ask you a slightly different question.  When a man

3   would pick up his route sheet, would he see what meters he

4   would be changing on that particular day?

5   A.  Yes.

6   Q.  Is it possible that a man when he looks at his route sheet

7   realizes that there's certain meters that he's going to need

8   for that day which are not already in that truck?

9   A.  Yes, and that's exactly what I'm agreeing with here today.

10  Q.  And so some men would have to go and get meters to load

11  them into their trucks so that they could actually service

12  those accounts, correct?

13  A.  Specialty meters.

14  Q.  Correct?

15  A.  Appointment based.

16  Q.  And you saw that happen, correct?

17  A.  Yes.

18  Q.  But every single day that you worked as general manager for

19  CCI, you signed these time sheets --

20  A.  Yeah.

21  Q.  -- saying that the men started work at 8 a.m., correct?

22  A.  Mm-hmm.

23  Q.  Right?

24  A.  Yes.

25  Q.  That was false?

F5kWmgc6                         Solimine

1    A.  Is that a question or a statement?

2    Q.  Yes.  That was incorrect; the men started work before 8

3    a.m., didn't they?

4    A.  On occasion, if there was a specialty meter that was

5    needed, they were asked to put it in their truck.

6    Q.  My question is different.

7    A.  I, I --

8    Q.  The men started work every single day before 8 a.m.?

9    A.  No, no, no.

10   Q.  Let me --

11   A.  No.  Not every day. no.

12   Q.  Some men started work before 8 a.m. --

13   A.  Some.

14   Q.  But none of these time sheets reflect the men working

15   before 8 a.m., correct?

16   A.  I've only seen a number of them.

17   Q.  O.K.  Let's go to Exhibit 72.  And let's just go to the

18   first page of Exhibit 72.  What time did every man sign in on

19   July 1, 2009?

20   A.  Eight a.m.

21   Q.  Let's go to Exhibit 73.  Does this appear to be a weekend

22   day, august 1, 2009?

23   A.  It's a possibility.  We worked staggered shifts, so it

24   could be a week, a weekday.  I'm not really sure.

25   Q.  We can go back for one moment.  This is August 1, 2009,

1    correct?

2    A.   Yes.

3    Q.   There appear to be only three people working that day,

4    correct?

5    A.   Yes.

6    Q.   And of those three people, they all signed in at 10 a.m.,

7    correct?

8    A.   Yes.

9    Q.   But they were signing out at 6:30 p.m., correct?

10   A.   Yes.

11   Q.   You told them that if they were signing in at 10 a.m., they

12   had to sign out at 6:30 p.m., correct?

13   A.   That was their shift, yes.

14   Q.   But the men would be in the office before 10 a.m. on those

15   days as well to pick up their CN3s, correct?

16   A.   Yes.

17   Q.   Let's go to the next day in August, the next one.  This is

18   August 3.  What time did everyone sign in on August 3?

19   A.   Eight a.m.

20   Q.   Can you think of a single day where you signed the time

21   sheet after May 26, 2009, where you authorized men to sign in

22   before 8 a.m.?

23   A.   No.

24   Q.   And, in fact, if some men did sign in before 8 a.m., you

25   told them they had to change it to 8 a.m., correct?

F5kWmgc6                          Solimine

1    A.  No.

2    Q.  Can we go back to Exhibit 70.  Looking at May 29, 2009, do

3    you see that?

4    A.  I do.

5    Q.  Now, that wasn't signed by you, correct?

6    A.  No.  That's, that signature is Crystal Kinney.

7    Q.  She was acting on behalf of you, as you said before, right?

8    A.  I believe so, yes.

9    Q.  Looking at this time sheet, does it appear to you that any

10   of the 8 a.m. sign-ins have been altered?

11   A.  Other than the dark signature for Anthony Gandolfo, that's

12   the only one that really appears to be.

13            MR. BHANDARI:  O.K.  Why don't we zoom in on Anthony

14   Buffalino.  Zoom in a little bit more.

15   Q.  Does it appear to you that Anthony Buffalino's original

16   time that he signed in was 7:00, but it was changed to eight?

17   A.  No.

18            MR. BHANDARI:  Zoom out a little bit.

19   A.  I'm sorry.  Which line is Anthony?  Can I see?

20   Q.  Very first one.

21   A.  Top one, no, it doesn't appear that way to me.

22   Q.  Doesn't appear that that's changed?  Looking at Charles

23   Buffalino, does it appear that Charles Buffalino's time was

24   changed?

25   A.  That one seems a little bit off, yes.

1    Q.  And what time does it appear was originally written in for

2    Charles Buffalino?

3    A.  It appears it may be a seven.

4    Q.  Now going to the next page of May 29, does it appear that

5    Michael McGlone's time was originally a different time than 8

6    a.m.?

7    A.  It appears that way.

8    Q.  Does it appear that Ariel Peniche's time was originally a

9    different time?

10   A.  It appears that way.

11   Q.  Does this refresh your recollection that you told the men

12   that they needed to change their time to 8 a.m. even if they

13   got in early?

14   A.  No, but this document states that it was changed.

15   Q.  Did you instruct Ms. Kinney to change the times?

16   A.  I don't recall telling her to change the times, no.

17   Q.  Did you change the times yourself?

18   A.  No.  No.  I didn't change the times.

19   Q.  So it's possible that you instructed the men to do it or

20   it's possible that you instructed Ms. Kinney to do it, correct.

21   A.  It's possible, but I don't recall.

22          THE COURT:  Is your best recollection that you don't

23   know one way or the other, or is your best recollection that

24   you did not do that?

25          THE WITNESS:  No.  It's my best recollection that I --

F5kWmgc6                        Solimine

```
 1   I'm sorry, your Honor.  What was the first one?
 2            THE COURT:  Is it your best recollection that you
 3   don't recall one way or the other?
 4            THE WITNESS:  Yes.
 5            THE COURT:  Or is it your best recollection that you
 6   did not do it?
 7            THE WITNESS:  I don't recall one way or the other.
 8            THE COURT:  O.K.
 9   BY MR. BHANDARI:
10   Q.  But for yourself, you recall that you didn't do it
11   yourself, correct?
12   A.  On this sheet, it appears that I didn't, since I didn't
13   sign it.  I wasn't there.
14   Q.  Now, let's talk about your job as general manager.  You had
15   superiors, correct?
16   A.  I did.
17   Q.  And your superiors included Mark Maguire and Tim Wertz,
18   correct?
19   A.  Mike Maguire.
20            MR. BHANDARI:  Sorry.  Baseball.  I apologize.
21   Q.  Your superiors included Michael Maguire and Tim Wertz, is
22   that correct?
23   A.  They were executives of the company, yes.
24   Q.  And they were your superiors, correct?
25   A.  Tim Wertz was.
```

F5kWmgc6                          Solimine

1    Q.  And Mike Maguire was also, correct?

2    A.  No, he was not.

3    Q.  Did you give a deposition?  Do you recall being deposed by

4    Ms. Dodson?

5    A.  I do.

6    Q.  And in that deposition, did you swear to tell the truth?

7    A.  I sure did.

8    Q.  And did you do your best to tell the truth?

9    A.  I believe so, yes.

10   Q.  I would like to show you a portion of the deposition.

11            MR. BHANDARI:  Your Honor, may I present the witness

12   with a binder.

13            THE COURT:  Yes.

14   Q.  Your deposition is in two parts.  I'm directing you to the

15   first half, which is depo tran 1, and I direct you to page 27,

16   I guess.

17   A.  Yes.

18   Q.  I'd like --

19   A.  You said page 27, right?

20   Q.  Page 27.

21            MR. BHANDARI:  Your Honor, I'm going to direct him to

22   read lines 4 through 11.

23            THE WITNESS:  Start reading?

24            THE COURT:  No.  Sustained.

25            MR. BHANDARI:  O.K.

F5kWmgc6                          Solimine

```
 1              THE COURT:  I apparently have been wasting my breath
 2      with both counsel in this case.  If you want to put a question
 3      to him and he gives an answer and only if he gives an answer
 4      that is inconsistent with the deposition can you even get to
 5      the deposition.  This is consistent with the other flaw in your
 6      questioning, which is going on now for days, where you say does
 7      that, pointing to X, Y, Z, refresh your recollection as such,
 8      when he never indicated a failure of recollection as to such.
 9      I am disappointed that the rules of evidence somehow don't seem
10      to be followed by either side in this case, but it's going to
11      be followed starting right now.
12              MR. BHANDARI:  O.K.
13      Q.  Was Mike Maguire one of your supervisors in the chain of
14      command at CCI?
15      A.  No.
16              MR. BHANDARI:  Your Honor, I would like to direct the
17      witness to review lines 4 through 11 of page 27.
18              THE COURT:  I'm sorry.  Who would be the people you
19      considered to be your superiors in the chain of command at that
20      time?
21              THE WITNESS:  I considered Tim Wertz, Dave Stetz as my
22      supervisors who I answer to, my bosses, my direct point of
23      contacts.
24              THE COURT:  Anyone else?
25              THE WITNESS:  Clarence Prichard, Rob Stillwell, Mike
```

F5kWmgc6                         Solimine

1    Maguire.  They were executives of the company.

2              THE COURT:  Sustained.  Put another question.

3    BY MR. BHANDARI:

4    Q.  So Tim Wertz was one of your supervisors, correct?

5    A.  He was my boss.

6    Q.  And Mike Maguire is one of the superiors in the chain of

7    command above you, correct?

8    A.  He's an executive of the company.

9    Q.  And if you were to fire one of the field techs, one of the

10   plumbers who was working on the AMR project --

11   A.  Yes.

12   Q.  -- you couldn't do that by yourself, right?

13   A.  Certainly not, no.

14   Q.  You needed to get approval from Tim Wertz, correct?

15   A.  No.

16   Q.  You needed to get approval from Mike Maguire?

17   A.  No.

18   Q.  You needed to get approval from Dave Stetz?

19   A.  Yes.

20   Q.  Or Tim Wertz?

21   A.  Yes.

22   Q.  Or Mike Maguire?

23   A.  No.

24             MR. BHANDARI:  I'd like to direct the Court to page

25   129 of the second volume of Mr. Solimine's transcript.  Now,

F5kWmgc6                        Solimine

1   the part, the section that is directly relevant is on page 130,

2   from lines 1 through 13.  But in order to understand what those

3   lines mean, you may have to read from page 129, line 23.

4              THE COURT:  Excuse me.  He's not talking to you.  He's

5   talking to me.  Sustained.

6   BY MR. BHANDARI:

7   Q.  So one of the people you were to call potentially if you

8   were going to fire one of the plumbers on the job was Mike

9   Maguire, correct?

10  A.  No.

11  Q.  Did you ever testify previously --

12             THE COURT:  Sustained.

13             MR. BHANDARI:  Your Honor, may I approach the bench.

14             THE COURT:  Yes.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

F5kWmgc6                              Solimine

1          (At the sidebar)

2          THE COURT:  No matter what you were going to say in

3     the rest of that question, it was improper.  You were about to

4     say "did you ever testify" blank.  I've already explained that

5     that's not the way you can properly ask questions.  I told that

6     to your adversary as well.  That's not the proper form of a

7     question when you're impeaching with a deposition, and we had a

8     very good example of this a minute ago.  He had testified that

9     one of his superiors was Mike Maguire.  You put the question,

10    Was one of your supervisors Mike Maguire, he said no, and then

11    you sought to impeach him with that testimony, whereas when,

12    after I sustained it, you put the question about superiors, he

13    then said yes, Mike Maguire was one of his superiors in the

14    sense that he was an executive higher up.  So there was no

15    inconsistency.  I have yet to hear any inconsistency about what

16    you're inquiring now, but more importantly, I have yet to hear

17    in the immediate question you asked for a sidebar on a properly

18    framed question.

19          MR. BHANDARI:  I think the inconsistency is that he's

20    asked here, "Did you run --"

21          THE COURT:  Page?

22          MR. BHANDARI:  Page 129, line 23:  "Did you run the

23    termination of anybody in corporate?"  He says, "I believe so,

24    yes."  And it says, "Even if you don't remember specifically

25    you spoke to who were the pool of people at corporate you would

F5kWmgc6                      Solimine

1    have called about that," and then he says, "Forgive me --"

2            THE COURT:  Which, by the way, was not objected to as

3    to form, so that remains a proper question even though it's

4    blatantly improper as to form.  Anyway, there was no such

5    objection, so the answer was, "Forgive me.  I'm not trying to

6    be rude.  We're talking about a lot of years here, a lot of

7    different positions have come in and out.  So I don't know.  It

8    varies.  I mean director of administration.  It might have been

9    David Stetz.  It might have been Tim Wertz.  It might have been

10   Mike Maguire.  I don't think --"

11           MR. BHANDARI:  Can I --

12           THE COURT:  "-- people, we have a way of doing things

13   so, you know, I don't know who was in a position at the time to

14   really pinpoint it."

15           MR. BHANDARI:  Can I --

16           THE COURT:  So what you have, on any theory, is he's

17   saying I don't remember, I don't remember, I don't remember,

18   and you want to introduce it to show that it's inconsistent

19   with his answering the specific question about whether Mike

20   Maguire approved the firing.

21           MR. BHANDARI:  No.  Might have been one of the people

22   you speak to.

23           THE COURT:  I don't see why "might have" is of any

24   evidentiary relevance.

25           MR. BHANDARI:  My read of this is that is the pool of

F5kWmgc6                          Solimine

1    people.  He doesn't know who it was, but those three people are

2    people he could have called for approval, and that shows they

3    had the supervisory authority.

4            THE COURT:  I'll put some questions to the witness to

5    move this along.

6            MR. BHANDARI:  Thank you.

7            (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F5K3MCG7                        Solimine - direct

1                    (In open court)

2                    THE COURT:  Before you were able to terminate someone,

3       you had to seek approval?

4                    THE WITNESS:  Yes, sir.

5                    THE COURT:  One of the people you terminated was Brian

6       Nicholas?

7                    THE WITNESS:  Yes, sir.

8                    THE COURT:  Another person was Rocco Ceparano, is that

9       right?

10                   THE WITNESS:  No, Rocco Ceparano was not terminated.

11                   THE COURT:  I'm sorry.  Mr. Nicholas was fired because

12      he got into a fight?

13                   THE WITNESS:  Yes, sir.

14                   THE COURT:  And the person he got into a fight with

15      was Mr. Ceparano?

16                   THE WITNESS:  No.  Mr. Ceparano was the one who

17      witnessed Mr. Nicholas get into a fight at the facility.

18                   THE COURT:  Very good.  All right.  So, after you

19      heard about Mr. Nicholas getting into a fight, you were the one

20      who actually terminated him.

21                   THE WITNESS:  Yes, sir.

22                   THE COURT:  Do you remember who you ran that by before

23      you did so?

24                   THE WITNESS:  Our corporate office, and in our

25      corporates office we have a director of administration.

F5K3MCG7                           Solimine - direct

1            THE COURT:  Wait a minute.  Do you remember
2      specifically who you --
3            THE WITNESS:  No, sir, I don't.
4            THE COURT:  So you're just saying it could have been,
5      what you recollect is you had to run it by someone.
6            THE WITNESS:  Yes.
7            THE COURT:  You don't recollect who it was.  Yes?
8            THE WITNESS:  Yes.
9            THE COURT:  But it had to be someone in the corporate
10     office.
11           THE WITNESS:  Yes, sir.
12           THE COURT:  All right.  Who were the people at that
13     time in the corporate office?
14           THE WITNESS:  I don't remember the day.  It could have
15     been Tim Morris, it could have been David Stetz, it could have
16     been Ann Wheeler, it could have been a supervisor of mine.
17     Again --
18           THE COURT:  The answer to my question is you don't
19     remember.
20           THE WITNESS:  No, I don't remember.
21           THE COURT:  Sustained.
22     BY MR. BHANDARI:
23     Q.  At the end of the day, what time would you leave the CCI
24     offices at the end of the day?
25     A.  It depended.  My schedule fluctuated daily.

1    Q.  What is kind of the range of times that would be a normal

2    range of times?

3    A.  Five.  Sometimes six.  Sometimes three.  Again, it varied.

4    Q.  So sometimes you would leave the office at 5 o'clock?

5    A.  Yes, sir.

6    Q.  Sometimes you would leave at 6 o'clock?

7    A.  Yes, sir.

8    Q.  When you would leave at 5 o'clock, would you sometimes see

9    plumbers in the office?

10   A.  Absolutely.

11   Q.  Would you sometimes see plumbers in the office at

12   6 o'clock?

13   A.  Rarely.

14   Q.  Sometimes you would?

15   A.  Sometimes.

16   Q.  When you would see plumbers in the office at 5 o'clock,

17   would you see them unloading their trucks, putting old meters

18   into bins at the CCI offices?

19   A.  Sometimes.

20   Q.  Would you see them filling out paperwork?

21   A.  Sometimes.

22   Q.  Would you see them reloading their truck at the end of the

23   day?

24   A.  Sometimes, yes.  Well, yes, because we would load our

25   trucks at the end of the day, so yes.

F5K3MCG7                        Solimine - direct

1    Q.  Would you authorize overtime for people who were loading

2    their trucks at the end of the day?

3    A.  No, not if it fell within their shift, no.

4    Q.  Would you authorize overtime for people who were unloading

5    their trucks, getting rid of meters at the end of the day?

6    A.  Not if it is within their shift, no.

7    Q.  You told people to sign out regularly at 4:30.

8    A.  That was the end of their shift, yes.

9    Q.  If it was 5 p.m. and you saw people unloading their truck,

10   would you authorize overtime for that?

11   A.  If they were there past the hour, then yes, I would assume

12   yes.

13   Q.  You would assume yes?

14   A.  Yes.

15   Q.  So I'll ask you specifically what you recall.  Do you

16   recall authorizing overtime at the end of the day for people

17   who were unloading their trucks after 4:30 p.m.?

18   A.  No.

19   Q.  Do you recall authorizing overtime at the end of the day

20   for people who were in the CCI office doing paperwork after

21   4:30 p.m.?

22   A.  No.

23   Q.  Do you recall authorizing overtime for people who were

24   loading up their truck at the end of the day after 4:30 p.m.?

25   A.  No.

F5K3MCG7                          Solimine - direct

1    Q.  At the beginning of the AMR project, people were being paid

2    under -- people were being paid with the assumption -- excuse

3    me.  Withdrawn.

4            The normal shift at the beginning of the AMR project,

5    let's say starting, let's take June of 2009 for example.

6    A.  Okay.

7    Q.  The shift in June of 2009 would normally be eight to

8    4:30 p.m., correct?

9    A.  Okay, yes.

10   Q.  That's an eight-and-a-half-hour shift, correct?

11   A.  That's correct.

12   Q.  So in order for overtime to not have to be paid, people

13   would have to take a half hour lunch, correct?

14   A.  Yes, they are required to.  Yes.

15   Q.  You were not monitoring whether or not people were taking a

16   half hour lunch at the beginning of the project, correct?

17   A.  No, sir.

18   Q.  In fact, did some people tell you that they were not taking

19   half hour lunches?

20   A.  No.

21   Q.  Did anybody ever tell you that Rocco Ceparano just had

22   Gatorade and gummy bears during the day and didn't eat lunch?

23   A.  No.  I don't recall that.

24   Q.  No one ever told you that?

25   A.  I don't recall gummy bears or Gatorades, no.

F5K3MCG7                          Solimine - direct

1    Q.  Do you remember talking to Joe Frangiosa when he told you

2    he wasn't taking a half hour lunch every single day?

3    A.  No.

4    Q.  Did you ever tell Joe Frangiosa that he could afford to

5    lose a few pounds?

6    A.  No.  I'm not a skinny person myself.  No.  I have feelings

7    as well.

8    Q.  You never said that?

9    A.  No.

10   Q.  Do you recall speaking to anybody at CCI about whether or

11   not they were actually taking their lunch breaks or they were

12   working?

13   A.  No.

14   Q.  Would you call people, would you call the plumbers when

15   they were out in the field during the day?

16   A.  Yes.

17   Q.  Would you ever tell them stop, you need to take a half hour

18   lunch right now?

19   A.  No.

20   Q.  Did you ever at any point tell them that there was going to

21   be a mandatory time when lunch had to be taken?

22   A.  No.

23   Q.  Did you ever at any point tell them that if they were not

24   taking a half hour lunch, they would be suspended?

25   A.  I don't recall that.  That's pretty -- that's pretty

1    strict.

2    Q.  But, there were other CCI policies that you did suspend

3    people for not following, correct?

4    A.  Possibly, yes.

5    Q.  For example, you went out in the field to do safety checks,

6    correct?

7    A.  Yes, sir.

8    Q.  A safety check meant to see whether or not people were

9    wearing the proper protective equipment, correct?

10            MR. BLANK:  Objection.  Irrelevant.

11            MR. BHANDARI:  Do you want me to explain, your Honor?

12            THE COURT:  No.  Overruled.  You may answer the

13   question.

14            MR. BHANDARI:  Can you please read back the question?

15            THE COURT:  The question was: "A safety check meant to

16   see whether or not people were wearing the proper protective

17   equipment, correct?"

18   A.  Yes.

19   Q.  You fired somebody for not wearing the proper protective

20   equipment, correct?

21   A.  Yes.

22   Q.  You fired Jesse DiMirco for that reason, correct?

23   A.  Yes.

24            MR. WITTELS:  Judge, I --

25            MR. BHANDARI:  I withdraw that question.

F5K3MCG7                          Solimine - direct

1    Q.  You never fired anyone for not taking a lunch break,

2    correct?

3    A.  No.

4    Q.  In fact, well, let me step back for a second.  You said

5    that you had total responsibility for the profit and loss of

6    the AMR project, correct?

7              MR. BLANK:  Object.  Asked and answered.

8              MR. BHANDARI:  It is a foundational question, your

9    Honor.

10             THE COURT:  I'll allow it.

11   Q.  You testified that you had total responsibility for the

12   profit and loss of the AMR project, correct?

13   A.  Yes.

14   Q.  You were responsible, and you were being evaluated, your

15   performance was evaluated on whether or not the AMR project was

16   profitable, correct?

17   A.  Yes.

18   Q.  One way to reduce the costs of the AMR project would be to

19   reduce labor costs, correct?

20   A.  No.

21   Q.  Well, if labor costs were lower, then the total costs of

22   the project would be lower, correct?

23             THE COURT:  Sustained.

24   Q.  Were you ever given a compliment by the CCI corporate

25   office that the AMR project was in the black?

```
 1                MR. WITTELS:  Objection, relevance.

 2                MR. BHANDARI:  This is --

 3                THE COURT:  Overruled.

 4   Q.  Were you ever given a compliment by the CCI corporate

 5   offices that the AMR project was in the black?

 6   A.  Can you please specify what you mean by "in the black"?

 7                MR. WITTELS:  I was going to object as vague.

 8                THE COURT:  Excuse me?

 9                MR. WITTELS:  Vague.

10                THE COURT:  Overruled.

11   Q.  You can answer the question.  Were you ever given that

12   compliment?

13   A.  Yes, we were profitable.

14   Q.  It was important to you that the AMR project was

15   profitable, correct?

16   A.  Yes.

17   Q.  The way it was profitable is if the men went to more

18   appointments during the day and swapped more meters and

19   installed more MTUs, correct?

20                THE COURT:  Sustained.

21   Q.  Was one way to increase profits by having the men swap more

22   meters during the day?

23                THE COURT:  Sustained.

24   Q.  Did you care about what the productivity of the men was?

25   A.  Yes.
```

F5K3MCG7                              Solimine - direct

1   Q.   During the day, would you ask the men what their numbers

2   were?

3   A.   Yes.

4   Q.   Did you ever tell the men they would be fired if their

5   productivity was not high enough?

6   A.   No.

7   Q.   You never told men that their productivity mattered?

8              MR. BLANK:   Objection.   Vague.

9              THE COURT:   Sustained.

10  Q.   You never told men that they would be terminated from CCI

11  if their productivity was too low?

12             MR. BLANK:   Objection.   Vague.

13             THE COURT:   Overruled.

14  A.   Can you please repeat that question?

15  Q.   Sure.   Did you ever tell men that they would be fired from

16  CCI if their productivity was too low?

17  A.   No.   Can I explain?

18  Q.   Yes.

19             THE COURT:   No.

20  Q.   Oh.

21             MR. BHANDARI:   I can't ask?

22             THE COURT:   No.   His counsel will ask if he wants, if

23  we ever get to his counsel.

24  Q.   Without using those exact words, did you ever talk to men

25  and discipline them -- excuse me.   Withdrawn.

F5K3MCG7                           Solimine - direct

1          Did you ever talk to men and tell them that it was

2     important that they had to get their productivity up?

3     A.  Yes.

4     Q.  Did you ever tell men that they should work harder during

5     the day when you would call them to get their numbers up?

6     A.  Yes.

7     Q.  Later in the CCI project -- excuse me.  Later in the AMR

8     project, you got a directive from CCI corporate saying that the

9     men needed to start recording their lunch breaks, correct?

10    A.  Yes, sir.

11    Q.  Who at the CCI corporate office told you that this needed

12    to be the new policy?

13    A.  I believe Ann Wheeler.

14    Q.  Did you talk to Tim Wertz about it?

15    A.  He was probably involved in a conference call or a chain of

16    e-mails or whatever.  But, you know, more or less it was

17    directed by HR.

18    Q.  So, you had talked to Tim Wertz once a week, at least,

19    correct?

20    A.  Back then I did.

21    Q.  How frequently would you talk to Tim Wertz back then?

22    A.  Pretty frequently.

23    Q.  How many times in a week?

24    A.  At least once, twice.

25    Q.  How frequently would you speak to Michael Maguire?

F5K3MCG7                          Solimine - direct

1    A.  Biweekly.

2    Q.  You would speak to Tim Wertz about any complaints that the

3    men had, correct?

4    A.  Anything that was worth bringing to the president, yes.

5    Q.  You thought that any complaints that were made by the men

6    related to overtime would be a complaint worth bringing to the

7    president, correct?

8    A.  Absolutely.

9    Q.  What's that?

10   A.  Absolutely.

11   Q.  Mike McGlone complained to you about not getting paid for

12   the time he worked in the morning and in the afternoon?

13   A.  No.

14   Q.  He never complained about that?

15   A.  No.

16   Q.  Joe Frangiosa complained to you about not getting paid for

17   the work he was doing in the morning and in the afternoons,

18   correct?

19   A.  No.

20   Q.  Did any of the men ever complain to you about having to

21   sign in at 8 a.m. even though they were working before 7 a.m.?

22   A.  Not that I recall.

23            MR. WITTELS:  Object.  That's not what the

24   testimony --

25            THE COURT:  Overruled.  The answer will stand.

F5K3MCG7                        Solimine - direct

1   A.  Not that I recall, no.

2   Q.  Did any of the men ever complain to you that you did not

3   authorize overtime when they were working after 4:30 p.m.?

4   A.  No.

5   Q.  Did you ever suspend Robert Schantz?

6   A.  I believe yes, I did once.

7   Q.  You suspended Robert Schantz because he spoke back to you,

8   is that correct?

9   A.  He was insubordinate during a meeting, yes.

10  Q.  At that meeting you were screaming at the men about their

11  numbers for a particular day?

12  A.  I don't know if I was screaming, but I was definitely

13  probably driving a point.

14  Q.  You were driving that point by raising your voice?

15  A.  I can't say if I raised my voice or not.  But I'm sure

16  there had to be an issue.  I do remember the incident between

17  Schantz and I though.

18  Q.  That was because on a Saturday you thought that the numbers

19  of men who were working on a Saturday weren't high enough,

20  correct?

21  A.  I can't recall if that was the specific incident.  I

22  remember just the incident that occurred between Robert Schantz

23  and I.

24          MR. BHANDARI:  I would like to have this marked as

25  Plaintiff's Exhibit 130.  May I approach, your Honor?

F5K3MCG7                          Solimine - direct

1              THE COURT:  Yes.

2    Q.  Do you recognize this document?

3    A.  Yes.

4    Q.  What is this document?

5    A.  This is a standard incident report form.

6    Q.  Did you fill out this incident report form?

7    A.  That is my handwriting.  I believe so, yeah.

8    Q.  It is dated September 21, 2010?

9    A.  Hmm-hmm.

10   Q.  Yes?

11   A.  Yes.

12              MR. BHANDARI:  Your Honor, I'd like to have Exhibit

13   130 entered into evidence.

14              MR. WITTELS:  Judge, I am going to object.  There has

15   already been a ruling regarding employee discipline.

16              THE COURT:  Overruled.  The document is received.

17              (Plaintiff's Exhibit 130 received in evidence)

18              MR. BHANDARI:  May I hand this to the jury?

19              THE COURT:  Yes.  You know.  I think we need to have a

20   side bar right now.

21              (Continued on next page)

22

23

24

25

1           (At the sidebar)

2           THE COURT:  Now, you have jointly and severally

3    created two time problems, because no one brought to the

4    attention of this Court until almost 4 p.m. today the fact that

5    this witness was not otherwise available at least in the next

6    couple of days.  When did you first find out that he was not

7    otherwise available?

8           MR. BLANK:  The answer is, I knew he was unavailable

9    on this coming Friday because of his wife's surgery, and I

10   think that was -- I learned this afternoon that his wife is

11   being prepped for surgery -- prepped for surgery tomorrow.

12          THE COURT:  When tomorrow?

13          MR. BLANK:  I don't have the exact time.

14          THE COURT:  We'll find out in a minute.  When did you

15   bring that to anyone's attention?

16          MR. BLANK:  Immediately when I found out.

17          THE COURT:  Which is when?

18          MR. WITTELS:  When we took our afternoon break.

19          THE COURT:  So, I have struggled to move this along,

20   but, this is a meaningful witness, plaintiffs' counsel has a

21   right to have his full time with this witness, and it seems

22   clear that he's not going to finish before five.  I'm not going

23   to keep the jury beyond five.  I gave them a pledge when we

24   first swore them in they would never go beyond five.  I had

25   told them they would sit today until 4:30, so we're already

F5K3MCG7                        Solimine – direct

1    well beyond that time, and we are not going to sit beyond five.

2            We also have the problem that when I said we would

3    interrupt the other witness to accommodate this situation, no

4    one said to me, well, Judge, we're not going to be able to

5    finish this witness in an hour.  Something I would have

6    expected from plaintiffs' counsel, and certainly might have

7    been raised by defense counsel.

8            So, in short, gentlemen, you have created a complete

9    bollocks of your own making.

10           So what I'm going to do is first excuse the jury now.

11   We will find out whether this witness is available tomorrow

12   morning or not.  We will find out the availability of the other

13   witness, and we will then proceed accordingly.

14           (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

F5K3MCG7                          Solimine - direct

1            (In open court)

2            THE COURT:  Ladies and gentlemen, we had promised you

3       that you would leave at 4:30 today.  Exactly right now.  So,

4       we're going to end for today.  To make it up to you, because

5       I'm sorry it went a bit longer than we intended, we will start

6       at 10 o'clock tomorrow rather than 9:30.  On the other hand, it

7       will be a real 10 o'clock, not one of my phony ones.

8            So, please be sure to be in the jury room by

9       10 o'clock and we will see you tomorrow.

10           I do want to note for the record that against all my

11      principles, I'm actually going to a Mets game tonight.  So,

12      we'll see you tomorrow at 10 o'clock.

13           (Jury excused)

14           THE COURT:  Mr. Solimine, what availability do you

15      have tomorrow?  I understand your wife is having surgery on

16      Friday and they're prepping her tomorrow.  What time are they

17      prepping her?

18           THE WITNESS:  They will be prepping her around 10:30.

19           THE COURT:  In the morning?

20           THE WITNESS:  Yes.

21           THE COURT:  Where is this?

22           THE WITNESS:  Methodist Hospital in Downtown Brooklyn.

23           THE COURT:  Do you have any idea how long that will

24      take?

25           THE WITNESS:  It's just pretesting, so it is blood

1   work.  I have to take her there and stuff like that.  As I told

2   my attorney, I can be here tomorrow afternoon if need be.

3            THE COURT:  You can be here at say 2 o'clock tomorrow?

4            THE WITNESS:  Sure.  Yeah.  As long as -- yeah, if

5   that works for you guys.

6            THE COURT:  How much longer do you have on his direct?

7            MR. BHANDARI:  Approximately a half hour, 20 minutes.

8            THE COURT:  And cross?

9            MR. BLANK:  I'm guessing about an hour.

10           MR. BHANDARI:  After that I may have more.  They might

11   go into things that I didn't, so I may have a more substantial

12   redirect than normal.

13           THE COURT:  We're going to start this witness tomorrow

14   at 2 o'clock.  His testimony, no matter what, will end by

15   5 o'clock tomorrow.  And I guarantee you that I will enforce

16   that to the hilt, so bear that in mind.  If I hear any

17   questions that I think are unnecessary, a waste of time, I will

18   sua sponte sustain the Court's own objection to them and move

19   things along.

20           So tonight both sides should pare down their questions

21   to what they are sure is directly relevant and not window

22   dressing.

23           MR. BHANDARI:  Your Honor, I have one request.  Can I

24   get an instruction from the Court that he's not supposed to

25   talk to the attorneys since he is on the stand right now and

F5K3MCG7                        Solimine - direct

1   should not be speaking to any attorneys.

2                  THE COURT:  Yes.  I have the great pleasure, as I'm

3   sure it's yours, of instructing you not to talk to any attorney

4   tonight.  So we'll see you at 2 o'clock tomorrow.

5                  THE WITNESS:  Thank you.

6                  (Witness not present)

7                  THE COURT:  Let's get the other witness back.

8                  MR. BHANDARI:  Mr. Frangiosa.

9                  THE COURT:  Thank you for bearing -- please be seated.

10                  THE WITNESS:  Thank you.

11                  THE COURT:  Thank you for bearing with these delays.

12   What is your availability tomorrow morning?

13                  THE WITNESS:  I'm starting a new project for a new

14   company, so I have to be there.  I'm going to be a foreman on

15   the project at Baruch College.

16                  THE COURT:  Okay.  What about Friday?

17                  THE WITNESS:  Same thing, your Honor.  My work shift

18   is from 7:30 to 3:30.  I could ask, if you want that, maybe to

19   see if I could leave early one afternoon to come.

20                  THE COURT:  I don't want to put you in an awkward

21   spot.  Who is your new employer?

22                  THE WITNESS:  PAR Plumbing.

23                  THE COURT:  Where are they located?

24                  THE WITNESS:  The main office is located out of

25   Lynbrook, New York, but we also have a Manhattan office.

F5K3MCG7

1          THE COURT:  And the project itself is where?

2          THE WITNESS:  At Baruch College, located at 13

3    Lexington Avenue.

4          THE COURT:  Not that far away from here.

5          THE WITNESS:  No, sir, no.

6          THE COURT:  I think what would be very helpful, and

7    I'm happy to talk to anyone there if you want me to.

8          THE WITNESS:  Okay.

9          THE COURT:  Because I don't want to put you in an

10   awkward spot at all.

11         THE WITNESS:  Yes, sir.

12         THE COURT:  But it would be very helpful if we could

13   have you be here, say -- let me ask, how much more do you have

14   on this witness?

15         MR. GLUNT:  We don't have any more.

16         THE COURT:  That's right.  We just finished the

17   direct.

18         MR. WITTELS:  I hadn't started.  I would say a half

19   hour.

20         THE COURT:  Half hour.  All right.  So, in that case,

21   there may not even be a need.  In an excess of caution, if you

22   could be here on Friday at 3:30, that will give us an hour and

23   a half.  If you can't make it by 3:30, it sounds like you could

24   make it by four.

25         THE WITNESS:  I could ask for an early start time.

F5K3MCG7

 1   And hopefully they'll be able to grant it and I'll let the

 2   attorneys know and you'll know by tomorrow.

 3        THE COURT:  Be sure to fill out your time sheets

 4   appropriately.

 5        THE WITNESS:  Yes, sir, yes, sir.  Yes, sir.

 6        THE COURT:  Anyway, okay.  So you'll let the attorneys

 7   know, but either way we will see you, worst case at 4 o'clock

 8   on Friday, but hopefully at 3:30 or so on Friday.

 9        THE WITNESS:  Yes.

10        THE COURT:  Very good.

11        MR. WITTELS:  Judge, may I raise the same admonishment

12   to this witness?

13        THE COURT:  You shouldn't talk to any attorney between

14   now and then.

15        MR. GLUNT:  Except to confirm that he will be --

16        THE COURT:  Other than to let them know your time.

17   You can talk to them about that.

18        THE WITNESS:  About just the time to confirm I'll be

19   here Friday, but nothing else.

20        THE COURT:  Not about the substance of the testimony.

21        THE WITNESS:  Okay.  Yes.

22        THE COURT:  Very good.  Thanks so much.

23        THE WITNESS:  Thank you.

24        THE COURT:  You may step down.

25        I'm not through with the attorneys, although they were

F5K3MCG7

1    kind of hoping.  Please be seated.  I will explain to the jury

2    tomorrow all this.  Though it's unfortunate, I've learned from

3    long experience that when witnesses are interrupted, while in

4    some ways it hurts the flow a little bit.  On the other hand,

5    having a witness return later actually makes the witness more

6    salient in the minds of the jury, so it is a equal tradeoff

7    both ways.  But I do want to make sure we don't have these

8    problems in the future.

9              Who do we have for tomorrow morning?

10             MR. BHANDARI:  Tomorrow the next witnesses were all

11   CCI witnesses, so it will be Mr. Wertz, Mr. Maguire, and then

12   Mr. Caton who is their next witness.  So it seems like tomorrow

13   will be all CCI witnesses.

14             THE COURT:  We shouldn't have a problem.

15             MR. WITTELS:  Judge, I have tried to be accommodating

16   to the order that they would like to call witnesses, but you

17   asked us to submit a witness list in order.

18             THE COURT:  Yes.

19             MR. WITTELS:  And there are one, two, three people

20   above the CCI witnesses that we just seem to keep skipping

21   over.  And I don't know why.

22             THE COURT:  What is the story there?

23             MR. BHANDARI:  For scheduling reasons they were not

24   able to come yesterday.  One of them is available to come on

25   Friday, and the other one cannot come until May 29.  It is the

F5K3MCG7

1    same sort of thing.  They have these jobs -- it makes it

2    difficult for us to schedule.  So that's why, this was our

3    intended order, this is how we wanted to put on our case.  I

4    told --

5         THE COURT:  Here's what I think makes sense.  I think

6    tonight you have to construct a new witness order and you will

7    be held to that order.  So, contact whoever you need to

8    contact, make sure you nailed it down.  But, I think it isn't

9    fair to the other side to have the order keep shifting.

10         Work it out tonight.  And let them know.

11         MR. BHANDARI:  Your Honor, I of course want to do

12    that.  It is very much -- to be fair, Mr. Wittels has been very

13    cooperative.  What he says is exactly right.  We don't fault

14    him at all.

15         However, this is a difficult 20-plaintiff case where

16    everyone is an hourly worker for the most part.  There are

17    people in Texas, people in Pennsylvania, people in other

18    states, we're doing our absolute best to try and get them and

19    it makes things more difficult for us too.

20         THE COURT:  Last I remember, they all affirmatively

21    chose to be plaintiffs in this case.

22         MR. BHANDARI:  Yes.

23         THE COURT:  Was that because they were under the

24    impression that the court would convene when it suited their

25    convenience?  Or did they have the more reasonable impression

F5K3MCG7

1    that when their case went to trial, they would have to make

2    accommodations so that the jury could hear the case in the

3    order that both sides planned to present it?

4           I understand people have jobs.  But I also understand

5    that when you make the affirmative determination that you want

6    to be a plaintiff in a lawsuit, and you're told it is going to

7    trial on such-and-such a date, you don't say, oh, well, I'm

8    sorry, but I've got this demanding boss and he says I got to be

9    here.

10          I am happy if you want to send the U.S. marshals out

11   and arrest each of your plaintiffs and bring them here.  But I

12   think that's not probably what you had in mind.

13          MR. BHANDARI:  No, your Honor.  All I'm saying is we

14   are going to endeavor to do that.  If there are problems with

15   it, it is not because we're trying to mislead anyone.  It is

16   because we have problems with our plaintiffs.

17          We'll have to cross that bridge when we come to it.

18          THE COURT:  On the other hand, I will say, and I'm

19   glad counsel have been accommodating.  If a witness is moved a

20   day here or a day there, I doubt that it severely prejudices

21   defense counsel because you would have prepared by then for the

22   witness.  If someone who is supposed to come a week from now is

23   suddenly brought now, that's a different story.  Then I agree

24   it is the possibility of prejudice.

25          I also want to say, and I know I'm being a curmudgeon,

F5K3MCG7

and of course it is what I love to be, but, many, many, many

questions that have been put by both sides have not been in the

form that complies with the rules of evidence, and more

importantly, advances the jury's understanding.

       I've yet to hear someone ask -- maybe I've missed

it -- a question like, what happened next.  Or what did he say

to you and what did you say to him.  Or any of the very

straightforward questions that both comply with the rules and

make it easy for the jury to follow.

       I understand that both sides are deeply into the case,

so, you are always strategizing and trying to make points and

so forth, but my concern is with making things clear to the

jury.

       So, I would urge you to start asking questions that

are no more than about six words long, that don't call for

hearsay, that aren't leading, except in the rare circumstances

where leading is permitted such as on cross or the one witness

that we had, that don't require a lot of foundation background.

       It will, in addition to having the side benefit of

keeping my blood pressure down, it will make the whole

testimony so much more clear to the jury, which is really my

object.  So, I take the great liberty of bringing that to your

attention.

       We'll see you tomorrow at 10 o'clock.

       (Adjourned until May 21, 2015, at 10 a.m.)

```
 1                         INDEX OF EXAMINATION

 2    Examination of:                              Page

 3    MICHAEL McGLONE

 4    Direct By Mr. Bhandari . . . . . . . . . . . 283

 5    Cross By Mr. Wittels . . . . . . . . . . . . 312

 6    Redirect By Mr. Bhandari . . . . . . . . . . 333

 7    Recross By Mr. Wittels . . . . . . . . . . . 343

 8    JOSEPH FRISCHE

 9    Direct By Mr. Glunt  . . . . . . . . . . . . 347

10    Cross By Mr. Wittels . . . . . . . . . . . . 385

11    Redirect By Mr. Glunt  . . . . . . . . . . . 396

12    JOSEPH FRANGIOSA

13    Direct By Mr. Glunt  . . . . . . . . . . . . 398

14    ANGELO SOLIMINE

15    Direct By Mr. Bhandari . . . . . . . . . . . 436

16                        PLAINTIFF EXHIBITS

17    Exhibit No.                              Received

18     128   . . . . . . . . . . . . . . . . . . 335

19     129   . . . . . . . . . . . . . . . . . . 440

20     130   . . . . . . . . . . . . . . . . . . 478

21                        DEFENDANT EXHIBITS

22    Exhibit No.                              Received

23     OO   . . . . . . . . . . . . . . . . . . 425

24

25
```